## UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| CNG FINANCIAL CORPORATION | : | Case No. 1:06-cv-040 |
| | : | |
| Plaintiff/Counterclaim-<br>Defendant, | : | Chief Judge Sandra S. Beckwith<br>Magistrate Timothy S. Black |
| | : | |
| vs. | : | **CNG FINANCIAL CORPORATION'S** |
| | : | **RESPONSE TO THE MOTION FOR** |
| GOOGLE INC. | : | **JUDGMENT ON THE PLEADINGS** |
| | : | **ON THE COUNTERCLAIM OF** |
| Defendant/Counterclaim- | : | **GOOGLE, INC.** |
| Plaintiff. | : | |

For its Response to the Defendant Google, Inc. ("Google")'s Rule 12(C) Motion for Judgment on its Counterclaim, CNG Financial Corporation ("CNG") states as follows:

### INTRODUCTION

CNG has spent years and millions of dollars developing its Check N' Go trademarks so that consumers associate the name with the services of a reputable, established lender and seek it out when looking for a source of payday loans. However, an internet consumer using the Google search engine to locate Check 'n Go by entry of the Check N' Go trademark will be presented not only with a link to the Check N' Go website, but also with links to the sites of numerous unaffiliated companies, designated as "Sponsored Links." These Sponsored Links appear on the screen directly under and to the side of the Check N' Go search term because Google has sold to various of Check 'n Go's competitors the ability to use the CNG trademark as a keyword which triggers the appearance of advertising for the competitor's link. This practice is particularly confusing because the competitors' names lack the recognition enjoyed by the Check N' Go mark and resemble generic descriptions that could apply to services offered by Check N' Go. Thus, a consumer cannot tell from the screen which link will take it to the real Check N' Go site.

Dockets.Justia.co

This program generates great profits for Google, but misleads consumers by creating a false impression that Check 'n Go sponsors the links which appear. Put simply, the consumer asks Google for a link to the authentic source of Check 'N Go's services and instead receives a result that leads the consumer to a competitor, without any warning from Google that it has also served up the unaffiliated links. Google says that this practice is helpful and tries to paint it as a legitimate form of comparative advertising which the courts have embraced.

Legally, however, Google resembles the restaurant employee who, when asked by a patron for a "Coke," serves a Pepsi-cola instead, without ever informing the diner of the substitution. Implicitly, the waiter represents that he has delivered the product that the trademark identifies, a genuine "Coke." Courts view this as infringement,[1] and have consistently reached the same result on analogous behavior involving internet keywords and in more traditional non-internet settings. Thus, despite its protests to the contrary, Google, and not CNG, now asks this Court to reject established precedent and create a new and potentially disturbing rule of law.

## STATEMENT OF FACTS[2]

CNG's Check 'N Go companies operate the country's second largest payday lending business, and CNG invests millions of dollars each year in promoting its registered Check 'N Go trademark through national advertising and on the Check 'N Go website. [Complaint, ¶16.] The website both promotes the companies' services and enables consumers to obtain loans from Check 'N Go Online directly over the internet. [*Id.* at ¶18.] Consumers can reach the Check N' Go website by typing in its address, www.checkngo.com, or by using an internet search engine.

---

[1] *See The Coca-Cola Company v. Overland, Inc.*, 692 F.2d 1250 (9th Cir. 1982); *The Coca-Cola Co. v. Dorris*, 311 F.Supp. 287 (E.D. Ark. 1970). To the extent that Google would argue that it offers a drink menu, rather than a particular beverage, the issue remains the same – in this case, Google's "menu" does not include any intelligible indication that the options it presents are not all "Coke" products.

[2] In accordance with the standard applicable to this motion, CNG's allegations and its denials of the allegations of the counterclaim are taken as true and the allegations of the pleadings are read in its favor.

According to Google, its search engine is the most widely used in the world, answering hundreds of millions of user queries every day. [Counterclaim, ¶7.] Google also sells a number of services to interested businesses, including the keyword-triggered advertising program entitled "Adwords." Adwords enables advertisers to purchase or bid on key words that generate an link (known as a Sponsored Link) to the purchaser's website. [Complaint, ¶23; Counterclaim, ¶8.] The Sponsored Link appears in the Google search results along with some advertising text designed to entice users to click on that link. Google profits every time an user clicks on the one of these Sponsored Links. [Complaint, ¶25; Counterclaim, ¶9.]

Google posts these so-called Sponsored Links on the top and the side of the results page triggered by the search query.[3] This creates a direct visual linkage between the user's entered search term (which appears in a bar at the top of the page) and the results listed directly below and to the side, in addition to the logical linkage made by the user who knows that his entry of the particular term produced that batch of results. [Complaint, ¶28; Counterclaim, ¶9.] The Google search engine results pages are also often designed so that the display of the "Sponsored Link" designation, as opposed to the ad itself, is inconspicuous or not apparent to users. Moreover, it is not made clear to users who exactly "sponsors" these links - - thereby leaving many users to believe that those links are "sponsored" by the company whose name they entered into the Google search engine window. [Complaint, ¶24.]

Google has sold various key words comprised, in whole or in part, of CNG's Check 'N Go trademark to Check 'n go's competitors. [Complaint, ¶27.] Consequently, Google causes the purchase of the Check 'N Go trademark to trigger the appearance of a Sponsored Link to these competitors' websites on the Google search results page, immediately below and to the side of Check N' Go, whenever a consumer types the trademark into the Google search window.

---

[3] Although Google refers to this as the margin, advertisers obviously would not pay for inconspicuous ad placement.

CNG alleges that this creates a false impression of affiliation between Check 'n Go and the services of its competitors and confuses consumers who believe that Check 'n Go has itself sponsored the links, while denying that the practice qualifies as fair use of CNG's trademark or legitimate comparative advertising. [Complaint, ¶¶36, 37; Reply, ¶17.] Thus, Google sells, and its advertisers purchase, the possibility that they will intercept customers who, due to CNG's extensive and pervasive advertising, are trying to find one of the nation's largest and best known and trusted payday lending operations.

Confused consumers may click on the Sponsored Links and be directed to the competitors' websites. They may not realize that the diversion has occurred, especially in this case, where many of the companies purchasing CNG's trademarks as Adwords keywords have not invested in name recognition to the extent that CNG has and go by fairly generic seeming identifiers, such as a link labeled "Loans" to a site called "www.MyCashNow.com," which could be mistaken for descriptors of Check 'n Go's services. The consumer, once distracted, may not return to Check 'n Go's website. Even if he appreciates the diversion, he will have to spend time and energy trying to backtrack or otherwise find Check 'n Go's sites. [Complaint, ¶30.]

When Google refused to stop this practice, CNG asserted several claims: that Google infringes CNG's trademark, that Google has contributory or vicarious liability for allowing CNG's competitors to infringe CNG's trademark in connection with the Adwords program, that Google's Adwords program creates a false or misleading impression of the affiliation of CNG with the competing sites offering payday loans, that Google has been unjustly enriched through its sale of CNG's trademark, and that Google has misappropriated the goodwill associated with this trademark. Google filed a counterclaim alleging that its Adwords program makes no infringing use of the CNG trademark, an allegation which CNG denied. Google now asks,

wholly inappropriately, that the Court resolve these disputed factual inquiries on the pleadings, by ruling as a matter of law that no "trademark" use of CNG's trademark has occurred.

## ARGUMENT

### A.    The Complaint states a cause of action under the Lanham Act.

The federal trademark statute prohibits the "use in commerce" of a registered trademark or factual description "in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion." 15 U.S.C. §§1114 and 1125.[4]  Thus, the argument that the Court must find a "trademark" use begs the question: does Adwords employ CNG's trademarks in connection with the advertising of services in a manner likely to cause confusion?  If it does, then the assertion that Google's use of the trademark also serves another "non-source identifying" function has no significance.

Google does not really dispute that it and its advertisers "use" CNG's trademark; its Adwords program undisputedly produces a result whereby the CNG trademark is literally "used or displayed in the sale or advertising of services and the services are rendered in commerce." *See* 15 U.S.C. §1127.[5]  Instead, Google argues that there is no "trademark use," a concept which the Sixth Circuit defines as the use of a trademark "in a way that identif[ies] the source of a

---

[4] Liability also attaches to one who induces infringement by another or continues to supply its product to one whom it knows or has reason to know is infringing.  *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 953-54 (1982).  Thus, even were the Court to believe that *Google* does not use CNG's trademark, Google may still be liable for the use of the trademark by its advertisers or on one of the other theories asserted by CNG.

[5] Traditional trademark analysis of use in commerce has centered on the jurisdictional function played the phrase, noted its extremely and broad scope, and simply adopted the common sense approach that the liable party must actually employ the trademark in connection with some commercial activity.  *See, e.g., OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F.Supp.2d 176, 185 (W.D.N.Y. 2000).  For instance, the *Holiday Inn* case, sometimes cited as establishing trademark use as a prerequisite for infringement, actually turned on a lack of use in the most elementary sense of the word.  *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 623-25 (6th Cir. 1996).  There, the central defendant obtained a vanity telephone number which corresponded to a frequent misdialing of the numeric equivalent to Holiday Inn's 1-800-HOLIDAY number, but never promoted it by reference to its alphabetical equivalent or the Holiday Inn trademark or took any other steps which created confusion between the two.  *Id.*  By contrast, Google has designed Adwords so that the correct input of the exact trademark will potentially misdirect consumers to competing sites and, at the least, will create a mental and visual association between the trademark and the ads for the services offered on those sites.

product." *See Interactive Products Corp. v. A2Z Mobile Office Solutions,* 326 F.3d 687, 695 (6th Cir. 2003). Google asserts that its sale of CNG's trademark does not create any impression as to the affiliation of Check 'n Go with the services advertised through the Sponsored Links; however, CNG asserts that it does – an allegation taken as true for purposes of this motion. *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). Thus, whether the use identifies the source of payday loans for consumers presents a clear question of fact.

Accordingly, under Google's source identifying theory, Google can prevail only if it has demonstrated that CNG can *undoubtedly* prove *no* set of facts which would support the argument that the users associate the Sponsored Links with sponsorship by Check N' Go. *Id.*, at 512 (emphasis added). As alleged by CNG, however, advertisers buy trademark keywords precisely because consumers mistakenly believe that the sponsored links appearing on the results page triggered by their search of the trademark are affiliated with that trademark. One need not even read the allegations in the light most favorable to CNG to envision such a situation, especially given that nothing in the text of the competitor's advertising or links, including their generic sounding names, clearly indicates that they do not also emanate from CNG. Plainly the determination as to whether the Check 'N Go trademark is used in a way that identifies the source of the sponsored links does not rest on some bright line rule that Google attempts to manufacture for this case, but rather on a factual inquiry, such as the ones conducted by every court to have examined similar practices.[6]

---

[6] In one case, the court noted that a study reflected that 62 percent of consumers do not understand the difference between sponsored links and natural search results. *Edina Realty, Inc. v. THEMLSonline.com*, 2006 WL 737064 (D.Minn.). In addition, CNG will present survey evidence in this case to establish that a significant number of consumers confronted with the search results page triggered by their search of the Check 'N Go trademark mistakenly believed that they would reach the Check 'N Go website by clicking on Sponsored Links.

**B.**    **Courts have consistently concluded that the type of practice at issue here constitutes a trademark use.**

1.    Cases involving Adwords have allowed trademark claims to proceed.

Indeed, the bright line rule which Google asks the court to create would essentially exempt internet advertisers from the reach of the Lanham Act, because virtually every use of a term to trigger a search engine, through metatags, domain names, keywords or the like, could be characterized as serving an organizational, non-source identifying function. Every case to have considered Google's liability for its sale of trademarks has held that this constitutes a trademark use to which the Lanham Act applies. Moreover, nearly every other analogous case where trademarks appear in metatags, hidden text, domain names and keywords to trigger competitors' advertisements in conjunction with other results generated by entry of the mark as a search term has found a trademark use.

In the leading case specifically addressing Adwords, the court held that the plaintiff, GEICO, had adequately pled use of its trademark where it alleged that Google allowed advertisers to pay Google to have their sites linked to the mark. *Government Employees Insurance Company v. Google, Inc.*, 330 F.Supp.2d 700, 704 (E.D.Va. 2004)("GEICO")("When defendants sell the rights to link advertising to plaintiff's trademarks, defendants are using the trademarks in commerce in a way that may imply that defendants have permission from the trademark holder to do so.") The court specifically rejected the authority upon which Google now relies, including a prior case from its own district. Instead, it focused on Google's sale of the trademark as a keyword "to which advertisers could directly purchase rights," as a violation

of the literal terms of the Act. *Id.* Whether this qualified as a fair use or created a likelihood of confusion presented fact specific issues for resolution after the pleading stage. *Id.* at 704.[7]

*Google, Inc. v. American Blind and Wallpaper Factory, Inc.* also refused to dismiss claims against Google based on its sale of trademarked keywords. *Id.*, 2005 WL 832398 (N.D.Cal.). Applying the standard governing this case, the court held that it did not appear "beyond doubt" that American Blind "could prove no set of facts in support of its claims which would entitle it to relief." *Id.* at *5. Although referencing the liberal standard applicable to motions on the pleadings, the court rejected any reading of the Lanham Act which would ignore the underlying intent to protect trademark owners from diminution of the value of those marks, through misappropriation or otherwise. *Id.* at *4, n.18.[8]

More recently, a court held that an advertiser's purchase of a trademark from Google in ordered to generate its Sponsored Link advertisement qualified as a use covered by the Act. *Edina Realty, Inc. v. TheMLSolution.com*, 2006 WL 737064 (D.Minn.). As *Edina* explains, the defendant's purchase of a trademarked term from Google not only guarantees placement in the search results, but also generates a visual association between the Sponsored Link and the mark, because Google displays the user's selected search term (such as the Check N' Go trademark) above the results containing the Sponsored Links. *Id.* at *3. "While not a conventional 'use in commerce,' defendant nevertheless uses the [trademark] commercially." *Id.*

---

[7] Ultimately, the court ruled in favor of Google at trial, on the grounds that the survey presented by the plaintiff failed to sustain its burden of demonstrating a likelihood of confusion as to the use at issue. *See Government Employees Insurance Co. v. Google, Inc.*, 2005 WL 1903128 (E.D.Va.).

[8] The *American Blind* court specifically addressed Google's argument, not made here, that it had no liability because it did not use the trademark on *its* goods or services. Although courts have occasionally phrased their rulings in terms specific to the defendant, the statute contains no such express requirement. And although Google employs the trademark in connection with its Adwords service and in connection with the products offered by CNG's competitors, a finding that it did not would not preclude Google's contributory or vicarious liability for the advertisers who use that trademark in advertising their services on Adwords. *Id.* at *5.

    2.    <u>Courts considering similar practices have concluded that trademark claims exist.</u>

To reach this result, the *Edina* court appropriately analogized Adwords to other situations in which search engines and similar entities or their customers trade in the right to have a particular trademarked term generate the advertisement of one of the trademark owner's competitors, situations which the courts have uniformly found actionable. *See id.* For instance, in *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020 (9th Cir. 2001), the court considered a practice used by various search engines called "keying," which "allows advertisers to target individuals with certain interests by linking advertisements to pre-identified terms." *Id.* at 1022. The search engines required adult entertainment companies to key their sites to a list including two Playboy trademarks, so that the advertisers' sites would appear whenever a consumer typed the Playboy trademarks into the search engine window. *Id.* at 1023. They then monitored the rate that users "clicked" onto the ads triggered by the key terms, in order to market their keyword service, and received a fee for the advertisers' use of the service. *Id.*

Without deciding whether the search engines were directly or contributorily liable – that is whether the search engine or its advertisers used the trademark - the court allowed the claim against the search engines to proceed past the summary judgment stage. *Id.* at 1024 ("We conclude that defendants are potentially liable under one theory and that we need not decide which one.") By "keying" certain advertisements to the trademarked terms, the defendants used the marks in commerce without the owner's permission. *Id.* Because a computer user may become confused and reach the site one of the trademark holder's competitors as a result of the search engine's use of the trademark, "[s]uch use is actionable." *Id.* at 1026.

Having found preliminarily that there was a use in commerce, the Ninth Circuit concluded, after lengthy analysis, that the possibility of actionable confusion existed when the

user clicked on the ambiguously labeled ads which appeared immediately after entry of the keywords, even though the user might realize upon accessing the site that it had no connection to the plaintiff. *Id.* at 1025. The Sixth Circuit and this Court have also rejected the idea that the only actionable consumer confusion occurs at the point of sale, and have recognized that infringement may occur, especially in the internet context, when the consumer arrives at a site he would not otherwise have visited as a result of a false belief that it carried the goods of the company whose trademark he sought. *See PACCAR, Inc. v. Telescan Technologies, LLC,* 319 F.3d 243, 253 (6th Cir. 2003); *overruled in part on other grounds, KP Permanent Make-Up, Inc. v. Lasting Impression, Inc.,* 543 U.S. 111 (2004); *Tdata Inc. v. Aircraft Technical Publishers,* 411 F.Supp.2d 901, 907 (S.D. Ohio 2006). CNG alleges that this type of "initial interest confusion" occurs when internet users input the search term "Check N' Go" but then click on an unaffiliated Sponsored Link before realizing the lack of connection between the two and, like the plaintiff in *Playboy,* should have the opportunity to present evidence to support that claim.

Considering a claim against an internet advertiser, the United States Court of Appeals for the Tenth Circuit also found the use of similar technology actionable in *Australian Gold, Inc. v. Advanced Technology Systems, Inc.,* 436 F.3d 1228 (10th Cir. 2006).[9] The defendant paid a company to list it in a preferred position whenever a computer user searched for the plaintiff's trademarks. *Id.* at 1239. By this method, as well as by listing the trademarks in their text and metatext, the defendants attempted to "divert traffic" to their sites. *Id.* "Thus, Defendants used the goodwill associated with Plaintiffs' trademarks in such a way that consumers might be lured to the [products] from Plaintiffs' competitors. This is a violation of the Lanham Act." *Id.*

---

[9] This and the *Playboy* case clearly belie Google's assertion that no appellate court has ever accepted the theories that CNG now pursues. Indeed, the vast weight of internet trademark authority supports CNG's claims.

These holdings build off the precedents relating to a similar and older practice, companies' use of competitors' trademarks as metatags. Metatags consist of lists of words hidden in a website which act as an index identifying the content of the website for search engines. *PACCAR*, 319 F.2d at 248 n.2. In that way they function just like the keywords used to produce Google's Sponsored Links because they trigger the appearance of certain links underneath the entered search term. Whereas with metatags the advertiser uses its competitor's trademark to "trick" the search engine into listing its website link on the results page triggered by a search of that mark, in Adwords the advertiser simply pays Google for the use of that trademark to accomplish the same result. *See Interstellar Starship Servs. v. Epix, Inc.*, 304 F.3d 936, 945, n.10 (9th Cir. 2002)(noting the evolution from metatags to Adwords: now "search engine algorithms incorporate corporate dollars into their formulae. Firms can pay the search engines in return for primary placement among the search results.").

Thus, despite the existence of what Google would characterize either as a non-source signifying function or legitimate comparative advertising, courts considering trademark metatag use have concluded that, when confusing, it qualifies as trademark infringement. *See, e.g., Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1064-65 (9th Cir. 1999); *Niton Corp. v. Radiation Monitoring Devices, Inc.*, 27 F.Supp.2d 102 (D. Mass. 1998); *Bihari v. Gross*, 119 F.Supp.2d 309, 322-23 (S.D.N.Y. 2000)(although not confusing, metatags constituted use in commerce). This includes the Eastern Division of this Court, in *Tdata*, 411 F.Supp.2d 901 at 907. On competing motions for summary judgment, the Court found that the defendant Tdata's practice of placing its competitor ATP's trademarks in the metatags of its websites violated 15 U.S.C. §§1114 or 1125. *Id.* at 907 (finding that "use of the [plaintiff's] mark in metatags constitutes infringing use of the mark to pull consumers to Tdata's

11

website and the products its features, even if the consumers later realize the confusion"). After a lengthy analysis, the Court concluded that "[t]he trademark aspect of this litigation boils down to whether Tdata is improperly trading or traded on a mark held by ATP." *Id.* at 912. As Tdata had placed the term in the metatag precisely because it intended to use its power as a trademark to draw consumers, its use gave rise to a claim for trademark infringement. *Id.*

Cases involving domain names also show that a use of a trademark can both serve a purpose other than signifying source and still also cause confusion as to source. These cases uniformly acknowledge that a domain name (in the form of "www.trademark.com") functions as a physical address on the internet. *See PACCAR*, 319 F.2d at 248 n.1, 250 (collecting cases). They also, however, examine the facts surrounding the use of that domain name to determine whether it creates a possibility that consumers will experience confusion as to the source of the products on the site found at that domain. *Id.* Thus, merely registering a domain name containing a trademark but never using it in conjunction with a site advertising any product is not an actionable use of the mark, because the domain name functions *only* as an address. On the other hand, associating a site with that trademark-containing domain name and engaging in commercial activity on the site generally means trademark infringement has taken place. *See id.* (stating the "obvious" fact that, although they also serve as addresses "words in many domain names can and do communicate information as to the source or sponsor of the website").[10]

The Sixth Circuit conducted this type of dual analysis in a case upon which Google relies, *Interactive Products Corp. v. A2Z Mobile Office Solutions, Inc.*, 326 F.3d 687 (6th Cir. 2003).

---

[10] Moreover, despite a superficial similarity, Google's role differs significantly from that of domain name registrars. In older cases, registrars escaped liability because they are involved *only* in the address aspect of the name; they do not suggest or market particular domain names, profit from misdirected searches, sell the registration knowing that the buyer will use it to infringe, or otherwise have any ongoing involvement in the design or use of the registered site. *See Bird v. Parsons*, 289 F.3d 865, 877-78 (6th Cir. 2002)(analogizing to *Holiday Inn* and explaining that mere registration did not infringe). The Act now provides for liability on the part of registrars upon a showing of bad faith intent to profit from the registration or operation of the site. 15 U.S.C. §1114(2)(D).

There, the defendant stopped selling a product with the trademark "Lap Traveler" on a page on its website, but neglected to rename the post-domain path associated with that page. On a motion for summary judgment, the court defined the preliminary question of use as "whether the presence of 'laptraveler' in the URL post-domain path for [the defendant's] portable-computer-stand webpage is likely to cause confusion among consumers regarding the origin of the [product actually sold on that page.] Stated another way, the issue is whether a consumer is likely to notice 'laptraveler' in the post-domain path and then think that the Mobile Desk may be produced by the same company (or a company affiliated with the company) that makes the Lap Traveler." *Id.* at 696. Rather than viewing the internal organizing function for the post-domain path as determinative, the Sixth Circuit thoroughly reviewed the purposes served by inclusion of the trademark, giving the plaintiff the opportunity to present evidence of confusion. *See also Interactive Products Corp. v. A2Z Mobile Office Solutions, Inc.*, 195 F.Supp.2d 1024, 1031 (S.D. Ohio 2001)(although plaintiff offered no legal authority for proposition that post-domain path use can infringe, court evaluated likelihood of confusion).

The court found no support for the proposition that a person searching for the Lap Traveler would be directed to the defendant's website or any particular page thereof as a result of the inconspicuous appearance of the trademark in the post-domain path. *Id.* at 697-98 (distinguishing cases in which defendants, by the use of metatags, did take steps to cause search engines to display links to their sites in conjunction with a trademark); *see also Tdata*, 411 F.Supp. at 912 (distinguishing metatag cases from *A2Z*). Instead, a consumer looking for a particular brand of product would enter that product's trademark, either as a domain name or a search term, just as CNG alleges that consumers looking for its services do here.

Accordingly, while post-domain paths typically do not signify source (implying that they may do so depending on the facts), the Court concluded that, for its purposes, "it is enough to find that [the plaintiff] has not presented any evidence that the presence of 'laptraveler' in the post domain path of [defendant's] portable-computer-stand web page is likely to cause consumer confusion." *Id* at 698.  Thus, *A2Z* turned on a lack of evidence of confusion, rather than a legal finding of non-use.  *Id.*; *American Blind*, at * 4 n.16.  The difficulty in separating the two inquiries illustrates how these cases are ill-suited for resolution as a matter of law on the use question.  *See* J. Thomas McCarthy, *Trademarks and Unfair Competition* §23:11:1 (4th ed.)(so-called non-trademark uses are simply those uses that are highly unlikely to cause confusion).

Moreover, *A2Z's* conclusion that the post-domain path implicated only the pure locator function remains distinguishable.  In this case, CNG alleges that the use of CNG's trademark is designed to direct consumers to Check 'n Go's competitors' websites and that the use of CNG's trademark does create a noticeable association between the mark and the websites offering competing services, creating source confusion.  Only because the majority of users in the *A2Z* case neither reached the site because of use of the trademark nor would notice the placement of the trademark in connection with the products offered on the site, *A2Z*, 326 F.3d at 697, could the court properly conclude that the trademark had not been used in commerce in connection with goods or services.  The absence of those facts precludes such a determination in this case.

In sum, whether identified as Adwords, keying or metatag cases, nearly every opinion addressing the behavior at issue has concluded that tying a trademark to the generation of a competitor's advertising raises an issue Congress intended the Lanham Act to address.  And whether Google or its advertisers makes the actual "use" of the trademark, giving rise to either direct or contributory liability, Adwords allows the advertisers to employ CNG's trademark in

connection with the advertising of competing services. Because it pays Google for this privilege, both the advertiser and Google ultimately profit from CNG's investment in developing a superior product and the name recognition that allows consumers to locate it. As the Ohio Court put it, "[n]o reasonable juror could conclude that this does not result from trademark infringement and unfair competition." *Tdata*, 411 F.Supp.2d at 912 (discussing use of trademarks as metatags). At the least, it raises sufficient doubt as to make judgment on the pleadings wholly inappropriate.

**C.    Cases to reach the opposite conclusion involve clearly distinguishable facts.**

Moreover, the circumstances presented here and in the majority of the Adwords, keying and metatag cases differ significantly from those in the cases cited by Google. Google relies most heavily on a trio of cases involving the internet advertising service WhenU.com. However, the WhenU business model and technology functioned quite differently from Google's Adwords program. To deliver "contextual" advertising, WhenU "mapped" its customer's ads by determining which of the various categories in its internal directory corresponded to the advertiser's products. *U-Haul International, Inc. v. WhenU.com, Inc.*, 279 F.Supp.2d 723, 743 (E.D.Va. 2003). The categories in the directory consist of tens of thousands of website addresses, keywords and algorithms such that the input of an included term or terms triggers the appearance of advertising linked to that category. *Id.* When the WhenU program makes a connection, it generates an advertisement from one of WhenU's customers, according to internal priority rules, that appears as a separate "pop-up" window displaying the name of the advertiser. WhenU advertisers cannot pay to target a specific competitor and have no access to the WhenU directories, which WhenU sells on the basis of categories, not particular terms. *Id.* at 745.

Accordingly, *U-Haul*'s ruling that the inclusion of "U-Haul" in WhenU's SaveNow directory did not make actionable use of the trademark, depended on the court's conclusion that

WhenU: (1) "does not sell the U-Haul URL to its customers;" and (2) does not "display the U-Haul URL or the words 'U-Haul' to the computer user when the add pops up." *Id.* at 728, 726 ("WhenU does not sell individual web addresses to its advertising clients and does not guarantee to any advertiser that its ad will be shown when a consumer visits a particular website.") This made WhenU's use for the "pure machine linking function." *Id.* at 728.[11] Obviously, unlike WhenU, Google does sell the CNG trademark and its search engine does display the trademark on the screen in conjunction with the "Sponsored Links" of CNG's competitors.

The Second Circuit likewise distinguished WhenU's conduct from that at issue here in *1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400 (2d Cir. 2005). It first noted that the use of the 1-800 web address in WhenU's directory did not create any possibility of visual confusion with the 1-800 trademark. *Id.* at *24. "In contrast to some of its competitors, moreover, WhenU does not disclose the proprietary contents of the SaveNow directory to its advertising clients nor does it permit these clients to request or purchase specified keywords to add to the directory." *Id.* at *24 (distinguishing *GEICO*); *see also* *33 ("[U]nlike several other internet advertising companies, WhenU does not 'sell' keyword trademarks to its customers or otherwise manipulate which category-related advertisement will pop up in response to any particular terms on the internal directory.") Finally, WhenU did not "divert or misdirect [computer] users away from 1-800's website, or alter in any way the results a [computer] user will obtain when searching with the 1-800 trademark or website address." *Id.* at *32 (citing *Playboy* and *Brookfield*). Again, behavior and results very different from those associated with Adwords.

---

[11] The *GEICO* court specifically refused to apply the WhenU holdings, including this decision in its own district, to the Adwords product at issue here. *GEICO*, 330 F.Supp.2d at 704 (identifying as the "critical distinction" that "WhenU allowed advertisers to bid on broad categories of terms that included the trademarks, but did not market the protected marks themselves as keywords to which advertisers could directly purchase rights.")

Rather than rejecting these distinctions, as Google suggests in its brief, the remaining WhenU court simply did not conduct the same sort of comparative analysis as the district court in Virginia, and made no attempt to reconcile its holding with the *GEICO* case, as did the Second Circuit. *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F.Supp.2d 734 (E.D.Mich. 2003)(refusing to grant preliminary injunction against WhenU).  Moreover, while referencing Google in dicta, the court had no occasion to analyze the actual workings of Google's program.  Instead, it relied on an unconsidered and, it turns out, mistaken belief that practices resembling "keying" (which it viewed as comparable to the Adwords process) could not implicate trademark protections.

The court identified *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 55 F.Supp.2d 1070, 1076 (C.D.Cal.), *aff'd* 202 F.3d 278 (9th Cir. 1999), as the only opinion to address whether "keying" a trademark constituted use.  Noting that the California court's ruling on a motion for preliminary injunction did not directly answer the question, the *Wells Fargo* court nonetheless relied on it to find that WhenU's practice did not qualify as a use. Approximately one year later, however, the Ninth Circuit revisited the *Playboy* case and expressly held, on a motion for summary judgment, that the defendants clearly used the disputed marks in commerce.  *Playboy*, 354 F.3d at 1024.  Thus, the only case the *Wells Fargo* court identified as involving a comparable situation ultimately concluded in CNG's favor.[12]

**D.**    **This Court need not follow the inconsistent result reached in New York.**

Finally, Google also relies on the only case which apparently rejects this existing authority.  The court in *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F.Supp.2d 402 (S.D.N.Y. 2006) recently dismissed claims against Adwords customers on the grounds that

---

[12]  In addition, although nominally decided on use, the WhenU cases emphasize that the pop up ads frequently involved easily identifiable competitors.  See *U-Haul*, 279 F.Supp.2d at 728 (simultaneous appearance of both the sought after website and the ad was appropriate comparative advertising).  This also distinguishes WhenU from this case, where CNG has alleged that the sponsored link did not originate from any readily identifiable source and certainly not one inherently distinct from CNG.

"the use by [the defendant competitors] in connection with the search engines is not an independent basis for a trademark action." *Id.* at 416. While the opinion did discuss the alleged machine linking purpose served by the use of the trademark in triggering the advertising, it also noted that "it is significant that defendants actually sell [the trademarked product] on their websites. Under these circumstances, there is nothing improper with defendants' purchase of sponsored links to their websites from searches of the [trademark] keyword." *Id.* at 415-16. Therefore, the decision turned as much on the traditional doctrine of fair use (by Google's advertising customers) as it did any analysis of Adwords in the abstract. By contrast, this case lacks *Merck's* "significant" factor, because the sponsored sites do not compare the services offered by Check n' Go to their own nor offer those services themselves.

**E.    No sound policy dictates exempting Google's potentially infringing conduct from trademark analysis.**

Moreover, the *Merck* court may simply have been led astray by Google's ubiquity and by its warnings of internet disaster if not given free reign to market trademarked terms to its advertising customers. Google's sale of trademarks is not crucial to the efficient functioning of the internet or even Google's search engine. A consumer looking for a broad listing of companies offering payday loans can simply type in a term such as payday loan. Companies whose sites make fair use of the trademark (by virtue of comparative advertising or the like) will likely still appear on list of results generated by its input. Other search engines manage to organize information without the auction of trademarked terms.[13] Indeed, even Google's European policy forbids such sales, and the web continues to function.

---

[13] Google has the technological capability of blocking the purchase of the trademarks of others, including CNG's Check 'N Go Mark, as a keyword/search term for its search engine. Indeed, Google's former trademark policy was to block such purchases, and other prominent search engine companies continue to do so. [Complaint, ¶32.]

If the court adopts a bright line rule that all keying does not qualify for trademark protection, it opens the door to potential abuse. For instance, a search engine could knowingly facilitate infringement to increase its own per click revenue with no obligation to account to the trademark owner. On the other hand, if the courts deal with specific behavior under the accepted tests of confusion and fair use, then all of the objectives of the law, including protection of consumers and owners, can be preserved. If a particular Adwords use generates a non-confusing result helpful to consumers, it may continue; if, as in this case, it does not, then it should stop.

## CONCLUSION

As one of its "basic objectives," trademark law "helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 163-64 (1995); *see also* 15 U.S.C. §1127 (purpose of the Lanham Act, is to, *inter alia*, "protect persons engaged in [] commerce against unfair competition.") Look back to Google's example of competition between Ford and Toyota. What if, instead of a recognized company like Ford, the advertiser was a start up manufacturer like KIA which was looking to generate initial interest in its new product by misleading consumers about an affiliation with Toyota? And what if, instead of simply placing an add on the page opposite a Toyota ad, KIA paid Car and Driver magazine to list the page numbers of KIA advertisements in the index of the magazine next to Toyota's name? A customer looking for information about Toyotas by way of the index might turn instead to a KIA page. That customer might get to the page, realize the mistake and move on to the real Toyota listing. However, he might also read about KIAs, a choice he would otherwise not have made, and a decision illustrating the type of initial interest confusion found actionable by the Sixth Circuit. And what if the KIA ad did not conspicuously identify itself as an ad for

KIA but instead contained a description of vehicles by model name alone and the (non-specific) name of various on-line dealers who offered those cars?  The reader might sift through this information, or he might just contact the KIA dealer, not realizing the mistake until after the KIA had begun to sound pretty good.  Recognizing both possibilities, the law provides Toyota with a remedy against KIA's hypothetical attempt to trade off of the initial interest in the Toyota name.

Likewise, what if Google's hypothetical pizza place somehow could place its doorway under the Domino's sign?  And what if lesser known companies did not just pay stores to place their products on shelves next to famous brands, but actually paid the stores to put their similarly packaged merchandise under a sign bearing the famous brands' trademarks?  Not just competitors, but also consumers, would expect the courts to address this behavior and not avoid the issue through a hyper-technical reading of statutory language.

In fact, the law does create a remedy if these practices undermine the purposes of trademark law by creating confusion.  Thus, CNG may at the least pursue its claim against Google for guaranteeing, in exchange for payment from CNG's competitors, that a user's input of the CNG trademark will generate a Sponsored Link to the website advertising the competitors' services.  Because CNG could conceivably prevail on its allegations that this practice results in consumer confusion, Google's motion must be denied.

Respectfully submitted,

/s/ Barry D. Hunter
Ann Gallagher Robinson
Frost Brown Todd, LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, OH  45202-4182
Tel.:  (513) 651-6800
Fax:  (513) 651-6981

Barry D. Hunter
Medrith Lee Norman
Frost Brown Todd LLC
250 West Main Street, Suite 2700
Lexington, Kentucky 40507
(859) 231-0000
(859) 231-0011-fax

Attorneys for CNG FINANCIAL
CORPORATION

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was electronically filed with the Clerk of the Courts using the CM/ECF, system which will send notification of such filing to the following, this 17th day of July, 2006:

Kenneth F. Seibel, Esq.
Jacobs, Kleinman, Seibel & McNally
2300 Kroger Building
1014 Vine Street
Cincinnati, OH  45202

Michael H. Page, Esq.
Klaus H. Hamm, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA  94107


/s/ Barry D. Hunter_____
Attorney for Plaintiff/Counter Defendant



LEXLibrary 0102393.0533475  305181v.1