CNG Financial Corporation v. Google Inc | Doc. 27 Att. 1
Case 1:06-cv-00040-SSB-TSB   Document 27-2   Filed 08/10/2006   Page 1 of 15

Page 1

FOCUS - 1 of 1 DOCUMENT

800-JR CIGAR, INC., Plaintiff, v. GOTO.COM, INC. et al., Defendants.

CIVIL ACTION NO. 00-3179

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

2006 U.S. Dist. LEXIS 48279

July 13, 2006, Decided
July 17, 2006, Filed

**COUNSEL:** [*1] For 800-JR **CIGAR,** INC., Plaintiff: JAN ALAN BRODY, CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEN, ROSELAND, NJ.

For **GOTO.COM,** INC., Defendant: PETER JOSEPH PIZZI, CONNELL FOLEY, LLP, ROSELAND, NJ.

**JUDGES:** John C. Lifland, U.S.D.J.

**OPINIONBY:** John C. Lifland

**OPINION:**

### OPINION & ORDER

**LIFLAND, District Judge**

Before the Court is the Motion of Plaintiff 800-JR Cigar, Inc. ("JR" or "JR **Cigar**") pursuant to *Federal Rule of Civil Procedure 56* for summary judgment as to liability on Counts I (trademark infringement, *15 U.S.C. § 1114*), II (unfair competition, *15 U.S.C. § 1125(a)*), III (dilution, *15 U.S.C. § 1125(c)*), V (common law trademark infringement), VI (New Jersey trademark infringement and dilution, *N.J.S.A. 56:3-13.16* and *N.J.S.A. 56:3-13.20*), and VIII (New Jersey statutory unfair competition, *N.J.S.A. 56:4-1 et seq.*) against Defendant GoTo.com, Inc. ("GoTo"), now known as Overture Services, Inc., and the cross-motion of Defendant GoTo for summary judgment in its favor [*2] on all claims asserted against it. n1 For the reasons explained herein, Plaintiff's motion will be denied and Defendant's cross-motion will be granted in part and denied in part.

> n1 GoTo argues that the non-intellectual property claims asserted against it--deceptive telemarketing and consumer fraud--fail as a matter law. JR **Cigar** does not move for summary judgment on these claims.

### BACKGROUND

JR **Cigar** is a prominent seller of **cigars** at discount prices. JR **Cigar** has marketed its products for more than thirty years under the service mark "JR **Cigars**," more recently under other marks featuring the formatives "JR" or "JR **Cigar**," and, even more recently, under the trade name "jrcigars.com," which is the address for JR's Internet website that was launched in April 1999. JR **Cigar** is the ultimate owner of six federal trademarks that utilize the formative "JR" or "JR **Cigar**." n2

> n2 At briefing, JR **Cigar** also had five pending applications on other marks involving the above-mentioned formatives. The Court is unaware of the outcome of those applications.

[*3]

GoTo is a pay-for-priority Internet search engine formed in 1997. Its service reaches approximately 75% of all Internet users. A search engine allows users to find information by entering a search term and receiving a list of results. Pay-for-priority search engines solicit bids from advertisers for key words or phrases to be used as search terms, giving priority results on searches for those terms to the highest-paying advertiser. Thus, each advertiser's rank in the search results is determined by the amount of its bid on the search term entered by the user. The list of paid results on GoTo's web site discloses the amount of each advertiser's bid. Advertisers pay GoTo only when a user clicks on their listings in the search results. After all paying advertisers' sites are listed as search results, GoTo lists unpaid or "natural" search listings, i.e., those whose sites are most logically relevant to

the search criteria. GoTo receives no revenue when a user clicks on unpaid listings.

Search terms are displayed on GoTo result pages only if a user enters those particular search terms. And if the search terms are displayed in web site descriptions in the search result listings, it is [*4] only because the owner of the listed web site included the term in its description for the listing.

It is arguable that GoTo does not use "jr cigar" or any other JR Cigar trademark to promote or advertise its own services. However, in addition to accepting bids for search terms and earning revenue therefrom, GoTo assists prospective and current advertisers in selecting search terms by providing an automated "Search Term Suggestion Tool." This tool enables an advertiser to assess the usefulness of a search term. When an advertiser enters a search term for which it is considering a bid, the Search Term Suggestion Tool applies various algorithms and automatically generates a list showing how many times that term and related terms were searched during the prior month. GoTo applies its standard editorial review process to search terms identified through the use of the Search Term Suggestion Tool.

Between April 1999 and June 2001, GoTo earned revenue of about $ 345 from paid listings for "jr cigar" and related search terms. Portions of that revenue stemmed from the term "jr" and clicks to web sites entirely unrelated to cigars, such as J&R Music. Another portion of this revenue resulted [*5] from clicks to a web site maintained by JR Cigar's attorneys.

JR Cigar itself did not pay GoTo for a priority listing, but some of its competitors (the non-search engine defendants) did. According to GoTo, some of the bids for "jr cigar" search terms were accepted because the advertisers' web sites contained content that was relevant to JR Cigar or its products under GoTo's relevancy guidelines. In other cases, GoTo accepted bids because its editors believed that the term "jr cigar" was a reference to a "junior" or small cigar.

In June 2000, JR became aware that GoTo was selling to the non-search engine defendants the right to use the term "JR Cigar" and slight variations of that term, including "J R Cigar," "J&R Cigar," "J-R Cigar," "JRCigars.com," and "800 JR Cigar" (collectively the "JR search terms"), as Internet keywords or other devices to generate advertising revenues for GoTo. According to JR Cigar, that enabled JR Cigar's competitors to "pass themselves off as JR" and "divert internet shoppers and purchasers from JR's website to their own competitive websites."

At no time did GoTo enter into any agreement with any advertiser encouraging the advertiser to bid on "jr cigar" [*6] or related search terms. According to GoTo, its advertisers represent to it that their web sites and search listings will not violate trademark rights of any third party. Moreover, GoTo claims that it exercises no control over the content of the web sites that appear among paid and unpaid listings.

At one time GoTo's "Editorial Manuals" and "Relevancy Guidelines" prohibited bidding on trademarks and on the names of advertisers' competitors, stating that:

> . For line listings, GoTo does not permit the mention of specific competitors or bidding for search terms that are trademarked names;
>
> . We do not accept search terms based on the products of our advertisers' competitors, unless our advertisers' websites present actual, significant information about their competitors' products by comparing them to their own.

These prohibitions were removed in 1999 and 2000, reportedly because it was impractical for editors to determine who owned trademarks and whether an advertiser's use was infringing.

On June 28, 2000, JR Cigar filed suit against GoTo and the non-search engine defendants. n3 GoTo responded to the receipt of the Complaint and demand letter by reviewing the paid [*7] listings for "jr cigar" and related search terms, and removed a number of listings that were not relevant. The two remaining paid listings include advertising by a JR Cigar attorney and by a site providing financial and other information about JR Cigar.

---

n3 The non-search engine defendants have reached settlements with JR.

---

In response to JR Cigar's complaint that its web site was not appearing among unpaid listings, GoTo apparently investigated and learned that the company that supplied unpaid results to GoTo and other search engines had applied an adult content rating to JR Cigar's site that blocked the site from GoTo's unpaid listings unless users set the adult filter to view all listings. Within days, the rating was changed. As a result, JR Cigar's site appears at or near the top of GoTo's unpaid listings.

**DISCUSSION**

## I. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter [*8] of law. *Fed. R. Civ. P. 56*; *Serbin v. Bora Corp., 96 F.3d 66, 69 n.2 (3d Cir. 1996)*. In evaluating a summary judgment motion, a court must "draw all reasonable inferences in favor of the non-moving party." *Armour v. County of Beaver, PA, 271 F.3d 417 (3d Cir. 2001)* (quoting *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000))*. A motion for summary judgment requires the non-moving party to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The initial burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Huang v. BP Amoco Corp., 271 F.3d 560, 564 (3rd Cir. 2001)*. Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*; *Anderson, 477 U.S. at 242*.

The mere existence of some alleged factual dispute between [*9] the parties will not defeat an otherwise properly supported motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*; *Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)* (noting that a motion for summary judgment is not defeated by mere allegations, general denials, or other "vague statements"). Rather, only disputes regarding facts that might affect the outcome of the lawsuit under the governing law will preclude the entry of summary judgment. *Anderson, 477 U.S. at 247-48*. If the evidence is "such that a reasonable fact-finder could return a verdict for the nonmoving party," summary judgment should not be granted. *Id. at 248*; *Lawrence v. Nat'l Westminster Bank of New Jersey, 98 F.3d 61, 65 (3d Cir. 1996)*.

## II. Parties' Arguments

JR **Cigar** seeks monetary and injunctive relief, arguing that GoTo (1) profited from the unauthorized sale of the JR marks as search terms to its customers; (2) used the JR marks to attract search customers to its site; and (3) created and implemented a scheme to divert Internet users seeking to find "jr **cigar**" [*10] to JR **Cigar's** competitors and rivals. JR **Cigar** argues that such conduct constitutes trademark infringement, unfair competition, and false designation of origin in violation of Sections 32(1) and 43(a) of the Lanham Act, *15 U.S.C. § 1114(1)* and *1125(a)*, involving the unauthorized use of JR marks in interstate commerce in a manner that is likely to create confusion. JR **Cigar** further argues that GoTo has diluted JR **Cigar's** "famous mark," entitling JR **Cigar** to permanent injunctive relief under the anti-dilution statute. n4 JR **Cigar** also contends that liability exists for common law and New Jersey statutory unfair competition, infringement, and dilution claims because virtually the same proof is required as for liability under federal law.

> N4 JR **Cigar** acknowledges that the issue of damages must await determination by the trier of fact.

GoTo responds that JR **Cigar** seeks "broad veto power" well beyond the bounds afforded by **trademark** protection. The argument goes that the [*11] **use** of a **trademark** on GoTo's web site is consistent with applicable law allowing for comparative advertising, "gripe sites," and other cases of fair use. GoTo further argues that its paid listings service is much like other cases wherein courts have allowed **use** of another's **trademark** in domain names, as key words for banner advertisements, and in metatags (hidden codes that influence whether a web site appears in search engine results). In summary, GoTo maintains that it has not made **trademark use** of any JR **Cigar** search terms for its own services and that there is no contributory infringement because it did not intentionally induce infringement or continue to offer its service to an advertiser that it knew to be infringing.

## III. Secondary Liability for Trademark Infringement

Before turning to the analysis of the parties' arguments, it is necessary to address issues of secondary or indirect liability which appear relevant to GoTo's conduct in this case.

Certain theories of secondary liability are recognized under the Lanham Act. *American Telephone & Telegraph Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1432-433 (3d Cir. 1994)* (hereinafter "AT&T"). [*12] The Supreme Court has endorsed a "theory of secondary liability for trademark infringement that comes very close to aiding and abetting." *Id. at 1432* (citing *William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 44 S. Ct. 615, 68 L. Ed. 1161, 1925 Dec. Comm'r Pat. 420 (1924))*. The theory of contributory infringement, as it came to be known, requires proof of either an intent to induce another to infringe a trademark or continued supply of goods or services to one whom the supplier (contributory infringer) knows or has reason to know is engaging in trademark infringement. *Inwood*

*Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854, 102 S. Ct. 2182, 72 L. Ed. 2d 606 (1982); *AT&T, 42 F.3d at 1432*. Thus, the actions undertaken by the supplier of services (contributory infringer) enable an infringer to confuse or deceive the ultimate consumer. See 4 J. Thomas McCarthy, McCARTHY ON TRADEMARKS AND UNFAIR *COMPETITION, § 25*:18, at 25-43. Although the doctrine was applied to drug manufacturers in the Inwood Labs case, "courts have expanded it beyond that particular origin." *AT&T, 42 F.3d at 1432-433* (noting application of the theory to situations involving franchisors and franchisees and [*13] to landlords and tenants in the context of flea markets).

The Third Circuit has also applied theories of agency law, including the doctrine of apparent authority, to conclude that

> in certain instances, secondary, indirect liability is a legitimate basis for liability under the federal unfair competition statute. There is a good reason for this: the Lanham Act is derived generally and purposefully from the common law tort of unfair competition, and its language parallels the protections afforded by state common law and statutory torts. Thus, the conduct prohibited by *section 43(a)* of the Lanham Act is even more analogous to common law torts than the antitrust laws at issue in *Hydrolevel*. The Act federalizes a common law tort. In construing the Act, then, courts routinely have recognized the propriety of examining basic tort liability concepts to determine the scope of liability. . . . Applying the analysis to the facts of this case, it is clear that liability based on agency principles is often appropriate.

*Id. at 1433-434* (internal citations omitted).

In the present context of Internet trademark infringement, the court in *Government Employees Insurance Co. ("GEICO") v. Google, Inc.*, 330 F. Supp. 2d 700 (E. D. Va. 2004), [*14] recognized contributory infringement and stated:

> Overture encourages advertisers to bid on trademarked words, and monitors and controls the allegedly infringing third-party advertisements. Although Overture argues that its monitoring is intended to prevent, not encourage, trademark infringement, that argument raises a disputed fact that cannot be resolved by a motion to dismiss. The claim that Overture monitors and controls the third-party advertisements is sufficient to plead actual or constructive knowledge required to allege contributory infringement.

*Id. at 705*. The GEICO court additionally commented on theories of liability based on a principal-agent relationship and concluded that "[b]ecause GEICO has alleged that both Overture and the advertisers control the appearance of the advertisements on Overture's search results page and the use of GEICO's **trademarks** therein, plaintiff has stated a claim for vicarious n5 infringement against Overture." Id.

---

n5 The term "vicarious infringement" used in the GEICO case was meant to refer to secondary liability in the trademark context, not with vicarious liability in the copyright and patent contexts. In copyright law, "[a] defendant is vicariously liable for copyright infringement if it has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *AT&T, 42 F.3d at 1441*; see also *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 125 S. Ct. 2764, 2776, 162 L. Ed. 2d 781 (2005). However, the Supreme Court has construed secondary liability in the trademark context more narrowly than in the copyright or patent contexts, and the Third Circuit has declined to apply vicarious liability in the trademark context. See *AT&T, 42 F.3d at 1441*.

---

[*15]

JR has not raised issues of secondary liability. Thus, the Court will proceed to analyze JR's claims of direct infringement against GoTo until such time that these issues are properly before it.

**IV. Trademark Infringement and Unfair Competition Claims**

To establish violations of either Section 32(1) or 43(a) of the Lanham Act, Plaintiff must show (1) ownership of a valid and legally protectable mark; (2) that defendant used the mark "in commerce" (3) "in connection with the sale, offering for sale, distribution, or advertising" of goods and services (4) in a manner likely to confuse customers. *15 U.S.C. §§ 1114, 1125(a)*; *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 (3d Cir. 1994). Section 32(1) of the Lanham Act states:

Case 1:06-cv-00040-SSB-TSB     Document 27-2     Filed 08/10/2006     Page 5 of 15

Page 5
2006 U.S. Dist. LEXIS 48279, *

(1) Any person who shall, without the consent of the registrant--

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to [*16] cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

*15 U.S.C. § 1114(1)*. Section 43(a) of the Lanham Act states:

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false [*17] or misleading description of fact, or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*15 U.S.C. § 1125(a)*.

These motions turn largely on GoTo's **use** of JR marks and confusion in the marketplace.

**A. Trademark Use**

First to be addressed is whether GoTo's "**use**" of JR marks -- accepting bids that include "jr **cigar**" and like key search terms for purposes of priority listing -- falls within the commercial **use** contemplated by statutory and common law **trademark** infringement prohibitions.

JR contends that GoTo's **use** of the "JR," "JR Cigar," and "800 [*18] JR Cigar" marks and variations of those marks are the sort of use contemplated by the Lanham Act, even though GoTo is not a distributor or direct competitor of JR **Cigar.** GoTo responds that the sale of JR marks is not "**trademark use**" attributable to GoTo, because it is the advertiser who selects the search term and **uses** it in conjunction with the content contained on the advertiser's website. GoTo perceives its involvement as merely limited to accepting the advertiser's bid on the search term after determining that the term is relevant n6 to the advertiser's Web site.

- - - - - - - - - - - - - - - - - -

n6 To determine relevancy after an advertiser selects its own search terms and determines its bids for each search term, a "search listing request" is assigned to an editor. Editors typically compare each search term to the advertiser's Web site and accept or reject the search term under the relevancy guidelines noted above.

- - - - - - - - - - - - - - - - - -

The Court finds JR's position to be more persuasive. Instructive on this point is the GEICO case, *supra*, where GEICO [*19] brought suit against **Google** and Overture Services, Inc. (formerly GoTo, the defendant in the present action) based on their **use** of GEICO's **trademarks** in selling advertising on **Google's** and Overture's Internet

search engines. *GEICO, 330 F. Supp. 2d at 700*. GEICO alleged that **Google** and Overture operated Internet search engines that were used by Internet users to search the Internet for sites offering certain products or services. *Id. at 701*. The search engines functioned by the Internet user entering search terms. Id. Those search terms were then compared with databases of websites maintained by the search engine, which resulted in a list of various websites matching the given search term. Id.

**Google** and Overture also sold advertising linked to search terms. *Id. at 702*. When an Internet user entered a search term, the results page displayed not only a list of websites generated by the search engine using neutral criteria, but also links to websites of paid advertisers, identified as "Sponsored Links." Id. GEICO alleged that the defendants' practice of selling advertising, by allowing GEICO's competitors to pay to have their [*20] ads appear next to the listings that resulted when GEICO's marks were entered as search terms, violated the Lanham Act, contributed to violations of the Act by third parties, and also constituted various state law torts.

**Google** and Overture moved to dismiss for failure to state a claim, arguing that the complaint failed to allege that defendants made **trademark use** of the marks. Specifically, defendants argued that their **use** of GEICO's marks was not "in commerce" and "in connection with the sale, offering for sale, distribution, or advertising of goods and services." Id. Defendants claimed that they only used GEICO's trademarks in their internal computer algorithms to determine which advertisements to show. The GEICO trademarks did not appear on the paid advertisements and therefore, **Google** and Overture argued, the Internet user could not be confused as to the origin of the advertised insurance products.

In its analysis, the GEICO court discussed recent cases holding that **use of trademarks** by software companies to generate pop-up Internet advertisements does not constitute "**trademark use**" of the marks under the Lanham Act. "Those cases are based on a finding that the marks [*21] were not used by the company making the pop-up software to identify the source of its goods and services." *Id. at 703*. See, e.g., *U-Haul Int'l, Inc. v. WhenU.com, Inc., 279 F. Supp. 2d 723, 727 (E.D.Va. 2003)*; see also *Wells Fargo & Co. v. WhenU.com, Inc., 293 F. Supp. 2d 734, 762 (E.D. Mich. 2003)*.

In the U-Haul and Wells Fargo cases, WhenU operated an Internet pop-up advertisement business. Its software program, called "SaveNow," was voluntarily downloaded by Internet users into their computers. To determine which pop-up ads to display, WhenU collected common search phrases, web addresses, and various keyword algorithms in an internal directory. The SaveNow program automatically scanned the user's Internet activity to discover whether that activity matched any information in the SaveNow directory. When the software identified a match, a pop-up advertisement was selected from among those provided by WhenU's clients and appeared on the Internet user's computer screen.

In finding that WhenU did not **use** plaintiffs' **trademarks** in commerce, the U-Haul and Wells Fargo courts both reasoned that WhenU did not sell the plaintiffs' [*22] trademarks to its customers or target specific websites, either in its software or in the selling of its services to advertisers. Rather, WhenU used the trademarks for a "pure machine-linking function" to internally associate terms with categories, and thus did not place the trademarks in commerce.

Similarly, in *1-800 Contacts, Inc. v. WhenU.com, Inc., 414 F.3d 400 (2d Cir. 2005)*, the Second Circuit found that WhenU did not make "**use**" of the plaintiff's **trademark**. Although WhenU reproduced plaintiff's website address, www.1800Contacts.com, in its proprietary directory, the court found compelling the fact that WhenU "does not disclose the proprietary contents of the SaveNow directory to its advertising clients nor does it permit its advertising clients to request or purchase specified keywords to add to the directory." *Id. at 409* (distinguishing *GEICO, supra*). n7

n7 GoTo does, arguably, permit its clients to "purchase" specified keywords.

The GEICO court [*23] also noted other cases which held that the **use of trademarks** as advertising keywords by the Netscape and Excite search engines potentially created a likelihood of confusion and that there was no dispute that those defendants used the marks in commerce. See, e.g., *Playboy Enterprises, Inc. v. Netscape Commc'n Corp., 354 F.3d 1020, 1024 (9th Cir. 2004)*. Similarly, courts have found that the **use of trademarks** in metatags amount to "**use in commerce**" for purposes of the Lanham Act. See *Bihari v. Gross, 119 F. Supp. 2d 309 (S.D.N.Y. 2000)* (using plaintiff's **trademarks** as metatags in websites critical of plaintiff involved infringing **use** because those websites also contained hyperlinks to plaintiff's competitors); *Playboy Enter., Inc. v. Asiafocus Int'l, Inc., 1998 U.S. Dist. LEXIS 10459, No. 97-734-A, 1998 WL 724000 (E.D. Va. April 10, 1998)* (commercial **use** found where defendant embedded plaintiff's **trademarks** within defendant's website's computer source code (i.e., metatags) in order to attract consumers searching for plaintiff).

The GEICO court ultimately concluded that Overture made **trademark use** of GEICO's marks. The court

Case 1:06-cv-00040-SSB-TSB    Document 27-2    Filed 08/10/2006    Page 7 of 15

Page 7
2006 U.S. Dist. LEXIS 48279, *

found that the allegations of the [*24] complaint supported **trademark use** because "the complaint [was] addressed to more than the defendants' **use of the trademarks** in their internal computer coding." *GEICO, 330 F. Supp. 2d at 703*. That is, the complaint addressed defendants' selling of and profiting from GEICO's marks.

The GEICO court distinguished the actions taken by defendant WhenU in the U-Haul case, stating:

> [W]hen defendants sell the rights to link advertising to plaintiff's trademarks, defendants are using the trademarks in commerce in a way that may imply that defendants have permission from the trademark holder to do so. This is a critical distinction from the *U-Haul* case, because in that case the only '**trademark use**' alleged was the **use of the trademark** in the pop-up software -- the internal computer coding. *WhenU allowed advertisers to bid on broad categories of terms that included the trademarks, but did not market the protected marks themselves as keywords to which advertisers could directly purchase rights.*

*Id. at 704* (emphasis added).

The distinction made by the *GEICO* court, italicized above, is applicable here. GoTo gives prominence [*25] in search results to the highest bidder by linking advertisers with certain trademarked terms. There is evidence in the record that, prior to the filing of JR's Complaint, GoTo accepted bids for the JR marks from no less than eleven of JR's competitors and ranked their priority on search results listings from highest to lowest based on who paid the most money. (Rothman Decl. Ex. B.) Such conduct is qualitatively different from the pop-up advertising context, where the **use of trademarks** in internal computer coding is neither communicated to the public nor for sale to the highest bidder.

Here, GoTo makes **trademark use** of the JR marks in three ways. First, by accepting bids from those competitors of JR desiring to pay for prominence in search results, GoTo trades on the value of the marks. Second, by ranking its paid advertisers before any "natural" listings in a search results list, GoTo has injected itself into the marketplace, acting as a conduit to steer potential customers away from JR to JR's competitors. Finally, through the Search Term Suggestion Tool, GoTo identifies those of JR's marks which are effective search terms and markets them to JR's competitors. n8 Presumably, the [*26] more money advertisers bid and the more frequently advertisers include JR's trademarks among their selected search terms, the more advertising income GoTo is likely to gain.

> n8 GoTo contends that its Search Term Suggestion Tool is an entirely automated utility that takes a term entered by the user and applies various algorithms to generate a list showing how many times that term was searched during the preceding month. Perhaps, but it is nonetheless clear to the Court that the Search Term Suggestion Tool permits GoTo to channel advertisers directly to JR's trademarks by demonstrating quantitatively the potential for successful advertising, thereby implicitly recommending those terms to advertisers.

For these reasons, the Court concludes that there are no disputed material issues of fact which would prevent the Court from concluding, as a matter of law, that GoTo is making **trademark use** of JR **Cigar's trademarks**. It must next be determined whether summary judgment is appropriate on the issue of whether GoTo's use [*27] of JR's **trademarks** creates a likelihood of confusion.

### B. Likelihood of Confusion

To establish a likelihood of confusion, a plaintiff must prove that "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Checkpoint Systems, Inc. v. Check Point Software Tech., Inc., 104 F. Supp. 2d. 427, 456 (D.N.J. 2000)* (citing *Ford Motor Co., v. Summit Motor Products, Inc., 930 F.2d 277, 292 (3d Cir. 1991)* aff'd *Checkpoint Systems, Inc. v. Check Point Software Tech., Inc., 269 F.3d 270, 280 (3d Cir. 2001)*. The likelihood of confusion is a highly factual issue, and accordingly summary judgment for either party is unlikely, absent a particularly one-sided factual record on this issue.

The Third Circuit applies the following ten-part analysis known as the *Lapp* factors for determining whether a likelihood of confusion exists:

> (1) similarity of the marks;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when [*28] making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion;
(5) the intent of the defendant in adopting the mark;
(6) the evidence of actual confusion;
(7) whether the goods are marketed or advertised through the same channels;
(8) the extent to which the targets of the parties' sales efforts are the same;
(9) the relationship of the goods in the minds of consumers; and
(10) other factors suggesting that the consuming public might expect the prior owner to manufacture both products, or manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1229 (3d Cir. 1978)*; see also *Checkpoint, 269 F.3d at 280* (citing *Interpace Corp. v. Lapp, 721 F.2d 460, 463 (3d Cir. 1983))*. The same ten factors apply regardless of whether or not the goods at issue directly compete. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 213 (3d Cir. 2000)*. No one factor is determinative, and not all factors are relevant in each case. [*29] *Checkpoint, 269 F.3d at 280*. In a situation where plaintiff and defendant deal in non-competing goods or services, "the court must look beyond the trademark to the nature of the products or services themselves, and to the context in which they are marketed and sold." *Fisons Horticulture, Inc. v. Vigoro Indus., 30 F.3d 466, 473 (3d Cir. 1994)*. The closer the relationship between the products and their sales contexts, the greater the likelihood of confusion. The Checkpoint court instructed that the Lapp factors remain relevant to any likelihood of confusion analysis, and should be accorded proper weight in determining whether, in the totality of the circumstances, marketplace confusion is likely. *Checkpoint, 269 F.3d at 297*.

*Lapp Factor (1): Similarity of the Marks*

Marks are confusingly similar if "ordinary consumers would likely conclude that . . . [the products or services] share a common source, affiliation, connection or sponsorship." *Trade Media Holdings Ltd. v. Huang & Assoc., 123 F. Supp. 2d 233, 240 (D.N.J. 2000)* (citing *Fisons, 30 F.3d at 477*). The similarity between the [*30] owner's mark and the alleged infringing mark may be the most important factor when products directly compete. *Checkpoint, 269 F.3d at 281* (citing *Fisons, 30 F.3d at 476*). Where products do not directly compete, mark similarity is not necessarily determinative of likely confusion, but rather one of a number of factors that must be examined. *Id. at 282*. Here, GoTo contends that its Internet search engine services do not compete with JR Cigar's retail cigar services, and that JR's marks bear no similarity to GoTo's mark. Therefore, GoTo argues that this Lapp factor should favor it.

JR responds that the test for mark similarity involves the identity between the goods and services being offered under the parties' trademarks, not merely a comparison of the two litigant's marks. JR explains that GoTo has used the JR search terms that are virtually identical to the JR Cigar marks to sell search result prominence to Internet marketers and sellers of cigars, and in doing so, GoTo has benefitted financially. According to JR, the fact that GoTo is a search engine rather than a cigar seller is not relevant to the issue of the similarity of the parties' [*31] use of the JR marks, because GoTo has injected itself into the cigar market through the way it sells its search services.

While JR sells cigars and GoTo sells priority listings to cigar marketers and sellers, among others, GoTo has used JR's marks in its efforts to promote its search engine services. There is no similarity between "JR" and "GoTo." But there is similarity, if not identity, between JR Cigar's marks and the search terms whose results GoTo sells to direct competitors of JR Cigar who are the highest bidders. Under these circumstances, the Lapp factor of similarity of the marks favors JR Cigar.

*Lapp Factor (2): Strength of the Owner's Mark*

The parties dispute the strength of JR Cigar's marks. "'Strength,' as applied to trademarks, refers to the commercial strength or marketplace recognition of the mark, as well as distinctiveness of the mark." *Jews for Jesus v. Brodsky, 993 F. Supp. 282, 302 (D.N.J. 1998)*, aff'd without opinion, *159 F.3d 1351 (3d Cir. 1998)*. Marks that are fanciful, arbitrary, or suggestive are considered strong, whereas those that are merely descriptive or generic are deemed to be weak. *Checkpoint, 269 F.3d at 282-83*. [*32] "Marks that are merely descriptive (without a secondary meaning) are generally weak and not entitled to strong protection. A mark is descriptive with a secondary meaning when the mark is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services." *Id. at 283*. A secondary meaning can be "established through extensive advertising which creates in the minds of consumers an association between the mark and the provider of the services advertised under the mark." Id.

JR Cigar argues that its marks are strong, four having become incontestable and creating a presumption of secondary meaning. JR maintains that because "JR" [n9] is

not a description of the products sold by JR and because arbitrarily arranged letters are not easily memorable, the JR marks qualify for the highest degree of protection under the Lanham Act. JR adds that the magnitude of sales--more than a billion dollars over a five-year span (Colleton Decl. Conf. Ex. 16)--and the extent of the unsolicited third-party recognition that has been received by the JR marks (Id., Exs. 14, 15) speak to the [*33] strength of its marks. JR also points out that the term "JR Cigar" routinely finishes at the top of cigar-related search terms reported monthly by GoTo itself in its "Search Term Suggestion Tool, (McCarthy Decl. Ex. 10), which GoTo urges advertisers to use "to drive traffic" to their websites. (Rothman Decl. Ex. G.)

n9 The letters "JR" were selected by the owner of 800-JR-Cigar in honor of his father, Jack Rothman. Rothman Dec. P5.

GoTo responds that JR's marks do not qualify for the highest degree of protection because marks consisting of initials are considered to be weak marks that are merely descriptive and without secondary meaning. GoTo contends that the initials "JR" are not distinctive in that the initials alone do not instantaneously conjure up JR Cigar in the minds of consumers. See *Anheuser-Busch, Inc. v. A-B Distrib., Inc., 910 F. Supp. 587, 593 (M.D. Fla. 1995)* ("A B" mark "is merely descriptive, and must be characterized as a weak mark."); *American Optical Corp. v. American Olean Tile Co., Inc., 1974 WL 20261, 185 U.S.P.Q. 405, 409 (S.D.N.Y. 1974)* [*34] ("There is nothing particularly distinctive about plaintiff's mark. The initials AO are letters in the alphabet available for use by everyone. It is merely descriptive and must be characterized as a weak mark."). It is also argued that the term "jr cigar" may be perceived as a descriptive term by consumers--i.e., a "junior" or "small" cigar. GoTo argues that the mark is further weakened by the existence of non-tobacco entities such as "J&R Music."

This factor favors JR Cigar. GoTo has not discredited the evidence put forth by JR Cigar as to the strength of its marks. GoTo does not dispute that JR has used its marks for as long as thirty years, spent millions of dollars promoting the sale of the JR products, achieved sales of over one billion dollars in a span of five years, and received extensive unsolicited third party recognition. That JR's marks consist of someone's initials, under these circumstances, does not reduce their strength because JR has pointed to evidence establishing secondary meaning of its marks. The Court is satisfied that the marks are demonstrably strong. As JR Cigar points out, the fact that more than twenty competitors bid on the "JR Cigar" name on GoTo's system [*35] further indicates that the cigar industry recognizes the power of the name. (Rothman Rply. Dec. Ex. 1-12; Denis Dec. Ex. 5-8.) GoTo has not successfully contradicted this evidence.

*Lapp Factor (3): Price of the Goods and Other Factors Indicative of the Care and Attention Expected of Consumers when Making a Purchase*

Consideration of this Lapp factor is highly relevant to the analysis of this action and also merges with initial interest confusion analysis. The Court's discussion of this factor is addressed in Part IV. C.

*Lapp Factors (4) & (6): Length of Time Defendant Has Used the Mark Without Evidence of Confusion and Evidence of Actual Confusion*

These Lapp factors are also highly relevant. GoTo argues that JR has presented no evidence of actual confusion, i.e., that a consumer clicked on an advertiser's listing believing it to be a JR Cigar listing, and once reaching the advertiser's web site, believed that it was affiliated in some way with JR Cigar, and purchased cigars from the advertiser's web site. Indeed, JR Cigar offers no survey evidence of actual consumer confusion. See *Eagle Snacks, Inc. v. Nabisco Brands, Inc., 625 F. Supp. 571, 583 (D.N.J. 1985)* [*36] (noting that failure to offer confusion survey may give rise to inference that survey results would be unfavorable). However, JR has presented evidence of diversion that is probative of initial interest confusion. Initial interest confusion is discussed more fully below.

The lack of evidence of actual confusion in the form of mistaken purchasing decisions favors GoTo. However, there is evidence regarding temporary diversion of potential customers away from JR's website. Whether this diversion supports a finding of initial interest confusion must be decided by the trier of fact.

*Lapp Factor(5): Intent of GoTo in Adopting the Mark*

JR Cigar contends that GoTo ignored its own Relevancy Guideline prohibitions against the sale of trademarks to competitors when it permitted JR's competitors to purchase JR marks. n10 JR Cigar also argues that GoTo's failure to permanently cease all conduct after receiving notice of this action signals willful and bad faith conduct. After receiving JR's Complaint, GoTo continued to permit at least five JR competitors to purchase JR marks (none of whom had relevant information on their sites). (See DeNys Decl. Exs. 5-8.) JR Cigar relies on *NFL v. New Jersey Giants, 637 F. Supp. 507, 518 (D.N.J. 1986),* [*37] which held that "[d]efendant's continuation of its activities after receipt of plaintiff's cease and desist letters constitutes bad faith and is deemed to be an actual and original intention to confuse consumers."

Case 1:06-cv-00040-SSB-TSB    Document 27-2    Filed 08/10/2006    Page 10 of 15

Page 10
2006 U.S. Dist. LEXIS 48279, *

n10 Although not raised by the parties, GoTo's development of the Search Term Suggestion Tool and its promotion of the Tool to advertisers wishing to identify effective search terms upon which to bid raises additional questions concerning GoTo's intent in adopting JR's marks. Those questions are suitable for resolution only by the trier of facts.

GoTo disputes the significance of this evidence and maintains that only advertisers who were making fair use were allowed to bid on search terms that are JR marks. GoTo argues that even though the Relevancy Guidelines were replaced by the end of 1999 (McCarthy Exs. 4-7), the Guidelines are consistent with principles of fair use routinely followed by the company, and that, where appropriate, it has removed listings of advertisers who did not appear to be making [*38] fair use. GoTo claims it took steps to ensure that JR's website would appear at or near the top of unpaid listings. Also, GoTo has pointed to evidence that its editors initially accepted some "jr cigar" search terms in the good faith belief that they were abbreviations for "junior cigar" and that, after learning about JR's Complaint, removed listings that did not comply with relevancy guidelines. Whether GoTo's editors really believed that "jr cigar" stood for a small cigar will be up to the trier of fact.

Evaluation of the foregoing evidence bearing on GoTo's intent is for the trier of fact.

*Lapp Factors (7) & (8): Whether the Goods are Marketed or Advertised Through the Same Channels and the Extent to Which the Targets of the Parties' Sales Efforts are the Same*

The Internet is used as the marketing channel for all concerned, so this factor does not further the analysis. See *Playboy Enter., 354 F.3d at 1028.*

"[W]hen parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion." *Checkpoint, 269 F.3d at 289.* Here, the targets of the present parties' sales efforts are different in the sense that [*39] GoTo is an Internet search engine that provides information on myriad topics of interest, whereas JR Cigar sells cigars and cigar-related products. However, from an Internet searcher's perspective, these efforts overlap to the extent these efforts are all directed to attracting consumers seeking to purchase cigars and related products. The eighth Lapp factor thus marginally favors JR.

*Lapp Factor (9): Relationship of the Goods in the Minds of Consumers*

"Under this prong, courts examine whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source affiliation or sponsorship. The test is whether the goods are similar enough that a customer would assume they were offered by the same source." *Id. at 286* (internal citation omitted). JR argues that the net result of GoTo's conduct is to direct Internet users searching for JR's website to the websites of JR's competitors, who, by definition, offer similar products. Paid search listings delivered in response to searches for JR's website suggest GoTo's promulgation of an association between GoTo's advertisers and JR, and an implied right [*40] to advertise using JR's name.

GoTo argues, as it has throughout, that JR's retail cigar services and GoTo's search engine services are not related. "Internet users looking for JR Cigar come to [GoTo] because they do not know how to locate JR Cigar, its products or information regarding it, not because they believe it is somehow connected to JR Cigar." Def. Br. at 28. While this may be true, GoTo's sales efforts to JR Cigar's competitors established a relationship between JR's retail cigar services and GoTo's search engine services. GoTo's argument oversimplifies the factual underpinnings at hand and overlooks the fact that Internet users looking for JR Cigar on GoTo's search engine don't necessarily find JR either, but may likely be diverted to a competitor instead.

The Court finds that the goods to which Internet users are ultimately directed in GoTo's search results are similar to JR's products and are likely to be so identified in the minds of consumers. The ninth Lapp factor thus favors JR.

### C. Initial Interest Confusion

A trademark violation based on initial interest confusion arises when a senior user's customers are diverted to a junior user's website offering [*41] similar products. The idea is that, upon arriving at the competitor's website, customers may be fully aware that the website is not JR's, but may buy from the competitor out of convenience or in the belief that JR's products are available from the competitor. See *Brookfield Commc'n. Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1064 (9th Cir. 1999).*

The Third Circuit has held that initial interest confusion supports a violation of the Lanham Act. *Checkpoint, 269 F.3d at 292.* Initial interest confusion "occurs when a consumer is lured to a product by its similarity to a known mark, even though the consumer realizes the true identity and origin of the product before consummating a purchase." *Id. at 294* (citing *Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456 at 464 (7th Cir. 2000)).* Without protection against initial interest confusion, an

Case 1:06-cv-00040-SSB-TSB   Document 27-2   Filed 08/10/2006   Page 11 of 15

Page 11
2006 U.S. Dist. LEXIS 48279, *

infringer receives a "free ride on the good will of the established mark." *Id.* at 295 (internal citations omitted). Indeed, "[c]onfining actionable confusion under the Lanham Act to confusion present at the time of purchase would undervalue the importance of a company's goodwill [*42] with its customers." Id.

Thus, courts have found that damage to a trademark holder results even where a consumer eventually becomes aware of the source's actual identity or where no actual sale occurs. See *Australian Gold, Inc. v. Hatfield, 436 F.3d 1228, 1239 (10th Cir. 2006); BigStar Entm't Inc. v. Next Big Star, Inc., 105 F. Supp. 2d 185 (S.D.N.Y. 2000).*

> This damage can manifest itself in three ways: (1) the original diversion of the prospective customer's interest to a source that he or she erroneously believes is authorized; (2) the potential consequent effect of that diversion on the customer's ultimate decision whether to purchase caused by an erroneous impression that the two sources of a product may be associated; and (3) the initial credibility that the would -- be buyer may accord to the infringer's products -- customer consideration that otherwise may be unwarranted and that may be built on the strength of the protected mark, reputation and goodwill.

*Australian Gold, 436 F.3d at 1239.*

The probative value of initial interest confusion and its significance varies from case to case. *Checkpoint, 269 F.3d at 297.* [*43] Relevant factors include (1) product relatedness (i.e., whether the goods or services are similar; whether the products at issue directly compete), (2) the level of care exercised by consumers in making purchasing decisions, (3) the sophistication of the purchaser/consumer; and (4) the intent of the alleged infringer in adopting the mark. *Id. at 296.* "Initial interest confusion in the internet context derives from the unauthorized **use of trademarks** to divert internet traffic, thereby capitalizing on a **trademark** holder's good will." *Australian Gold, 436 F.3d at 1239;* see also *Brookfield, 174 F.3d at 1064.* Thus, in this factual context, evidence of the diversion of traffic away from JR's website to those of its competitors is also a significant factor.

*Product Relatedness*

This factor examines whether the goods and services are similar and whether the products at issue directly compete. GoTo again argues that it does not compete with JR, and that when the goods or services of the parties are dissimilar, there can be no initial interest confusion. The correct inquiry here is not whether the present parties are themselves competitors [*44] in the same business, but rather a comparison of the similarity of the goods and services being offered under the trademark being used by both.

GoTo and JR both used JR's marks -- GoTo used JR's marks to promote its search engine services to **cigar** suppliers other than JR, and JR uses its marks to promote its own **cigars**. As discussed above in connection with the "Similarity of the Marks" and "Relationship of the Goods" *Lapp* factors, GoTo's use of the marks suggests an affiliation or connection between JR and GoTo based on GoTo's alleged infringing use of the marks.

*Level of Care Exercised by Consumers in Making Purchasing Decisions and Sophistication of the Consumer*

"When consumers do not exercise a high level of care in making their decisions, it is more likely that their initial confusion will result in a benefit to the alleged infringer from the use of the goodwill of the other firm." *Checkpoint, 269 F.3d at 296-97.* Cost of the product, the sophistication of the consumer, and the length of the purchasing process are relevant here. Unsophisticated buyers are more likely to be confused as to source or affiliation when confronted with similar trademarks, [*45] and there is an inverse relationship between the cost of a product and the amount of care the reasonably prudent buyer will use in acquiring it. See *id. at 284-85.*

JR argues that "[t]he relatively modest price levels of [JR's] products -- even for the more costly premium hand rolled **cigars** -- suggest that . . . consumers are unlikely to exercise undue care in purchasing many **cigars**. The moderate price levels further suggest that consumers may not be attentive to being redirected to the websites operated by JR's competitors from an internet search result that superficially appears to be directing the consumer to JR's website." (Pl. Br. at 14). GoTo does not respond to JR's arguments.

Without evidence in the record as to the price of JR's products, the sophistication of **cigar** buyers generally and JR's customers specifically, and the length of the purchasing process, all of which bear on whether an Internet user interested in **cigars** could be lured away from JR **Cigar,** the Court cannot address this issue. Upon hearing such evidence, the trier of the facts may find that consumers are unlikely to exercise care in their purchasing decisions and may not be attentive about [*46] being redirected away from JR's website, but JR's unsupported allegations on this issue are insufficient to meet its burden of proof on summary judgment.

Case 1:06-cv-00040-SSB-TSB    Document 27-2    Filed 08/10/2006    Page 12 of 15

Page 12
2006 U.S. Dist. LEXIS 48279, *

*Intent of Alleged Infringer in Adopting the Mark*

The proper inquiry here is whether GoTo intentionally adopted JR's marks to create confusion among consumers making purchasing decisions. *Checkpoint, 269 F.3d at 296.* GoTo claims that it made fair use of JR's marks. JR claims that GoTo purposefully lured consumers away from its website to those of its competitors for financial gain. The factual issue of GoTo's intent is in dispute.

*Evidence of Diversion Supporting the Likelihood of Confusion*

JR points to evidence that Internet users who input JR Search Terms on GoTo's search engine were directed to a list including websites other than JR's website, the first eleven of which were paid listings. (Rothman Decl. Ex. B.) Between April 1999 and June 2001, while GoTo was selling the JR advertising rights to the highest bidders, JR **Cigar** maintains that approximately 20,000 of the 70,407 searches reflected in Rothman Conf. Ex. D were made on the GoTo search system, meaning Internet users were thwarted in their efforts [*47] to find JR's website on some 20,000 occasions. (Rothman Decl. P10 and Conf. Ex. D.) According to JR, such searches resulted in the Internet users who conducted these searches being shown 170,847 impressions or listings of sites other than the JR website and caused approximately 1,000 of those consumers to "click through" to the sites of JR's competitors. (Rothman Decl. PP11, 12 and Conf. Exs. D and E.) Indeed, during a two-month period between May and June 2000, GoTo averaged a 23.98% "diversion rate" in click-throughs to JR **Cigar** competitors. (Rothman Decl. Conf. Ex. F.) These statistics, JR contends, evidence a significant diversion of Internet traffic away from JR's website to those of its competitors, which, in turn, represents confusion created by GoTo's sale of advertising rights to JR's name.

GoTo responds that complaints of diversion of traffic from JR's website to those of its competitors, absent proof that any customers were actually confused, is insufficient to prove confusion. GoTo again contends that there has been no diversion of customers from plaintiff to defendant in that no one has bought a single **cigar** from GoTo. The Court finds that response unconvincing, because [*48] there is evidence that JR has suffered from the diversion occasioned by GoTo's bidding process and its use of JR's marks. See *Securacomm Consulting, Inc. v. Securacom Inc., 984 F. Supp. 286, 298 (D.N.J.1997)* ("Infringement can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion."), rev'd on other grounds, *166 F.3d 182, 186 (3d Cir. 1999)* ("In this appeal, [appellant] does not challenge the district court's finding of infringement or order of injunctive relief.").

The statistical evidence of diversion of customers that JR has presented is arguably indicative of a likelihood of confusion. See *Taj Mahal Enter. v. Trump, 745 F. Supp. 240, 249 (D.N.J. 1990)* (noting that the key to actual confusion is whether there has been a diversion of customers); *Trade Media Holding Ltd. v. Huang & Assoc., 123 F. Supp. 2d 233, 241 (D.N.J. 2000)* (evidence of diversion establishes likelihood of confusion). JR has come forward with evidence of diversion in support of actual confusion. GoTo does not contradict it. This state of the record favors JR, [*49] but the trier of fact must decide to credit this evidence of diversion of traffic away from JR's website to those of its competitors, in deciding whether there is a likelihood of confusion.

To summarize, the Court has concluded, as a matter of law, that GoTo made **trademark use** of JR's marks. As to the likelihood of confusion element, however, there are material issues in dispute; namely, the third, fourth and sixth Lapp factors dealing with evidence of confusion and the impact, if any, of initial interest confusion, and the fifth Lapp factor dealing with GoTo's intent in adopting the mark. These factors are highly relevant to the analysis of this action and preclude summary judgment for either party.

As summary judgment is inappropriate on JR's claims for trademark infringement and unfair competition, the Court need not consider GoTo's affirmative "fair use" defense, except to note that use of JR's marks by GoTo is probably fair in terms of its search engine business; that is, where GoTo permits bids on JR marks for purposes of comparative advertising, resale of JR's products, or the provision of information about JR or its products. However, fairness would dissipate, and [*50] protection under a fair use defense would be lost, if GoTo wrongfully participated in someone else's infringing use. Thus, the factual issue of whether GoTo's conduct supports a fair use defense is for the trier of fact.

**V. Federal and State Anti-Dilution Claims**

Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." *15 U.S.C. § 1125(c).* To establish a prima facie case for relief under the federal anti-dilution act, a plaintiff must plead and prove (1) the plaintiff is the owner of a mark that qualifies as a "famous" mark in light of the totality of eight factors listed in *§ 1125(c)(1)* n11; (2) the defendant is making commercial use in interstate commerce of a mark or trade name; (3) defendant's use began after the plaintiff's mark became famous; and (4) defendant's use causes dilution by lessen-

Case 1:06-cv-00040-SSB-TSB    Document 27-2    Filed 08/10/2006    Page 13 of 15

Page 13
2006 U.S. Dist. LEXIS 48279, *

ing the capacity of the plaintiff's mark to identify and distinguish goods or services. *Times Mirror Magazines, Inc. v. Las Vegas Sports News, 212 F.3d 157, 163 (3d Cir. 2000).* [*51] The underlying purpose of the dilution doctrine is that a gradual attenuation of the value of a famous **trademark** occasioned by another's unauthorized **use** constitutes an invasion of the holder's rights. Id. Factors to be considered in determining whether there has been dilution include: "actual confusion and likelihood of confusion, shared customers and geographic isolation, the adjectival quality of the junior use, and the interrelated factors of duration of the junior use, harm to the junior user, and delay by the senior user in bringing the action." *Id. at 168.*

n11 Section 43(c) of the Lanham Act sets forth eight non-exclusive factors for determining fame:

(A) the degree of inherent or acquired distinctiveness of the mark;
(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
(C) the duration and extent of advertising and publicity of the mark;
(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade of the mark's owner and the person against who the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

*15 U.S.C. § 1125(c)(1)(A)-(H).*

[*52]

Whether a mark is considered famous is akin to a determination on the strength of a mark. See *Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc., 858 F. Supp. 1268, 1277 (S.D.N.Y. 1994),* aff'd, *57 F.3d 1062 (2d Cir. 1995).* The degree of distinctiveness of a mark informs whether the mark is famous. See *15 U.S.C. § 1125(c)(1)(A);* see also *Times Mirror, 212 F.3d at 165* ("The degree of acquired or inherent distinctiveness of a mark bears directly upon the issue of whether that mark is famous."). Distinctiveness turns on the following considerations: (1) the length of exclusivity of use of the mark; (2) the size or prominence of the plaintiff's enterprise; (3) existence of substantial advertising by the plaintiff; (4) established place in the market and (5) proof of intentional copying. *Times Mirror, 212 F.3d at 165.*

The fame of the JR marks may be tested within the **cigar** market. "[A] mark not famous to the general public is nevertheless entitled to protection from dilution where both the plaintiff and defendant are operating in the same or related markets, so long as the plaintiff's [*53] mark possesses a high degree of fame in its niche market." *Id. at 164.* As explained by the Third Circuit,

A mark that is highly distinctive only to a select group of purchasers may be protected from diluting uses directed at that particular class or group. For example, a mark may be highly distinctive among purchasers of a specific type of product. In such circumstance, protections against a dilution of the mark's distinctiveness is ordinarily appropriate only against users specifically directed at that particular class of purchasers.

Id. (quoting *Restatement (Third) of Unfair Competition § 25 cmt. e (1995 Main Vol.)).*

JR **Cigar** argues that by using its marks as search terms, GoTo forces customers looking for the JR website to wade through numerous other websites and that using its marks as search terms dilutes them within the meaning of anti-dilution laws. GoTo defends against the Federal Anti-Dilution Act and its New Jersey counterpart by arguing that it does not use the JR marks in commerce. The Court rejects that argument for the reasons already stated.

GoTo's second defense against the dilution claims [*54] is that JR marks are not entitled to protection under the anti-dilution statutes because the JR marks are not famous. GoTo argues that there is no evidence that JR marks are strong because the mere expenditure of money on promotional efforts does not establish fame,

JR Cigar has only nine retail locations, its billboard advertising is limited to one state, it has been selling on the Internet for only two years, and it has failed to produce a fame survey.

As discussed above, the record shows that JR is a preeminent cigar marketer. The company is over thirty years old and has spent millions of dollars on promotion. (Rothman Decl. PP15-17, Colleton Decl. P9.) The JR marks have been in use for up to thirty years. JR CIGARS, in particular, has been in use since 1970. (Colleton Decl. PP3-4.) Two marks for JR, as well as JR-ULTIMATE and JR ALTERNATIVE, are incontestable and are therefore presumed to have acquired secondary meaning. (Colleton Decl. at PP3-4.) JR Cigar has nine retail locations and has been selling on the Internet, at the time of briefing, for two years. JR has earned more than a billion dollars in revenues under the JR marks and JR Cigar tradename in the five-year span preceding [*55] briefing. (Colleton Decl. Conf. Ex. P16.) In addition, the JR marks have received extensive unsolicited third-party recognition in the form of news articles and awards, samples of which are in the record. (Colleton Decl., Exs. 14, 15.) Also, JR marks are prominent among search terms used by Internet browsers when looking for cigars. (McCarthy Decl. P12.)

The Court is satisfied that JR's marks are famous for purposes of the dilution statutes.

Dilution claims under New Jersey law are subject to the same considerations as federal dilution claims. See *Novartis Consumer Health, Inc. v. McNeil-PPC, Inc., 53 U.S.P.Q. 2d 1406, 1409 (D.N.J. 1999).* Accordingly, fame of the marks is established as to the state law cause of action as well.

Whether there has been dilution is another matter. Confusion, actual or likely, is one factor bearing on the dilution analysis, and especially important in the context of GoTo's unique use of the marks. As discussed above, there are disputed issues of fact concerning likelihood of confusion that preclude summary judgment.

## V. Non-Lanham Act Claims: Deceptive Telemarketing and Consumer Fraud

JR Cigar asserts two non-intellectual [*56] property claims: deceptive telemarketing under the federal Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), *15 U.S.C. § 1602(b)*, and consumer fraud under the New Jersey Consumer Fraud Act ("NJCFA"), *N.J.S.A. § 56:8-1 et seq.* GoTo cross-moves for summary judgment on these claims, arguing that (1) it is immune from liability under the Communications Decency Act, *47 U.S.C. § 230*; (2) JR Cigar does not have standing to bring telemarketing claims or the consumer fraud claim; and (3) its behavior cannot be reasonably characterized as meeting the requisite threshold for a consumer fraud violation -- "unconscionable" behavior.

JR Cigar counters that the Communications Decency Act immunity may not cover GoTo since it may not qualify as an "interactive computer service." Pl. Rply. Mem. in Opp. at 27. JR Cigar further argues that relief under the Telemarketing Act and NJCFA is not limited to consumers. Finally, it argues that GoTo's conduct is unconscionable under the NJCFA inasmuch as GoTo solicited bids on and sold the right to advertise under JR's marks to JR competitors despite knowledge of the filing of JR's Complaint. [*57]

*Immunity*

The purpose of the Communications Decency Act is to promote self-regulation of Internet service providers. Basically, the Act shields service providers from liability for the content of websites of third parties that are accessed through the Internet. The Act affords immunity to "interactive computer services," defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provide access to the Internet and such systems offered by libraries or educational institutions." *47 U.S.C. § 230(c)(1).*

The Court is not persuaded that GoTo qualifies for immunity under the Act. GoTo contends that it is an "interactive computer service" because it is an "information service . . . that provides or enables computer access by multiple users to a computer server . . [and] provides access to the Internet . . . ." However, as far as this Court can tell, GoTo does not provide access to the Internet like service providers such as AOL. The only authority cited in support of GoTo qualifying for this designation is an unpublished [*58] Superior Court of California case where it was undisputed that eBay qualified as an "interactive computer service." *Stoner v. eBay, Inc., No. 305666, 2000 WL 1705637, at *1 (Cal. Super. Nov. 1, 2000).* The Court does not find that argument persuasive.

Moreover, immunity under the Act applies to any cause of action that would make service providers liable for information originating with a third-party user of the service. Immunity does not seem to fit here because the alleged fraud is the **use of the trademark** name in the bidding process, and not solely the information from third parties that appears on the search results page. It is not the purpose of the Act to shield entities from claims of fraud and abuse arising from their own pay-for-priority advertising business, rather than from the actions of third parties.

*Standing*

GoTo also argues that JR **Cigar** does not have standing to bring the state law consumer fraud claim and the federal deceptive telemarketing claim. Consumers and commercial competitors have standing to bring claims under the NJCFA. *Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc., 992 F. Supp. 709, 716 (D.N.J. 1998)*; [*59] *General Development Corp. v. Binstein, 743 F. Supp. 1115, 1130 (D.N.J. 1990)*. JR fails to explain how it should be considered a commercial competitor of GoTo. Instead, JR offers the following conclusory statement in support of standing: "Overture's assertion that only consumers may bring claims under the federal Fraud Act and the New Jersey [Consumer] Fraud Act is simply wrong. Under the New Jersey [Consumer] Fraud Act, a commercial competitor has standing to bring a claim. . . . Thus, JR has standing to assert claims under [the statute]." (Pl. Rply Mem. in Opp. at 29.)

JR **Cigar** is neither a consumer of **cigars** nor of GoTo's services. As a **cigar** retailer, JR cannot be considered a commercial competitor of GoTo's search engine. While JR may have had standing to sue the non-search engine defendants (all of whom have already settled with JR), JR has not provided the Court with any arguments that would support standing under the NJCFA against GoTo. Accordingly, summary judgment will be granted to GoTo on JR **Cigar's** claim under the NJCFA.

As to the Telemarketing Act, the Act states that those persons who are "adversely affected" are authorized to bring a civil action [*60] against a deceptive telemarketer. *15 U.S.C. § 6104(a)*. First, GoTo argues that it is the public, not JR **Cigar** itself, that has been allegedly deceived by GoTo's actions and that JR **Cigar** therefore lacks standing to bring a claim. This argument is without merit. JR **Cigar** is most certainly aggrieved by practices (if proven) that take unfair advantage of its marks and divert customers away from its website.

GoTo's second argument is that extending the Act beyond actual telemarketing would create Internet liability that Congress never contemplated, by applying the Act to an Internet search engine simply because it connects to the Internet via telephone lines. JR **Cigar** counters that the plain wording of the statute contemplates plans to induce purchases of goods and services by use of one or more telephones, but cites no authorities that recognize the Act's applicability to Internet search engines.

The Court agrees with GoTo, and concludes that the facts of this case do not support a cause of action under the Telemarketing Act.

## CONCLUSION

There are factual issues which preclude summary judgment in favor of either party, as discussed above, particularly [*61] with respect to likelihood of confusion. Moreover, summary judgment in favor of JR **Cigar** is unwarranted because JR **Cigar** has failed to advance the legal theory which the Court feels best embraces the facts of this case, contributory or indirect infringement. The Court believes that any further proceedings in this case should be conducted under that theory, given that GoTo is the only remaining defendant.

In sum, disputed issues of fact preclude granting summary judgment as to liability in favor of JR **Cigar** on Counts I (trademark infringement, *15 U.S.C. § 1114*), II (unfair competition, *15 U.S.C. § 1125(a)*), III (dilution, *15 U.S.C. § 1125(c)*), V (common law trademark infringement), VI (New Jersey trademark infringement and dilution, *N.J.S.A. 56:3-13.16* and *N.J.S.A. 56:3-13.20*), and VIII (New Jersey statutory unfair competition, *N.J.S.A. 56:4-1 et seq.*). Summary judgment in favor of GoTo is appropriate as to the New Jersey Consumer Fraud Act and the Telemarketing and Consumer Fraud and Abuse Prevention Act, but not otherwise.

Accordingly, [*62] **IT IS** on this 13th day of July 2006,

**ORDERED** that the Motion of Plaintiff 800-JR **Cigar**, Inc. for summary judgment as to liability against Defendant **GoTo.com**, Inc. on Counts I (trademark infringement, *15 U.S.C. § 1114*), II (unfair competition, *15 U.S.C. § 1125(a)*), III (dilution, *15 U.S.C. § 1125(c)*), V (common law trademark infringement), VI (New Jersey trademark infringement and dilution, *N.J.S.A. 56:3-13.16* and *N.J.S.A. 56:3-13.20*), and VIII (New Jersey statutory unfair competition, *N.J.S.A. 56:4-1 et seq.*) is denied; and it is further

**ORDERED** that the Cross-Motion of Defendant **GoTo.com**, Inc. for summary judgment in its favor on all counts asserted against it is granted as to the New Jersey Consumer Fraud Act and the Telemarketing and Consumer Fraud and Abuse Prevention Act claims, but is otherwise denied.

/s/ John C. Lifland, U.S.D.J.