## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| CNG FINANCIAL | ) | |
| CORPORATION, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     vs. | ) | Case No. 1:06-cv-040 |
| | ) | |
| GOOGLE, INC, | ) | |
|     Defendant. | ) | |
| | ) | |
| | ) | |

ORDER

This matter is before the Court on the Motion for Judgment on the Pleadings filed by Defendant and Counter-Claimant Google, Inc. ("Google") on its counter-claim against Plaintiff CNG Financial Corporation ("CNG"). Doc. no. 24. CNG opposes the motion. Doc. no. 25. For the reasons that follow, the motion is **DENIED**.

## I. Background

CNG, an Ohio corporation headquartered in Mason, Ohio, filed the complaint in this action against Google, a Delaware corporation with its principal place of business in California, alleging trademark infringement and related causes of action. Doc. no. 1. The action arises out of Google's practice of selling CNG's federally registered "Check 'N

1

Dockets.Justia.com

Go" service mark and other similar names and phrases as keyword search terms to advertisers on Google's search engine website. CNG describes in the complaint the following facts giving rise to its claims.

CNG's Check 'N Go companies operate the second largest payday lending operation in the country. Since at least 1995, CNG and its predecessor corporation have used the name and mark "Check 'N Go" by, *inter alia*, licensing Check 'N Go Online and the Check 'N Go companies to use that mark in connection with their payday lending services. CNG is the present owner of a Federal Service Mark Registration for the mark. The mark has become "famous" within the meaning of the Federal Dilution Statute, 15 U.S.C. § 1125(c). In addition to promoting the Check 'N Go mark in conjunction with the payday lending services of Check 'N Go Online and the Check 'N Go companies, the Check 'N Go Website offers consumers a facility to apply for and obtain loans from Check 'N Go Online directly through the Internet. A large number of existing and new customers visiting the website take out payday loans from Check 'N Go Online.

Google is an Internet search engine. It uses algorithms to process keywords that an Internet user types into a search engine window against its data base and to produce a search results page, which lists the websites that match the Internet user's keyword search. Google's algorithms typically operate so that these websites are listed on the search results page in order of decreasing relevance to the keyword searched, with the most relevant websites listed first.

In addition to making its search engine available to consumers through its website, Google provides its search engine platform to other search engine companies and sells a number of products and services to individuals and entities. One of the programs Google offers to its business customers is a keyword-triggered advertising program entitled "AdWords." The program enables advertisers to purchase or bid on keywords that generate an advertising link known as a "Sponsored Link" to the purchaser's website. For example, a company in the payday lending business might bid on the keyword "payday loan" so that the company's website will be the first, or among the first, "Sponsored Links" when a customer enters the keyword "payday loan" in Google's search engine window. In this example, Google posts these Sponsored Links on the top and side of its search engine results page triggered by the "payday loan" search. The designation "Sponsored Link" is confusing and misleading because in many instances, the search engine "results" pages are designed so that the "Sponsored Link" display is inconspicuous or otherwise not apparent to Google users. Moreover, it is not apparent to Google users who exactly sponsors these links, thereby leaving many Internet users to believe that these links are sponsored by the company whose name they entered into the Google search engine window. Google profits every time an Internet user "clicks" on a "Sponsored Link" for one of the advertisers to whom Google has sold keywords in its "AdWords" program.

Google has sold various keywords, comprised in whole or in part of the Check 'N

Go mark and other similar names and phrases, to competitors of Check 'N Go Online and the Check 'N Go companies and other unauthorized users. Although Google agreed, when notified by CNG of its trademark rights in the search term "Check 'n Go," to bar Google advertisers from using the mark (which agreement Google has failed to honor), Google refused to stop selling the mark or any other similar names and phrases as keyword search terms to those advertisers. Consequently, Google causes the purchase of the Check 'N Go mark and other similar names and phrases to trigger the appearance of a link to these competitors' websites on the Google search results page whenever a consumer types Check 'N Go, or similar names and phrases such as "checkngo," "check and go," and "check & go," into the Google search window. Moreover, consumers typing the keywords "checkngo" and "Check 'N Go" into Google's search window are directed to the Sponsored Links of competitors containing those names and marks within the ad text.

By operation and design of its AdWords program, Google causes consumers who specifically intend and desire to find a Check 'N Go website to be directed, instead, to a search results page containing links to the websites of competitors of Check 'N Go Online and the Check 'N Go companies. Thus, Google sells, and it customers hope to purchase, the possibility that they will intercept customers who, due to CNG's extensive and pervasive advertising resulting in invaluable good will, are trying to find CNG's operation. Once intercepted, consumers may "click" on the links to competitors of Check

4

'N Go Online and the Check 'N Go companies and thus be directed to the competitors' websites. Consumers may not realize they have unwittingly "clicked on" a competitor's website and once there may not ever return to CNG's website. Through this practice, Google causes the infringement and dilution of CNG's mark.

Google has knowingly sold CNG's mark in commerce and has included the mark and other similar names and phrases in Google's search engine for Google's own profit and to increase the competitive advantage of competitors of Check 'N Go Online and the Check 'N Go companies. Google's refusal to block the purchase of the mark and other similar names and phrases as keyword/search terms for its search engine constitutes conscious and deliberate disregard of CNG's trademark and other related rights in its Check 'N Go mark.

Based on these allegations, CNG brings causes of action for Trademark Infringement under the Lanham Act, 15 U.S.C. § 1114(1) (First Cause of Action); Contributory Trademark Infringement under the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a) (Second Cause of Action); Vicarious Trademark Infringement under the Lanham Act (Third Cause of Action); False Representation under the Lanham Act, 15 U.S.C. § 1125(a) (Fourth Cause of Action); Dilution under the Lanham Act, 15 U.S.C. § 1125(c) (Fifth Cause of Action); Ohio Trademark Infringement (Sixth Cause of Action); Common Law Trademark Infringement (Seventh Cause of Action); Unjust Enrichment (Eighth Cause of Action); and Misappropriation (Ninth Cause of Action).

CNG makes the following allegations in support of Count One:  Google's unauthorized and willful use and sale of the Check 'N Go mark as a keyword in connection with its "AdWords" program constitutes a use in commerce which infringes CNG's exclusive rights in its federally-registered mark.  Such use is likely to cause confusion, mistake or deception as to the source of the services offered by advertisers who use the Check 'N Go mark and other similar names and phrases on Google's search engine to promote their own products and services with Google's express authorization to do so.  Such actions are also likely to cause confusion as to whether CNG is sponsoring, has authorized, or is somehow affiliated with the products or services advertised on Google's search engines using CNG's Check 'N Go mark.  Consumers are likely to be initially confused into believing that "clicking" on Google's "Sponsored Links" will lead to a Check 'N Go website and/or to information about Check 'No Go Online or the Check 'N Go companies and their payday lending services.  Even after accessing the websites associated with "Sponsored Links," consumers are likely to be confused into believing that those websites and the information they contain are associated with, sponsored by, or otherwise affiliated with or connected to Check 'N Go Online and the Check 'N Go companies.  Google's unauthorized and willful use of CNG's registered service mark in connection with its "AdWords" program constitutes trademark infringement in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

In support of its Contributory Trademark Infringement claim, CNG argues that the use of its Check 'N Go mark on Google's search engine is likely to cause confusion, mistake and deception among Google's users as to whether CNG is the source of, or is sponsoring or affiliated with, the products and services offered on such third-party advertisers' web sites. CNG claims that through its sale of the mark as a keyword, Google aids and materially contributes to the third-party advertisers' violations of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), and is therefore contributorily liable for the infringing use of the Check 'N Go mark by its advertisers who use the Check 'N Go mark to trigger their advertisements.

In support of its Vicarious Trademark Infringement claim, CNG alleges that Google has the right, ability and obligation to control the use of the Check 'N Go mark by third-party advertisers as part of its "AdWords" program; the third-party advertisers' use of the Check 'N Go mark in the context of Google's "AdWords" program is likely to cause confusion among consumers and constitutes infringement of CNG's rights in the Check 'N Go mark; and Google receives a direct financial benefit from the third-party advertisers' infringing use of the Check 'N Go mark and is vicariously liable for the infringing use of the mark by third-party advertisers.

CNG alleges in support of its False Representation claim under the Lanham Act that Google's use of its mark and other similar names and phrases on and in connection with its "AdWords" program conveys the misleading commercial impression to the public that the advertisers listed in Google's manipulated search results pages, or their services, are approved by, sponsored by, or somehow affiliated or connected with CNG. CNG claims this constitutes a false designation of origin and false description and representation in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## II. Google's counterclaim

Google has asserted a counterclaim against CNG. For its counterclaim, Google alleges that it has offered its "AdWords" program to customers since October 2000. The program permits Google's advertising customers to bid on the opportunity to display advertising links known as "Sponsored Links" on the margins of its search engine results pages based on whichever keywords appear in user queries posted to Google's Internet search engine. Google's advertising customers pay Google based on the number of Internet users who "click" on these Sponsored Links. Google's advertisers select the keywords that will trigger their advertisements. Google's trademark policy distinguishes between two potential uses of words and phrases: (1) use as a keyword to trigger the appearance of a Sponsored Link, and (2) use in the text of the ad itself. Its trademark policy allows its customers to select words and phrases that are identical to, or similar to, words and phrases that Google has been given notice are trademarked as keywords to

trigger the appearance of Sponsored Links.  Conversely, its trademark policy prohibits its advertising customers who are not authorized to do so by the trademark owner from including in the text of a Sponsored Link words or phrases that are identical to, or similar to, words or phrases that Google has been given notice are trademarked.  Google claims that returning these Sponsored Links in response to a search query that includes words identical or similar to a trademark does not constitute a representation of the origin or source of the links.  The possibility of any consumer confusion is further negated as a trademark owner has the ability to prevent unauthorized users on Google from using the trademarked word or phrase, or words or phrases similar thereto, in the text of a Sponsored Link.

Google claims that CNG itself does not contend that any consumer confusion results from the events it avers in its complaint hypothetically may occur.  Google claims that according to CNG's own complaint, "No consumers are deceived or confused as to the origin of goods or services by Google's advertisers seeking to present information, or an invitation to receive information, about competing goods and services to a consumer looking for information about goods and services of a certain sort."  Counterclaim, ¶ 17. Google acknowledges that some uses of trademarked words or phrases in the text of an ad could lead to consumer confusion as to the origin of the goods or services advertised. Google claims that to avoid the need to evaluate the possibility or likelihood of consumer confusion with each new Sponsored Link, Google disallows the use of trademarks in the

text of Sponsored Links when it has been given notice of those trademarks.

Google seeks a declaratory judgment that its current policy regarding the sale of keyword-triggered advertising, which permits its advertising customers to select keywords that are identical to or similar to words or phrases that Google has been given notice are trademarked, while at the same time not permitting them to use such words or phrases in the text of a Sponsored Link, does not constitute trademark infringement.

### III.  Google's Rule 12(c) Motion

Google moves for judgment on its counterclaim pursuant to Fed. R. Civ. P. 12(c). Google requests oral argument on the motion under Local Rule 7.1(b)(2) on the ground that the motion raises a legal issue of significant public importance because the issue affects not only the parties to the action, but potentially any party who advertises on Internet search engines.  Google asserts that it is filing a Rule 12(c) motion on its counterclaim rather than a Rule 12(b)(6) motion on CNG's claims because CNG's complaint arguably addresses two different theories of liability in a single count: first, that triggering advertisements on Internet user searches violates the Lanham Act, which Google characterizes as a pure question of law; and second, that advertisers' use of CNG's marks in the text of ads gives rise to confusion for which Google is liable, which is a theory that Google concedes may raise contested issues of fact not suitable for resolution on the pleadings.  Google argues that it is entitled to judgment on the pleadings on its counterclaim that the first practice does not violate CNG's trademark rights.  Google

alleges that this counterclaim presents a purely legal question, which the Court can and should decide on the pleadings.

Google states that because it moves for judgment on the pleadings, it has treated the allegations in CNG's complaint as if they were true. Google also incorporates into its motion the allegations in its counterclaim that CNG has admitted in its reply to the counterclaim.

## IV. <u>Standard of review</u>

In ruling on a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), the court assumes that the factual allegations of the complaint are true. <u>Ziegler v. IBP Hog Mkt., Inc.</u>, 249 F.3d 509, 512 (6th Cir. 2001). The court must determine whether the claimant undoubtedly can prove no set of facts in support of its claims that would entitle it to relief. <u>Id</u>. All well-pleaded material allegations of the pleadings must be accepted as true. <u>Paskvan v. City of Cleveland Civil Serv. Comm'n</u>, 946 F.2d 1233, 1235 (6th Cir. 1991). The motion is well-taken only when no material issue of fact exists and the moving party is entitled to judgment as a matter of law. <u>Id</u>. A court need not accept as true legal conclusions or unwarranted factual inferences. <u>Todd v. City of Zanesville Police Dept</u>., 2006 WL 1027756, *1 (S.D. Ohio April 19, 2006) (unpublished decision) (citing <u>Mixon v. State of Ohio</u>, 193 F.3d 389, 400 (6th Cir. 1999)).

The procedural posture of this case is unusual given that Google has filed a motion for judgment on the pleadings on its own counterclaim, which is the antithesis of Plaintiff's claim for trademark infringement based on keyword-triggering advertisements. Although Google is the movant in this case, the Court must assume the factual allegations of CNG's complaint are true and determine whether CNG can undoubtedly prove no set of facts in support of its claim in order to determine whether Google is entitled to judgment on the pleadings on its counterclaim.

## V.  The parties' arguments

Google argues that it is entitled to a declaratory judgment on its counterclaim because Google advertisers' use of CNG's trademark as a keyword that triggers the appearance of their advertisements in the form of Sponsored Links is not a "use" of the CNG mark within the meaning of the Lanham Act and, in fact, does not implicate trademark law at all.  Google argues that in order for use of a trademark to constitute "use" under the Lanham Act, the mark must be "used or displayed in the sale or advertising of services and the services are rendered in commerce . . ." 15 U.S.C. § 1127.  Google claims that if a defendant is using a plaintiff's trademark in a way that does not identify the source of a product, then trademark laws do not apply.  Google claims that it is entitled to judgment as a matter of law insofar as CNG claims that use of its trademark as a triggering device for the display of advertisements by other entities constitutes a trademark violation since this is a "non-trademark use."

12

CNG counters that Google does not really dispute that Google and its advertisers use CNG's trademark in the sale or advertising of services. CNG asserts that the sale of its trademark by Google creates an impression that CNG is the sponsor of the Sponsored Links appearing on the results page triggered by consumers' search of the CNG trademark, so that consumers mistakenly believe that the Sponsored Links are affiliated with CNG's trademark. CNG argues that every case to have considered Google's liability for its sale of trademarks has held that this constitutes a trademark use to which the Lanham Act applies. CNG further argues that in nearly every other analogous Internet case where trademarks appear in metatags, hidden text, domain names, and keywords to trigger competitors' advertisements, courts have found a trademark use.

## VI.  Request for oral argument

Google requests oral argument on its motion. The parties have fully briefed the legal issues presented, and the Court has thoroughly reviewed the pleadings and the legal authorities cited by the parties in support of their respective positions. The Court does not believe that oral argument would be helpful in resolving the legal issues raised by the motion for judgment on the pleadings but finds the motion can be decided on the parties' papers. Accordingly, the Court will deny Google's request for oral argument.

## VII.  <u>The Lanham Act</u>

The Lanham Act, 15 U.S.C. § 1114 provides,

(1) Any person who shall, without the consent of the registrant--

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

Section 1125 provides as follows:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which - -

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Section 1127 defines a "trademark" as "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . in commerce . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."  The term "service mark" means "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown."  Id.  The term "mark" includes any trademark or service mark. Id.  The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade.  Id.  Section 1127 provides that for purposes of that chapter, a mark shall be

15

deemed to be in use in commerce on services "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce . . ."

These statutes, by their terms, provide for liability only where there has been the "use" of a trademark. The Sixth Circuit has acknowledged that "use" of a trademark is a prerequisite to the imposition of liability under §§ 1114 and 1125:

> The plain language of § 32 of the Lanham Act forbids only the " *use* in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark . . . which . . . is likely *to cause* confusion." 15 U.S.C. § 1114 (emphasis added). Additionally, § 43(a) of the Act provides a cause of action only against "[a] person who . . . *uses* in commerce any word, term, name, symbol, or device . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact . . . ." 15 U.S.C. § 1125(a) (emphasis added).

Holiday Inns, Inc. v. 800 Reservation, Inc. 86 F.3d 619, 625 (6th Cir. 1996). The Sixth Circuit noted in Holiday Inns that use of a trademark or a deceptively similar copy of a mark is an "essential element of proof" of a violation of the Lanham Act and a prerequisite to a finding of a Lanham Act violation that must be satisfied before an inquiry into the likelihood of confusion becomes relevant. Id. at 625-26.

The Sixth Circuit has clarified that not all uses of a trademark qualify as a "use" within the meaning of the Lanham Act. The Court made this point in the case of Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc., 326 F.3d 687, 695 (6th Cir. 2003) by noting that there was a preliminary question about whether defendants were using the challenged mark in a way that identified the source of their goods. Id. at 694.

The court stated that,

> If defendants are only using [plaintiff's] trademark in a "non-trademark" way - that is, in a way that does not identify the source of a product - then trademark infringement and false designation of origin laws do not apply.

Id. at 695.

Thus, the threshold issue in this case is whether Google is using CNG's trademark within the meaning of the Lanham Act when it sells CNG's trademark to third parties as a triggering keyword for the appearance of those parties' advertisements as Sponsored Links on the results page for an Internet search query.  In resolving this issue, the Court is guided by the following decisions of other courts that have examined the question of trademark use in the context of Internet keyword searches and similar scenarios.

## VIII.  Case law

A. Keyword search cases

Several courts in other districts have addressed claims of trademark infringement brought against Google and other Internet search engines based on their practice of selling advertising linked to keyword search terms.  These courts have reached different results. In GEICO v. Google, Inc., 330 F. Supp.2d 700, 704 (E.D. Va. 2004), defendants moved to dismiss the plaintiff's claims brought under §§ 1114 and 1125 and plaintiff's related state law claims pursuant to Rule 12(b)(6).  Defendants argued that the complaint failed to allege facts supporting a claim that defendants had used the marks "in commerce" and "in connection with the sale, offering for sale, distribution, or advertising of goods and services" because the complaint did not allege that the defendants had used the plaintiff's

17

trademarks in a way that identified the user as the source of a product or indicated the endorsement of the mark owner.  Defendants also argued that because they only had used the trademarks in their internal computer algorithms to determine which advertisements to show, this use of the trademarks never appeared to the user, so the user could not be confused as to the origin of the goods.

The court found the line of authorities cited by the plaintiff to be better reasoned and held that under those cases and an unstrained reading of the complaint, the plaintiff had pled sufficient facts to allege "trademark use."  330 F.Supp.2d at 703.  The court reasoned:

> Contrary to defendants' argument, the complaint is addressed to more than the defendants' use of the trademarks in their internal computer coding.  The complaint clearly alleges that defendants use plaintiff's trademarks to sell advertising, and then link that advertising to results of searches.  Those links appear to the user as 'sponsored links.'  Thus, a fair reading of the complaint reveals that plaintiff alleges that defendants have unlawfully used its trademarks by allowing advertisers to bid on the trademarks and pay defendants to be linked to the trademarks.

> Under the analysis in PETA [People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 364 (4th Cir. 2001)], defendants' offer of plaintiff's trademark for use in advertising could falsely identify a business relationship or licensing agreement between defendants and the trademark holder.  In other words, when defendants sell the rights to link advertising to plaintiff's trademarks, defendants are using the trademarks in commerce in a way that may imply that defendants have permission from the trademark holder to do so . . .

Id. at 704.

The court determined that although GEICO had sufficiently alleged that defendants used its protected marks in commerce, this did not necessarily mean that the use violated

18

the Lanham Act.  Rather, the court found that decision could not be made until discovery had been completed.  The court framed the underlying policy issue as follows:  "Where keyword placement of . . . advertising is being sold, the portals and search engines are taking advantage of the drawing power and goodwill of these famous marks.  The question is whether this activity is fair competition or whether it is a form of unfair free riding on the fame of well-known marks."  Id. at 704 (citing J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 25:70.1 (2004)).  The court concluded that the issues of whether defendants' uses are legitimate fair uses of the trademarks in competition and whether they create a likelihood of confusion are fact-specific issues not properly resolved through a motion to dismiss.  Id.[1]

In Google, Inc. v. American Blind and Wallpaper Factory, Inc., 2005 WL 832398 (N.D. Cal. March 30, 2005) (unpublished decision), defendants moved to dismiss American Blind's claims of trademark infringement and unfair competition and related claims on the ground that American Blind had not alleged actionable trademark "use" under § 1114(1)(a) and § 1125(a)(1) and (c).  The court stated that it had carefully considered the arguments and authorities presented by defendants but found their arguments were not sufficient in light of the uncertain state of the law to warrant dismissal of the claims at the pleading stage.  Id. at 5.  Rather, the court determined after examining the relevant legal authorities that resolution of the novel legal issues presented by the case

---

[1] Following a bench trial, the Court determined that the plaintiff had failed to establish a likelihood of confusion stemming from Google's use of GEICO's trademark as a keyword.

should await development of a full factual record.  Id. at 6.

In Edina Realty v. TheMLSonline.com, 2006 WL 737064 (D. Minn. March 20,

2006), the court denied summary judgment on claims for trademark infringement under

the Lanham Act and related claims brought by plaintiff, holder of the trademark "EDINA

REALTY."  Defendant had purchased from Google and Yahoo search terms that usually

resulted in defendant's sponsored link advertisement appearing on the search engine

results page at the top of the list of websites generated in response to a consumer's search

for "Edina Realty," with the link to plaintiff's website appearing in a less noticeable

position further down the page.  In addition, defendant wrote the advertising text that

appeared in the sponsored link.  Defendant had also used plaintiff's mark in hidden links

and text on its website, with the hidden text including the phrase "Edina Realty." This

caused Internet search engines to place defendant's website higher up than natural results

in the list of websites responsive to a search for Edina Realty.  The court determined that,

> While not a conventional 'use in commerce,' defendant nevertheless uses the
> Edina Realty mark commercially.  Defendant purchases search terms that
> include the Edina Realty mark to generate its sponsored link advertisement.
> See Brookfield Communications, Inc. v. W. Coast Entm't Corp., 174 F.3d
> 1036, 1064 (9th Cir. 1999) (finding Internet metatags to be a use in
> commerce).  Based on the plain meaning of the Lanham Act, the purchase of
> search terms is a use in commerce.

Id. at *3.

The district court in 800-JR Cigar, Inc. v. GoTo.com, Inc., 437 F.Supp.2d 273 (D.

N.J. 2006) ruled as a matter of law on summary judgment that defendant GoTo was

making trademark use of JR Cigar's trademarks under §§ 1114 and 1125.  The court

described defendant GoTo's business practices as follows: GoTo is a pay-for-priority

Internet search engine which allows users to find information by entering a search term

and receiving a list of results.  GoTo solicits bids from advertisers for keywords or phrases

to be used as search terms, giving priority results on searches for those terms to the

highest-paying advertiser.  Advertisers pay GoTo only when a user "clicks" on their

listings in the search results.  GoTo lists unpaid or "natural" search listings, i.e., those sites

most logically relevant to the search criteria, after all paying advertisers' sites.  In addition

to accepting bids for search terms and earning revenue therefrom, GoTo assists

prospective and current advertisers in selecting search terms by providing an automated

tool that enables an advertiser to assess the usefulness of a search term.

Plaintiff brought suit after becoming aware that GoTo was selling to the non-search

engine defendants the right to use the plaintiff's mark "JR Cigar" and slight variations of

that term as Internet keywords or other devices to generate advertising revenues for GoTo.

The court determined that GoTo makes trademark "use" of the JR marks in the following

three ways:

> First, by accepting bids from those competitors of JR desiring to pay for prominence in search results, GoTo trades on the value of the marks. Second, by ranking its paid advertisers before any "natural" listings in a search results list, GoTo has injected itself into the marketplace, acting as a conduit to steer potential customers away from JR to JR's competitors. Finally, through the Search Term Suggestion Tool, GoTo identifies those of JR's marks which are effective search terms and markets them to JR's competitors. Presumably, the more money advertisers bid and the more frequently advertisers include JR's trademarks among their selected search terms, the more advertising income GoTo is likely to gain.

Id. at 285.

The court in Buying for the Home, LLC v. Humble Abode, LLC, et al., 2006 WL 3000459 (D. N.J. Oct. 20, 2006), after recognizing the split of authority and reviewing the varying decisions on the trademark use issue, concluded on summary judgment that plaintiff's allegations that defendant competitors purchased plaintiff's trademark as a keyword on Google's Internet search engine and used that keyword to trigger a sponsored link were sufficient to satisfy the "use" requirement of the Lanham Act. The Court noted that it was "mindful of the challenges that sometimes arise in applying existing legal principles in the context of newer technologies" and that defendants' alleged use of plaintiff's trademark "is certainly not a traditional 'use in commerce.'" Id. at *8 (citing Edina Realty, 2006 WL 737064 at *3). The court nonetheless found that plaintiff had satisfied the "use" requirement of the Act because defendants' alleged use of plaintiff's mark was "in commerce" and was "in connection with any goods or services." Id. The court found that the purchase traded on the value of plaintiff's mark and the mark was

allegedly used to trigger commercial advertising, which included a link to defendants'
furniture retailing website.  Id.  Therefore, the alleged use of the mark was tied to the
promotion of defendants' goods and retail services and was used to provide a computer
user with direct access, via a link, to defendants' website through which the user could
make purchases.  Id.  The Court stressed that a determination as to whether defendants'
alleged use of plaintiff's mark was unlawful could be made only after an examination of
all of the elements of plaintiff's claims, including the likelihood of confusion.  Id.

In Merck & Co., Inc. v. Mediplan Health Consulting, Inc., 425 F.Supp.2d 402
(S.D.N.Y. 2006) (unpublished decision), the court reached the opposite result and held that
the use of keywords in an Internet search to trigger sponsored links, and specifically
defendants' purchase of plaintiff's trademark "Zocor," does not constitute "use in
commerce" within the meaning of the Lanham Act. The court reasoned that defendants'
internal use of the mark "Zocor" as a keyword is not use of the mark in a trademark sense
since defendants do not "place" the ZOCOR mark on any goods, containers, displays or
associated documents or use them in any way to indicate source or sponsorship.  Id. at 415.
The court subsequently denied the plaintiff's motion to reconsider its decision in light of
the intervening decision in Edina Realty and other cases reaching a similar conclusion.
431 F.Supp.2d at 425, 426.  The court recognized the split of authority and acknowledged
the issue confronting it to be a difficult one.  Id.  The court noted that trademark use
ordinarily involves placing a trademark on goods or services to indicate that they emanate
from or are authorized by the owner of the mark.  Id. at 427.  The court reemphasized,

Here, in the search engine context, defendants do not 'place' the ZOCOR marks on goods, containers, displays, or associated documents, nor do they use the marks to indicate source or sponsorship. Rather, the marks are used only in the sense that a computer user's search of the keyword 'Zocor' will trigger the display of sponsored links to defendants' websites. This internal use of the keyword 'Zocor' is not use of the mark in the trademark sense; rather, this use is more akin to the product placement marketing strategy employed in retail stores, where, for example, a drug store places its generic products alongside similar national brand products to capitalize on the latter's name recognition. See id. at 411. The sponsored link marketing strategy is the electronic equivalent of product placement in a retail store.

For the reasons stated in the Opinion, I conclude that defendants' purchase from Google and Yahoo of the right to have their websites displayed as 'sponsored links' when a computer user searches the keyword 'Zocor' does not constitute trademark use. See Merck, at ---- n. 9, 2006 WL 800756, at *9. Moreover, here defendants actually sell Zocor, albeit Zocor manufactured by Merck's Canadian affiliates. Hence, there was nothing improper-in a trademark sense-with their purchase of sponsored links tied to searches of the keyword 'Zocor.'

Id. at 427. The court found defendants' use of the search engines to be comparable to pop-up advertisement schemes held to be non-infringing in other cases. Id. at 428.

In Rescuecom Corp. v. Google, Inc., 2006 WL 2811711 (N.D. N.Y. Sept. 28, 2006), the court reached a similar result. The court granted Google's motion to dismiss Rescuecom's trademark claims on the ground that Google's sale of Rescuecom's trademark to Rescuecom's competitors as a keyword that triggers the appearance of sponsored links to the competitors' websites is not a trademark use within the meaning of the Lanham Act. The court found that plaintiff could not establish trademark use by proving that Google was "capitalizing on the good will of plaintiff's trademark by

marketing it to plaintiff's competitors as a keyword in order to generate defendant's own advertising revenues, that plaintiff's competitors believed defendant is authorized to sell its trademark, or that Internet users viewing the competitors sponsored links are confused as to whether the sponsored links belong to or emanate from plaintiff." Id. at *5.  The court further found that even if true, plaintiff's allegation that Google's use of its mark prevents Internet users from reaching its website because an Internet user who has searched for Rescuecom cannot "click" on a sponsored link and access plaintiff's website simultaneously would not entitle plaintiff to relief.  Rather, the court found that plaintiff must have alleged that defendant made a trademark use of Rescuecom in the first instance. Id. at **5-6.  In addition, the court found plaintiff's allegation that defendant's activities alter search results was not sufficient to show trademark use in the absence of an allegation that any of the sponsored links displayed plaintiff's trademark.  Id. at *6. Finally, the court found defendant's internal use of plaintiff's trademark to trigger sponsored links is not a use of a trademark within the meaning of the Lanham Act because there was no allegation that defendant places its trademark on any goods, displays, containers, or advertisements or that its internal use is visible to the public.  Id. at *7.  The court concluded that in the absence of any such allegations or allegations that Google used plaintiff's trademark in a way that indicates source or origin, plaintiff could prove no facts in support of its claim which would demonstrate trademark use.  Id

B. <u>Metatags/initial interest confusion doctrine</u>

In a similar vein, other courts have examined whether the use of trademarks in "metatags"[2] violates the Lanham Act. Several courts have found a Lanham Act violation in this context based on a theory of initial-interest confusion, which occurs "when a manufacturer improperly uses a trademark to create initial customer interest in a product, even if the customer realizes, prior to purchase, that the product was not actually manufactured by the trademark-holder." See <u>Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP</u>, 423 F.3d 539, 549 (6th Cir. 2005), <u>cert denied</u>, 126 S.Ct. 2355 (2006). In <u>Brookfield Communications</u>, 174 F.3d 1036, the Ninth Circuit addressed Brookfield's request that defendant West Coast be enjoined from using marks confusingly similar to Brookfield's moviebuff.com mark in metatags and buried code. The court found that West Coast had acted affirmatively in placing Brookfield's trademarks in the metatags of its website but did not specifically consider whether this constituted a "use" within the meaning of the Lanham Act. <u>Id</u>. at 1065. The court instead addressed the likelihood of confusion element and determined that West Coast's use of "moviebuff.com" in metatags

---

[2] A "metatag" is invisible text within websites that is used by search engines for indexing. A metatag been described as "a list of words normally hidden in a web site that acts as an index or reference source identifying the content of the web site for search engines. This has been analogized to the subject index of a card catalog indicating the general subject of a book." 4 McCarthy, <u>Trademarks and Unfair Competition</u>, § 25:69 at 25-157 (4th ed.)

would result in initial-interest confusion. Id. at 1062. The court explained that,

> Web surfers looking for Brookfield's "MovieBuff" products who are taken
> by a search engine to "westcoastvideo.com" will find a database similar
> enough to "MovieBuff" such that a sizeable number of consumers who were
> originally looking for Brookfield's product will simply decide to utilize
> West Coast's offering instead. Although there is no source confusion in the
> sense that consumers know they are patronizing West Coast rather than
> Brookfield, there is nevertheless initial interest confusion in the sense that,
> by using "moviebuff.com" or "MovieBuff" to divert people looking for
> "MovieBuff" to its web site, West Coast improperly benefits from the
> goodwill that Brookfield developed in its mark. Recently, in [Dr. Seuss
> Enters. v. Penguin Books USA, Inc.], we explicitly recognized that the use
> of another's trademark in a manner calculated "to capture initial consumer
> attention, even though no actual sale is finally completed as a result of the
> confusion, may still be an infringement." Dr. Seuss, 109 F.3d 1394, 1405
> (9th Cir. 1997) (citing Mobil Oil Corp. v. Pegasus Petroleum Corp., 818
> F.2d 254, 257-58 (2d Cir. 1987).

Id.

In Tdata Inc. v. Aircraft Technical Publishers, 411 F.Supp.2d 901, 906 (S.D. Ohio

2006), Judge Frost of this district addressed whether plaintiff Tdata's use of defendant

ATP's trademarks as metatags in the program code of plaintiff's websites constituted a

violation of § 1125(a). Judge Frost initially rejected plaintiff's argument that the initial-

interest confusion doctrine cannot apply in Internet cases. Judge Frost found that the Sixth

Circuit in Gibson had left open the door for applying the doctrine in Internet cases, while

emphasizing that the ultimate inquiry is "whether the consumer might be misled about the

source of the relevant product or service." Id. at 906-07 (citing Gibson, 423 F.3d at 550,

n. 15, 551 ). Judge Frost noted that several other courts have found that the initial-interest

confusion doctrine applies "when a confusingly similar designation is used in a hidden

27

'metatag' on an Internet web site." Id. at 907 (citing 4 McCarthy, Trademarks and Unfair

Competition, § 23:6 (4th ed.)).  He specifically adopted the rationale provided by the

Ninth Circuit in Brookfield Communications, 174 F.3d at 1062:

> Using another's trademark in one's metatags is much like posting a sign with
> another's trademark in front of one's store. Suppose West Coast's competitor
> (let's call it "Blockbuster") puts up a billboard on a highway reading-"West
> Coast Video: 2 miles ahead at Exit 7"-where West Coast is really located at
> Exit 8 but Blockbuster is located at Exit 7. Customers looking for West
> Coast's store will pull off at Exit 7 and drive around looking for it. Unable to
> locate West Coast, but seeing the Blockbuster store right by the highway
> entrance, they may simply rent there. Even consumers who prefer West
> Coast may find it not worth the trouble to continue searching for West Coast
> since there is a Blockbuster right there. Customers are not confused in the
> narrow sense: they are fully aware that they are purchasing from Blockbuster
> and they have no reason to believe that Blockbuster is related to, or in any
> way sponsored by, West Coast. Nevertheless, the fact that there is only
> initial consumer confusion does not alter the fact that Blockbuster would be
> misappropriating West Coast's acquired goodwill.

Id.  Judge Frost held that this rationale applied to the Tdata case in which Tdata's use of

ATP's mark - "use resulting from the affirmative act of including the mark as a metatag -

can only serve to bring to Tdata's website potential customers, some of whom might never

have gone there but for use of ATP's mark." Id.  Judge Frost determined that "use of the

company's mark in metatags constitutes infringing use of the mark to pull consumers to

Tdata's website and the products it features, even if the consumers later realize the

confusion." Id.  Judge Frost also found, however, that the initial-interest confusion

doctrine is applicable as only one part of the eight-factor likelihood of confusion inquiry.

Id. at 908.

    In Australian Gold v. Hatfield, 436 F.3d 1228 (10th Cir. 2006), defendants, among

other alleged wrongful acts, used plaintiffs' trademarks in the metatags of their websites. The court recognized that initial interest confusion in the Internet context "derives from the unauthorized use of trademarks to divert Internet traffic, thereby capitalizing on a trademark holder's goodwill." Id. at 1239.  The court found that defendants' acts of using plaintiffs' trademarks on defendants' web sites, placing plaintiffs' trademarks in the metatags of defendants' websites, and paying to have their websites listed in a preferred position whenever a computer user searched for plaintiffs' trademarks, were all attempts to divert traffic to defendants' web sites. Id. at 1239.  The court noted that while viewing defendants' web sites, customers had the opportunity to purchase products from plaintiffs' competitors and that defendants continued to use the trademarks to divert Internet traffic to their web sites even when they were not selling products. Id.  The court therefore found that defendants used the goodwill associated with plaintiffs' trademarks in such a way that consumers might be lured to defendants' products from plaintiffs' competitors, which is a violation of the Lanham Act. Id.  The court went on to evaluate plaintiffs' claim for initial-interest confusion and determined that the district court had not erred in denying defendants' motion for judgment as a matter of law since the evidence on the likelihood of confusion did not point only in favor of defendants. Id. at 1240.

C. Pop-up advertisements

In contrast to decisions finding "use" of trademarks within the meaning of the Lanham Act or initial-interest confusion supporting a Lanham Act violation in the metatag context, a number of cases have found no trademark "use" within the meaning of the Lanham Act and consequently no violation of the Act in connection with the use of pop-up advertising.  In 1-800 Contacts, Inc. v. WhenU.com, Inc., 414 F.3d 400, 403 (2nd Cir.), cert. denied, 126 S.Ct. 749 (2005), the appellate court reversed the district court's grant of preliminary injunction in favor of plaintiff on its claims that defendant was infringing its trademarks in violation of §§ 1114 and 1125 by causing plaintiff's competitors' pop-up ads in defendant's "SaveNow" program, a proprietary software application, to appear on a computer user's desktop whenever the user accessed the plaintiff's website.  The court found no "use" of plaintiff's trademark by defendant within the meaning of the Lanham Act when defendant (1) includes plaintiff's website address, which is almost identical to plaintiff's trademark, in an unpublished directory of items that trigger delivery of defendant's contextually relevant advertising to computer users, or (2) causes separate, branded pop-up ads to appear on a computer user's computer screen either above, below, or along the bottom edge of the plaintiff's website window.

With regard to inclusion of plaintiff's website address in the SaveNow pop-up directory, the court noted at the outset that defendant does not use plaintiff's trademark in the manner normally at issue in an infringement claim.  That is, it "does not 'place' 1-800's trademarks on any goods or services in order to pass them off as emanating from or

30

authorized by 1-800. (citations omitted). The fact is that WhenU does not reproduce or display 1-800's trademarks at all, nor does it cause the trademarks to be displayed to a [computer user]." <u>Id</u>. at 408.  To the contrary, the court found that defendant reproduced plaintiff's website address, which was similar, but not identical to, plaintiff's trademark, and that the difference between the address and the trademark were significant because they transformed the trademark - which is entitled to protection under the Lanham Act - "into a word combination that functions more or less like a public key to 1-800's website." <u>Id</u>. at 408-09.  Moreover, the court found that defendant was using the website address precisely because it was a website address and not because it bore any resemblance to plaintiff's trademark since the only place defendant reproduced the address was in the SaveNow directory, which is inaccessible to both the computer user and the general public.  <u>Id</u>. at 409.  Therefore, the court found the appearance of plaintiff's website address in the directory does not create a possibility of visual confusion with defendant's mark. <u>Id</u>.  The court found that more importantly, a WhenU pop-up ad cannot be triggered by a computer user's input of plaintiff's trademark or the appearance of that trademark on a webpage accessed by the computer user.  <u>Id</u>.  The court determined that,

> A company's internal utilization of a trademark in a way that does not communicate it to the public is analogous to a individual's private thoughts about a trademark.  Such conduct simply does not violate the Lanham Act, which is concerned with the use of trademarks in connection with the sale of goods or services in a manner likely to lead to consumer confusion as to the source of such goods or services.  <u>See</u> 15 U.S.C. § 1127 . . .

<u>Id</u>.

The court went on to address whether the placement of pop-up ads on a computer user's computer screen contemporaneously with either the plaintiff's website or a list of search results obtained by the computer user's input of the plaintiff's website address constitutes "use" under the Lanham Act.  The court found that it did not because the pop-up ads appear in a separate window prominently branded with the WhenU mark, and the appearance of WhenU's pop-up ad is not contingent upon or related to plaintiff's trademark, the trademark's appearance on plaintiff's website, or the mark's similarity to plaintiff's website address, but by the fact that plaintiff chose to use a mark similar to its trademark as the address to its web page and to place its trademark on its web site.  Id. at 410.  The court also rejected the district court's suggestion that the crux of defendant's wrongdoing was its alleged effort to capitalize on computer user's specific attempts to access plaintiff's website and to thereby profit from the goodwill and reputation in the plaintiff's website that led the user to access that website in the first place.  Id.  The court found that absent improper use of plaintiff's trademark, such conduct does not violate the Lanham Act any more than does the placement of store-brand generic products next to trademarked products on store shelves.  Id.

The court specifically distinguished the case before it from the district court decision in GEICO and noted that, unlike several other Internet advertising companies, WhenU does not sell keyword trademarks to its customers or otherwise manipulate which category-related advertisement will pop up in response to any particular terms on the internal directory.  Id. at 411.  The court noted that WhenU does not link trademarks to

any particular competitor's ads and that a customer cannot pay to have its pop-up ad appear on any specific website or in connection with any particular trademark.  Id. at 412.

The court went on to reject plaintiff's argument that WhenU's conduct is "use" because it is likely to confuse computer users as to the source of the ad.  Id.  The court found that this rationale put the cart before the horse because "use" is a separate element from "in commerce" and "likelihood of confusion" that must be decided as a threshold matter.  Id. at 412.  The court rejected the rationale of cases that it found had conflated these distinct elements.  Id.

Similarly, in U-Haul Int'l, Inc. v. WhenU.com, Inc., 279 F.Supp.2d 723 (E.D. Va. 2003), the court granted summary judgment on the plaintiff's trademark claims brought under §§ 1114 and 1125 because it determined that the defendant's pop-up ads appearing in a separate window on an individual's computer, obstructing the trademark holder's advertisement, was not a "use in commerce" of the holder's trademarks as required to support claims for trademark infringement.  The court reasoned that first, the WhenU branded window is separate and distinct from the U-Haul website window.  Id. at 727. Second, "use" is not established merely because trademarks are simultaneously visible to a consumer since this is no more than comparative advertising.  Id. at 728.  Third, WhenU's inclusion of the U-Haul Uniform Resource Locator (URL) and U-Haul in its directory incorporated into the SaveNow program does not constitute "use" under the Lanham Act since WhenU does not sell the U-Haul URL to its customers nor display the U-Haul URL or the words "U-Haul" to the computer user when the ad pops up, and U-

Haul failed to adduce any evidence that WhenU uses U-Haul's trademarks to identify the source of its goods or services.  <u>Id</u>.  Fourth, WhenU's pop-up scheme does not interfere with the use of U-Haul's website by its customers and dealers because the SaveNow program does not interact with U-Haul's computer servers or systems.  <u>Id</u>.

In <u>Wells Fargo & Co. v. WhenU.com, Inc</u>., 293 F.Supp.2d 734 (E.D. Mich. 2003), a case on which Google heavily relies in support of its position, the plaintiff sought to enjoin as violative of trademark and copyright law the delivery of defendant's pop-up advertisements to customers who had affirmatively accepted the terms of the defendant's License Agreement.  The court denied the plaintiff's motion for preliminary injunction after making extensive findings of fact.  The court found that the advertisements and coupons that SaveNow delivers to a participating consumer's desktop appear in a window that is separate and distinct from any other window already open on the desktop; all SaveNow advertisements contain a notice stating, "This is a WhenU offer and is not sponsored or displayed by the website you are visiting;" WhenU's advertisements do not use any trademark registered to plaintiffs in the advertisements themselves; and URLs are included in the Directory only to identify the website itself for the purpose of determining the interests of participating consumers.  <u>Id</u>. at 745-747.  The court determined that WhenU does not use any of plaintiff's trademarks to identify goods or services, to indicate any sponsorship or affiliation with the goods or services advertised by WhenU, or to identify the source or origin of any goods or services advertised by WhenU.  <u>Id</u>. at 747. The court determined that WhenU advertisements do not appear "on" plaintiffs' websites,

34

since SaveNow "cannot and does not access the servers where plaintiffs' websites are physically located." and "[n]othing that an individual does in the window displaying one website interferes with data transmitted to or from another website." Id. at 747. The court further determined that WhenU advertisements do not "modify" plaintiffs' websites since SaveNow does not transmit, display or reproduce images of plaintiffs' websites. Id. at 748. Instead, SaveNow displays an image of an advertisement which contains a link to a site designated by an advertiser, and the consumer may "click" on the link if he so chooses. Id. Finally, the court determined that WhenU advertisements do not "frame" plaintiffs' websites, a term that refers to one webpage displaying the contents of another webpage within its own borders. Id. at 749.

## IX. Opinion

After carefully considering the governing statutes and the decisions that have been handed down in this area, the Court declines to grant judgment on the pleadings in favor of Google on its counterclaim. As is clear from the above review of the case law, whether an Internet search engine's sale of a trademark to advertisers as a keyword constitutes "use" of the mark within the meaning of the Lanham Act is far from a settled issue. Such "use" does not fit neatly within the terms of the Act. The computer technology at issue is new and rapidly evolving, and the legal principles to be applied predate the technological advancements that have enabled the parties to take advantage of the commercial opportunities afforded by the Internet. The Court must therefore apply the established law to a commercial situation that was not anticipated when the law was enacted. The Court

must do so bearing in mind the important policy issue presented; that is, whether an Internet search engine, by "taking commercial advantage of the drawing power and goodwill" of famous marks in this manner is engaging in "fair competition presenting web users with useful alternatives," or whether such activity "is a form of unfair free riding on the fame of well-known marks."  See 4 McCarthy, Trademarks & Unfair Competition § 25:70.1 at 25-175 (4th ed.).

The weight of authority holds that the practice of selling trademarks for use as keywords to trigger advertisements constitutes "use" of a trademark within the meaning of the Lanham Act, and CNG has made factual allegations suggesting that the elements of a Lanham Act violation, including the "use" element, may be satisfied in this case.  The Court is not convinced based on the record before it, however, that Google's sale of CNG's marks is an unlawful trademark "use" for which CNG is entitled to protection under the Act.  While the threshold "use" determination is ultimately a legal determination, the Court believes it will be in a better position to make the determination in this particular case once it has all of the facts before it.  Moreover, as indicated above, the question of whether Google's commercial conduct constitutes "use" of a trademark raises an important policy question.  The Court believes the existence of that policy issue counsels in favor of developing a full record before the Court resolves the legal issue before it.  In short, because the law is unsettled, important policy issues are at stake, and the record contains factual allegations suggesting that by selling the rights to link advertising to CNG's trademarks Google may be using the trademarks in commerce in a

manner that brings such conduct within the purview of the Lanham Act, the Court finds that the threshold "use" determination in this case is not properly made on a motion for judgment on the pleadings.

X.  <u>Conclusion</u>

In accordance with the foregoing, Google's Motion for Judgment on the Pleadings (doc. no. 24) is **DENIED.**

**IT IS SO ORDERED.**

Date: <u>11/20/06 </u>                                        <u>S/ Sandra S. Beckwith          </u>
                                                        Sandra S. Beckwith, Chief Judge
                                                          United States District Court