UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| CNG FINANCIAL CORPORATION | : |
| | :   Case No. 1:06-cv-040 |
|        Plaintiff/Counterclaim- | : |
|        Defendant, | :   Chief Judge Sandra S. Beckwith |
| | :   Magistrate Timothy S. Black |
|   vs. | : |
| | :   **CNG'S FINANCIAL** |
| GOOGLE INC. | :   **CORPORATION'S RESPONSE** |
| | :   **TO THE MOTION BY GOOGLE** |
|        Defendant/Counterclaim- | :   **TO COMPEL THE PRODUCTION** |
|        Plaintiff. | :   **OF DOCUMENTS** |

      CNG Financial Corporation ("CNG") has sued Google for trademark infringement and related causes of action. Google is selling, over CNG's objections, CNG's federally registered "Check 'N Go" trademark as a keyword search term to advertisers on Google's search engine website. As a result of this practice, internet users seeking to reach CNG's website by typing "Check 'N Go" into Google's search window are presented with "sponsored links" to the websites of numerous of CNG's competitors that have paid Google to appear on the search results page triggered by the "Check 'N Go" search.[1]

      As a remedy for this unauthorized diversion of CNG's business, CNG seeks to: (1) enjoin Google's further sale of CNG's Check 'N Go trademark and (2) require disgorgement of the profits earned by Google from its sale of same. Because of the difficulty of proving the quantum of lost sales (here, lost loans), and because the principle motive behind this case has

---

[1] A copy of CNG's website home page is attached as Exhibit A. A copy of a sample search page generated by a Google search of the term Check 'N Go is attached as Exhibit B. Copies of the websites to which the "sponsored links" appearing in Exhibit B are linked, none of which is sponsored or otherwise authorized by CNG, are attached as Exhibit C.

always been to stop Google's continued infringement and misappropriation of CNG's trademark, CNG has decided to forego its claim for compensatory damages. Yet, despite the fact that CNG is not suing Google for its lost profits or for any other measure of compensatory damage, Google still claims that it needs CNG to produce: (1) *all* of CNG's quarterly and annual audit financial statements and annual reports from January 1, 2001 to the present; (2) *all* corresponding notes and schedules; (3) *all* documents demonstrating CNG's monthly gross revenues from products and services sold under the Check 'N Go marks from the first use of those marks to the present; and (4) *all* documents demonstrating CNG's monthly profits and/or losses from products and services sold under the Check 'N Go marks from the first use of those marks to the present.[2]

Google has failed to establish the relevance of its extensive requests for CNG's financial documents and, despite a generally liberal granting of discovery requests, courts have often denied discovery of sensitive financial information where such discovery has no relevance to the pending claims. *See, e.g., Medtronic Sofamor Danek, Inc. v. Michelson,* No. 01-2373-M1V, 2003 WL 21946594, at *2 (W.D. Tenn. July 23, 2003) (stating that "unnecessary disclosure of financial information should be avoided"). Google's burdensome discovery requests in this case, seeking to require CNG to produce not only its audited financial statements but also each and every accounting document in CNG's possession relating to each and every item of revenue and expense recognized by CNG in its business operations, make no sense in the context of this case and should be denied.

---

[2] CNG has produced, both before and after Google's filing of its Motion to Compel, the financial information pertaining to Avante TelAvance, Inc., CNG's operating subsidiary that runs its internet lending operation. [Hunter Decl., ¶¶ 2, 5] In addition, undersigned counsel telephoned Google's counsel to attempt to get Google to place some limit on its request for additional financial documents; however, Google's counsel refused. [*Id.*, ¶ 6.]

## PROCEDURAL BACKGROUND

The merits of this case are extensively set forth in the papers addressing Google's Motion for Judgment on the Pleadings, which this Court denied by its November 21, 2006, Order. As such, CNG will not respond to the one sided and self-servicing characterization of the "facts" that Google recites as a prelude to its discovery motion.[3]

On the other hand, Google's blatant mischaracterization of the parties' efforts to resolve their discovery differences *does* warrant a response. Back on June 26, 2006, five full months before Google first communicated any concern with CNG's objection to producing its consolidated financial information, CNG plainly asserted that objection. Indeed in its response to Google's discovery requests CNG agreed to produce its documents reflecting the financial results of its online subsidiary (because it was at the time reserving its right to assert a lost profits claim based on the internet loans lost by that subsidiary), but it objected to producing any further financial information—including the consolidated financial information that Google now seeks. [Google's Memorandum, pp. 4-5; *see also* Hunter Decl., ¶3.]

After six months of apparent acquiescence to CNG's position in this regard, on November 27, 2006, Google's counsel suddenly complained about perceived deficiencies in CNG's initial financial production and abruptly demanded immediate production of the consolidated financial information to which CNG had long objected.[4] Rather than discussing this position with CNG's counsel, who on November 27 and for days thereafter was in their presence in California taking Google's witnesses depositions, they instead faxed their November 27 discovery demands to

---

[3] Plainly, Google could provide all of the beneficial information it claims to provide to its internet users searching for payday lenders through the use of non-trademarked search terms such as "cash advance", "payday loan", and the like. And it is notable that other major search engines, such as Yahoo, are able to service their internet users without selling competitor's trademarks to their advertising customers.

[4] The financial information about which Google first complains in its November 27 correspondence was already produced in early June, 2006, along with CNG's initial Rule 26(a) disclosures. [Hunter Decl. ¶3.]

CNG's counsel's Kentucky offices—where they knew he was not present. [Hunter Decl., ¶3.] On December 6, upon his return from California, CNG's counsel undertook to promptly provide additional financial information concerning the internet loans, and he reiterated his objection to Google's requests for additional consolidated financial information. [Exhibit K to Google's counsel's Declaration; *see also* Hunter Decl., ¶4.] In addition, CNG's counsel attempted to reach a compromise, based on his withdrawing of CNG's claim for lost profits, to limit the scope of Google's requests for additional financial. This attempt was flatly rejected by Google's counsel. [Hunter Decl. ¶6.]

According to Google's counsel's Declaration, "[CNG indicated that it] planned to wait until the Friday before the scheduled depositions to produce such documents." In fact, what CNG's counsel told Google's counsel was that, *unlike Google,* who produced to CNG's counsel thousands of pages of critically relevant documents on the last business day preceding CNG's depositions of Google, CNG would *not* reciprocally engage in such discovery abuse. [Hunter Decl., ¶4.][5] Indeed, as promised, CNG has already produced its supplementation of the discovery which Google prematurely nit-picked in its initial moving papers, thereby rendering moot much of the petty criticisms contained in that Motion. [Hunter Decl., ¶5.]

In addition, apart from the governing legal principles that, as demonstrated below, render CNG's profits wholly irrelevant to the equitable relief CNG seeks in this case, simple common sense demonstrates the speciousness of Google's claims. According to the public policy argument advanced by Google in its moving papers, "CNG may actually lose money on the services it seeks to provide over the internet…[or it may]…make so minimal an amount from

---

[5] CNG took Google's depositions on the Monday, Tuesday, and Wednesday following the Thanksgiving holidays. At noon on the Wednesday preceding Thanksgiving, Google delivered a CD containing thousands of pages of documents reflecting that, contrary to what Google had sworn in its interrogatories answers and of obvious relevance to CNG's claim for contributory infringement, Google *had* encouraged the payday lending companies appearing on its "Check 'N Go" search page to purchase "Check N Go" as a keyword search term from Google. *Id.*

4

transactions coming through its website that it has not really suffered any substantial losses as a result of Google's alleged actions...."[6] However, in making this argument Google wrongly assumes that the only business CNG seeks to promote over the internet is the online lending operation run out of its wholly-owned subsidiary, Avante TelAvance, Inc. (which is a new, developing line of CNG's business).

Google's professed reason for wanting to review all documents in CNG's possession pertaining to any and all items of its financial results is to determine whether all of CNG's overhead and consolidated expenses have been properly assigned to CNG's online subsidiary's normal course financial statements, which have been produced by CNG and which show a substantial profit. However even if, as posited by Google, these ordinary course financial statements have overstated the profitability of CNG's online lending operation, such a fact would not be probative of anything in this case. This is so because, in addition to the online lending operations, CNG's website also advertises and promotes the brick and mortar operations (1400+ stores) that serve as the bedrock of CNG's financial enterprise. [Exhibit A.] And while substantial criticism has been leveled against CNG's operating subsidiaries' payday lending operations (as it has been leveled against all participants in that industry), CNG is not aware that anyone has ever questioned the profitability of those operations.

Google does not suggest that it needs to see CNG's financials to determine the profitability of CNG's overall operations—all of which are promoted in the CNG website from which Google has diverted away traffic. Thus, even if the profitability of those operations were relevant in this case (which as demonstrated below they are not), and even if Google could

---

[6] Google claims that if CNG's competitors are willing to pay more money to Google then CNG loses as a result of Google's infringement, then that is a basis for denying injunctive relief. This extraordinary assertion, that an infringer should be permitted to continue to infringe another's trademark if it derives sufficient profit from the wrongdoing is, not surprisingly, directly contravened by the governing legal authorities discussed below.

5

represent to this Court that it doubts the profitability of CNG's overall operations (which plainly it cannot), Google's avowed concerns about whether CNG is making money from its payday lending operations could be disabused by a simple review of CNG's audited income statement. Google would still have no need for the further extensive financial disclosures that it has stubbornly demanded in this case—*a case where CNG is not asserting any claim for lost profits.*

## ARGUMENT

### A. CNG's Financials Are Not Relevant to CNG's Request for an Injunction.

CNG is not required to show any actual economic harm in order for this Court to enjoin Google from continuing to infringe on CNG's trademark. Thus, CNG's financial statements are not relevant to its request for an injunction, and Google's motion should be denied.

When seeking an injunction, a plaintiff must demonstrate irreparable injury and no adequate remedy at law, and the court must balance the hardship to the plaintiff if the relief is not granted, that to the defendant if granted, and the public's interest in the issuance of the injunction. *See Audi AG v. D'Amato*, No. 05-2359, 2006 U.S. App. LEXIS 29127, at *35 (6th Cir. Nov. 27, 2006). Google attempts to present this balancing as a purely economic analysis – in other words, which party stands to lose more money. However, it is well-established in this Circuit that once the owner of a mark has established a likelihood of or actual confusion, harm or damage is presumed for purposes of entering an injunction. *See Abercrombie & Fitch v. Fashion Shops of Ky., Inc.*, 363 F. Supp. 2d 952, 966 (S.D. Ohio 2005) (granting plaintiff's motion for a preliminary injunction after finding that "[i]rreparable injury is presumed as a result of a finding of a likelihood of confusion for purposes of the Lanham Act"); *OmniAmerica v. St. Gold Records, Ltd.*, 916 F. Supp 672, 680 (N.D. Ohio 1996) (entering a preliminary injunction and stating "if the court agrees with OmniAmerica that it can show…consumer confusion, the Court

may presume irreparable injury"); *Cent. Benefits Mut. Ins. Co. v. Blue Cross & Blue Shield Assoc.*, 711 F. Supp. 1423, 1434 (S.D. Ohio 1989) ("Trademark infringement by nature is generally irreparable and the showing of a high probability of confusion almost invariably gives rise to irreparable harm."). Thus, although this Court should balance the equities before issuing an injunction, in the trademark infringement context this analysis does not include a comparison of economic impact. Google's failure to cite a case stating otherwise is telling.

Despite Google's repeated insinuations that CNG decided to forego its claim for compensatory damages because of some grand scheme to conceal its finances, in actuality courts, including those in the Sixth Circuit, have long-recognized the difficulty of proving such damages. *See Vining Indus., Inc. v. M.B. Walton, Inc.*, Case No. C-3-96-314, 1997 U.S. Dist. LEXIS 23763, at *29-*30 (S.D. Ohio March 20, 1997) (finding that "[t]he Plaintiff will suffer irreparable harm if the Defendant is not enjoined, because it will be difficult (if not impossible) for the Plaintiff to prove damages"). Because of this difficulty of proving damages and the inevitable "impairment of intangible values" that occurs when a party's trademark is infringed, *see Vining Indus.*, 1997 U.S. Dist. LEXIS 23763, at *28-*29 (noting that "a finding of irreparable harm will normally flow from a finding of likelihood of confusion" because of "the difficulty in proving damages and from the impairment of intangible values"), the presumption of harm arises regardless of any showing of economic loss. Thus, CNG does not have to show any economic harm to obtain an injunction. *See, e.g., Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1091 (7th Cir. 1988) (balance of the equities favored the plaintiff, even though the plaintiff failed to establish loss of business or profits as a result of the defendant's infringement, because "the owner of a mark is damaged by a later use of a similar mark which place[s] the owner's reputation beyond its control, *though no loss in business is shown*.")

7

(citation omitted). Because CNG need not make any showing of economic loss to obtain an injunction, Google's motion to compel production of CNG's financial documents should be denied as irrelevant to any of CNG's claims or defenses.

> **B.  CNG's Financials Are Not Relevant to CNG's Request for Disgorgement of Profits.**

Preliminarily, even if Google were correct in its assertion that a plaintiff needs to prove that it lost sales to an infringing defendant in order to recover a disgorgement of the defendant's profits, Google would still not be entitled to discovery into CNG's financials, in a case where CNG is not seeking to prove lost profits. Instead, if Google is correct here, it only means that CNG cannot require Google to disgorge its profits from its sale of CNG's trademark—not that CNG's financials are relevant to this case. In any event, Google is not correct. Google *can be* required to disgorge the profits it has earned by its wrongful sale of CNG's "check n go" trademark without any showing that CNG has lost profits as a result of Google's willful infringement.

Google's only cited case for its argument that CNG's financials are relevant to its request for disgorgement is one out of the District of Hawaii. *See Sugai Prods., Inc. v. Kona Kai Farms, Inc.*, No. 97-00043 SPK, 1997 U.S. Dist. LEXIS 21503 (D. Haw. Nov. 19, 1997). In *Sugai Products*, the court discussed the plaintiffs' disgorgement claim in the context of deciding whether to grant class certification. The court thus made its statement concerning the need to evaluate specific injuries and damages for each plaintiff as part of its decision to deny such certification in light of too many individualized issues. *Id.* at *44-*47. This case is clearly distinguishable in light of the fact that the court was not directly speaking to a request for disgorgement, and because the court was discussing Ninth Circuit law. *Id.* at *45 ("Under *Ninth*

8

*Circuit law*, plaintiffs may seek disgorgement where…") (emphasis added). In fact, even under Ninth Circuit law, where the defendant infringer is not a direct competitor of the plaintiff, disgorgement is appropriate "to prevent unjust enrichment," not just as compensation for lost profits. *Id.*

Courts in this Circuit have not conditioned disgorgement of profits of a willful infringer on a showing of economic harm to the party so infringed. The only generally-stated standard is that "[a]n element of bad faith or willfulness is usually necessary." *Frisch's Rests., Inc. v. Elby's Big Boy*, 849 F.2d 1012 (6th Cir. 1988).[7] In fact, the Sixth Circuit has cited with approval cases holding that the owner of a mark need not prove the infringement caused him to lose any sales. *See Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 606 (6th Cir. 1991). Any risk of a windfall or speculative award falls on the infringer, because "both common sense and the statute suggest that the burden of apportioning the profits should be placed on the defendants." *Id.*[8]

This Court has further recognized that "an accounting under Section 35(a) of the Lanham Act is appropriate under three alternative situations: (1) if the plaintiff sustained damage from the infringement, (2) if the infringer is unjustly enriched, and (3) if necessary to deter a willful infringer from doing so again." *Frisch's Rest., Inc. v. Elby's Big Boy*, 661 F. Supp. 971, 989 (S.D. Ohio 1987); *see also Wynn Oil*, 943 F.2d at 607 ("Profits are awarded under different rationales including unjust enrichment, deterrence, and compensation.") (citation omitted). Thus, Google's assertion that, absent a showing of economic harm, "plainly CNG would not be entitled to receive a windfall award of whatever monies Google has obtained," is clearly not the law in

---

[7] Even this requirement is questionable. *See J-Rich Clinic, Inc. v. Cosmedic Concepts, Inc.*, No. 02-CV-74324-DT, 2006 WL 2473478, at *3 (E.D. Mich. Aug. 25, 2006) (in light of 1999 amendments to the Lanham Act, certifying for interlocutory appeal the question, "Is a finding of willfulness or bad faith a mandatory prerequisite to an accounting for profits under § 35(a) of the Lanham Act?").

[8] Moreover, *Balance Dynamics v. Schmitt Industries*, 204 F.3d 683, 695 n.6 (6th Cir. 2000), makes it clear that a plaintiff can recover a defendant's profits, without any showing that it has lost profits, where it can show that the defendant gained its profits as a result of its wrongful conduct. CNG can easily make such a showing in this case, where CNG's competitors are paying Google to use CNG's trademark on Google's AdWords Program.

this Circuit. Preventing unjust enrichment and deterrence provide two other situations in which CNG could recover. Because CNG need not show lost profits or other economic harm in order to obtain disgorgement of Google's profits, Google's request for CNG's financials is irrelevant, and its motion should be denied.

### C. CNG's Claim For Punitive Damages Does Not Make CNG's Financials Discoverable.

Here, again, if CNG is correct that it can recover punitive damages without proving the quantum of damage it has suffered from Google's wrongful conduct in this case, then CNG's financials are irrelevant. Alternatively, if Google is correct that proof of compensatory damage is the *sine qua non* of a punitive damages claim, then CNG cannot recover punitives in this case, where it is not seeking to prove its compensatory damages. Either way, CNG is still not requesting any lost profits or other compensatory damages, and discovery into CNG's financials is thus not warranted.

### CONCLUSION

In sum, for all of the foregoing reasons, Google's Rule 37 Motion should be denied. Alternatively, if this Court determines that Google is entitled to confirm that CNG is making money from the activities it promotes on its website, *i.e.* its entire payday lending operation, then the Court should limit Google's discovery to CNG's audited financial statements.

Respectfully submitted,

/s/ Barry D. Hunter
Ann Gallagher Robinson
Frost Brown Todd, LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, OH 45202-4182
Tel.: (513) 651-6800
Fax: (513) 651-6981

Barry D. Hunter
Medrith Lee Norman
Frost Brown Todd LLC
250 West Main Street, Suite 2700
Lexington, Kentucky 40507
(859) 231-0000
(859) 231-0011-fax

Attorneys for CNG FINANCIAL
CORPORATION

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was electronically filed with the Clerk of the Courts using the CM/ECF, system which will send notification of such filing to the following, this 8th day of January, 2007:

Kenneth F. Seibel, Esq.
Jacobs, Kleinman, Seibel & McNally
2300 Kroger Building
1014 Vine Street
Cincinnati, OH  45202

Michael H. Page, Esq.
Klaus H. Hamm, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA  94107

/s/ Barry D. Hunter
Attorney for Plaintiff/Counter Defendant

LEXLibrary 0102393.0533475  322194v.1