UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CNG FINANCIAL CORPORATION,

       Plaintiff/Counterclaim-Defendant,

    v.

GOOGLE INC.,

       Defendant/Counterclaim-Plaintiff.

Case No. 1:06cv040

Chief Judge Sandra S. Beckwith
Magistrate Timothy S. Black

**REPLY BRIEF IN SUPPORT OF
SUMMARY JUDGMENT**

Dockets.Justia.com

## TABLE OF CONTENTS

<u>Page</u>

I.     INTRODUCTION ........................................................................................1

II.    FACTS ......................................................................................................2

III.    ARGUMENT.............................................................................................3

      A.    CNG has no evidence that Google uses its trademark as a trademark.....................3

           1.    Because trademark use and confusion are separate inquiries, CNG's confusion survey is not evidence of use. ........................................5

           2.    CNG's argument for a new definition of "relevant" is not evidence of use.........................................................................7

           3.    The only case with similar facts decided under Sixth Circuit precedent favors Google. ..........................................................10

      B.    CNG has not come forward with evidence that consumers are likely to be confused about the source of Sponsored Links advertising its competitors..........................................................................11

           1.    Without actual confusion evidence, CNG cannot prove a likelihood of confusion. ..........................................................11

           2.    Because CNG's survey did not test for a likelihood of confusion, CNG does not have likelihood of confusion evidence. ..........................................................................13

      C.    CNG is not entitled to an injunction because it cannot show that it suffers irreparable harm. ..........................................................19

      D.    The CDA preempts CNG's state law claims. ......................................19

IV.    CONCLUSION.......................................................................................20

394052.02

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*1-800 Contacts, Inc. v. WhenU.com, Inc.*,
   414 F.3d 400 (2d Cir. 2005).............................................................................6

*American & Foreign Insurance Co., Inc. v. Sequatchie Concrete Services, Inc.*,
   441 F.3d 341 (6th Cir. 2006) .........................................................................4

*Audi AG v. D'Amato*,
   469 F.3d 534 (6th Cir. 20060.....................................................................12, 19

*AutoZone, Inc. v. Tandy Corp.*,
   373 F.3d 786 (6th Cir. 2004) ...................................................................12, 16

*Conagra, Inc. v. Hormel & Co.*,
   784 F.Supp. 700 (D. Neb. 1992)......................................................................18

*Connectel, LCC v. ITXC, Inc.*,
   2004 U.S.Dist. LEXIS 4628 (E.D. Penn. 2004) ...................................................17

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*,
   109 F.3d 275 (6th Cir. 1997) .........................................................................12

*Daubert v. Merrell Dow Pharms.*,
   509 U.S. 579 (1993)..................................................................................14, 16

*Deal v. Hamilton County Board of Education*,
   392 F.3d 840 (6th Cir. 2004) ..........................................................................18

*General Motors Corp. v. Lanard Toys, Inc.*,
   468 F.3d 405 (6th Cir. 2006) ............................................................................4

Google Inc. v. American Blind & Wallpaper Factory, Inc.
   No. 03-5390 JF (N.D. Cal. 2007)................................................................11, 18

*Government Employees Ins. Co v. Google Inc.*,
   2005 WL 1903128, at 7 (E.D. Va. 2005).......................................................12, 19

*Hamzik v. Zale Corp.*,
   2007 U.S.Dist. LEXIS 28981, at *8 (N.D.N.Y. 2007) ...........................................11

*Holiday Inns, Inc. v. 800 Reservation, Inc.*,
   86 F.3d 619 (6th Cir. 1996) .........................................................................5, 6

*Interactive Products Corp. v. a2z Mobile Office Solutions, Inc.*,
   326 F.3d 687 (6th Cir. 2003) ...........................................................................5

*Ironclad L.P. v.Poly-America, Inc.*,
   2000 U.S.Dist. LEXIS 10728 (N.D. Tex.)............................................................18

## TABLE OF AUTHORITIES
### (cont'd)

**Page(s)**

*Leelanau Wine Cellars  v. Black & Red, Inc.,*
 452 F.Supp.2d 772 (W.D. Mich. 2006) ...........................................................................13, 19

*Major League Baseball Properties, Inc. v. Sed Non Olet Denarius Ltd.,*
 817 F.Supp. 1103(S.D.N.Y. 1993) ..........................................................................................18

*Martin v. Blaser Swisslube, Inc.,*
 2005 U.S.Dist. LEXIS 33859 at * 21 (D. N.J. 2005)...........................................................16, 17

*Merisant Co. v. McNeil Nutritionals LLC,* 2007
 2007 U.S. Dist. LEXIS 27681 (E.D. Pa. April 12, 2007 ...........................................................17

*National Football League Properties, Inc. v. ProStyle, Inc.,*
 57 F.Supp.2d 665 (E.D. Wis. 1999)...........................................................................................18

*Padillas v. Stork-Gamco, Inc.,*
 186 F.3d 412 (3d Cir. 1999).........................................................................................................16

*Perfect 10, Inc. v. CCBill LLC,*
 2007 U.S.App. LEXIS 7238 (9th Cir. 2007) ...........................................................................20

*Prestonettes v. Coty,*
 264 U.S. 359 (1924)........................................................................................................................6

*Prudential Insurance Co. v. Gibraltar,*
 694 F.2d 1150 (9th Cir. 1982) ...................................................................................................17

*Rock & Roll Hall of Fame and Museum, Inc. v. Gentile Productions,*
 71 F.Supp.2d 755 N.D. Ohio 1999).............................................................................................6

*Simon Property Group L.P. v. mySimon, Inc.,*
 104 F.Supp.2d 1033 (S.D. Ind. 2000) ......................................................................................13

*Spraying Systems Co. v. Delavan, Inc.,,*
 975 F.2d 387 (7th Cir. 1992) .....................................................................................................17

*Therma-Scan, Inc v. Thermoscan, Inc.,*
 295 F.3d 623 (6th Cir. 2002) .....................................................................................................13

*Universal City Studios, Inc. v. Nintendo Co.,*
 746 F.2d 112 (2d Cir. 1984).......................................................................................................17

*Wells Fargo & Co. v. WhenU.com, Inc.,*
 293 F.Supp.2d 734 (E.D. Mich. 2003).......................................................................................11

*Whirlpool Properties Inc. v. LG Electronics U.S.A.,*
 2006 U.S.Dist. LEXIS 1378 ................................................................................................17, 18

TABLE OF AUTHORITIES
(cont'd)

Page(s)

**STATE CASES**

*Wright v. Dayton,*
  814 N.E.2d 514 (Ohio App. 2004)...................................................................................20

**FEDERAL STATUTES**

47 U.S.C. § 230(c)...........................................................................................................19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CNG FINANCIAL CORPORATION,

        Plaintiff/Counterclaim-Defendant,

        v.

GOOGLE INC.,

        Defendant/Counterclaim-Plaintiff.

Case No. 1:06cv040

Chief Judge Sandra S. Beckwith
Magistrate Timothy S. Black

**REPLY BRIEF IN SUPPORT OF
SUMMARY JUDGMENT**

## I.    INTRODUCTION

      CNG's opposition relies on rewriting both trademark law and the meaning of the word "relevant." Trademark use is a threshold requirement under the Lanham Act, and to meet it a plaintiff must demonstrate that the defendant uses the asserted trademark to identify the source of its goods or services. In this case, the issue boils down to whether a Sponsored Link appearing in response to a search for "Check 'N Go," along with a list of 99,600,000 other website links, implicitly represents that CNG is the source of the ad. The answer is of course not. Google's search engine displays all links—sponsored or otherwise—that it finds that are relevant to a query, not just those affiliated with the owner of a particular trademark. The millions of results have millions of sources and, thus, without more, the fact that a particular result appeared with millions of others in response to a particular query does not represent anything about the result's source. The appearance of a link is an indicia only that the link is relevant to the search query.

      To get around these facts, CNG first attempts to rewrite the Lanham Act's use requirement. It argues that likelihood of confusion evidence should be considered when determining whether Google has used its mark. Relying on its incorrect reading of the use requirement, CNG offers as evidence its (flawed) confusion survey and argues that because there is (supposedly) confusion, there must be use. But, in accordance with controlling law, the Court

already has ruled that CNG cannot take this route because the "use" is a "prerequisite . . . that must be satisfied before an inquiry into the likelihood of confusion becomes relevant."[1]

CNG next crafts an unrecognizable definition of the word "relevant." It contends that a link to an Irish airline is relevant to a search for "Check 'N Go" (which is the name of CNG's payday lending business) but that links to its competitors in the payday lending business are not. With this theory of relevance as its basis, CNG argues that because Google users expect to see only relevant search results, the appearance of any links promoting payday lending services other than CNG's will be so unexpected that searchers will simply assume CNG is the source. The problem with this argument, of course, is that it is completely counterfactual. Links to CNG's competitors are relevant to "Check 'N Go"; the competitors and CNG are in the same business and a customer of one business is a potential customer of the other. So their appearance does not signify that CNG is their source. Instead, along with the other search results, their appearance signifies only that the Sponsored Links are relevant to the term "Check 'N Go."

Because Google does not use CNG's trademark, the Court should not reach the issue of whether Google's use of the mark is likely to cause consumer confusion. But, in any case, CNG has no admissible evidence that consumers are likely to be confused. CNG's only evidence is a survey so flawed that it does not even ask the right question. Instead of measuring confusion caused by use of CNG's trademark as a triggering criterion for Sponsored Links, the survey measures confusion caused by different variations of Sponsored Link text. As a result, the survey is irrelevant to the issues in this case. Without admissible evidence about consumer confusion, CNG cannot prove likelihood of confusion.

## II.    FACTS

Because Google details the relevant facts in its opening brief, it does not do so again here. Suffice it to say that the material facts are not in dispute. CNG concedes that Exhibit A to the Hamm Declaration is an accurate representation of a Google search results page for the query "Check 'N Go." That page displays ten search results and indicates that approximately 99,600,000 results appear on subsequent pages. The displayed results include links to CNG's

---

[1] Order (D.I. 35) at 16.

website, to the discount Irish airline Ryanair's online check in system, and to a website advertising a golfing gizmo called the Check-Go Sweet Spot Finder. Above the search results in a shaded box labeled "Sponsored Link" is an advertisement titled "Loans" for the www.MyCashNow.com website. And, in a column on the right side of the search results under the heading "Sponsored Links" are ads for eight other websites, each with their website address displayed in green font. None of the Sponsored Links contain the phrase "Check 'N Go" or any other phrase that CNG has asked Google to block from appearing in Sponsored Links.

This printout—a similar version of which the Court can replicate by conducting a search on Google—is the key piece of evidence necessary for the court to decide Google's motion for summary judgment. The parties dispute only the legal implications of this results page. Other relevant evidence includes Google's trademark procedure and correspondence between the parties: it is undisputed that "Check 'N Go" does not appear in any of the Sponsored Links because CNG requested Google to prevent the phrase from appearing in them and Google honored that request, pursuant to it trademark policy.[2] The final relevant evidence is a recommendation from the federal government agency dedicated to protecting consumers—the Federal Trade Commission—that search engines label advertisements as "Sponsored Links" and segregate them from natural search results in order to make it clear that they are paid advertisements.[3] CNG disputes none of this evidence. And, for reasons explained below and in Google's accompanying Motion to Strike Evidence Submitted By CNG In Opposition to Google's Motion For Summary Judgment, the evidence cited by CNG is inadmissible and not relevant to the question of whether Google uses CNG's trademark as a trademark.

### III.    ARGUMENT

**A.    CNG has no evidence that Google uses its trademark as a trademark.**

CNG has come forward with no evidence to preclude summary judgment on the

---

[2] For a description of these policies, see pages 5-6 of our opening brief and the evidence cited therein. For a description of the correspondence between Google and CNG, see pages 8-9 of our opening brief and the evidence cited therein.

[3] Declaration of Klaus H. Hamm In Support of Google's Motion for Summary Judgment ("Hamm Decl.") Ex. E.

trademark use issue. CNG's brief criticizes Google for seeking to have "this case decided on rhetoric rather than evidence."[4] This argument ignores the allocation of burdens at summary judgment. On summary judgment, the moving party's burden is to show the *absence* of a disputed material fact. As the summary judgment standard case cited by CNG points out, "[t]he burden is generally on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."[5] Once the moving party makes this showing, the burden shifts and "the nonmoving party must produce specific facts demonstrating a genuine issue of fact for trial if it is to withstand summary judgment. Where the defendant demonstrates that after a reasonable period of discovery the plaintiff is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment should be granted."[6]

Although Google has provided evidence and argument about why it does not use CNG's trademark, CNG cites no evidence showing that Google uses its mark. The principal evidence CNG relies upon—its survey—goes to confusion, not use. Other than that, CNG relies only on argument that its competitors' ads are not relevant to a search for "Check 'N Go." CNG argues that these supposedly competitive ads are so unexpected—while a user might expect a link to CNG's website, or to an article about CNG, or to an Irish airline, it would not expect a link to CNG's competition—that users simply assume that CNG is the source, while reserving judgment about the source of the many other links that appear. But CNG has no evidence backing its self-serving definition of relevance, and the evidence it does cite—such as inadmissible employee declarations that CNG's competitors are "fly-by-night" operators—does not advance its theory.

---

[4] CNG Financial Corporation's Memorandum In Opposition To Google's Motion for Summary Judgment ("Opp'n") at 2.

[5] *General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006) (internal quotations omitted).

[6] *American & Foreign Ins. Co., Inc. v. Sequatchie Concrete Servs., Inc.*, 441 F.3d 341, 344 (6th Cir. 2006) (citations and quotations omitted).

1.    **Because trademark use and confusion are separate inquiries, CNG's confusion survey is not evidence of use.**

CNG cannot will the trademark use requirement out of existence. It is part of the Lanham Act, and recognized not just by the Sixth Circuit but also by *this Court in this litigation*. It requires trademark use to be decided before considering trademark confusion evidence. Nevertheless, CNG pushes for an interpretation that not only defies this Court's earlier ruling, but renders the use requirement a nullity. CNG argues that the requirement's "sole purpose is to insure that there exists a sufficient risk of source confusion to warrant a full fledged confusion inquiry."[7] Consistent with its vision that the use requirement is merely a first cut at the confusion analysis, CNG devotes the first subsection of its trademark use analysis to the argument that its user confusion survey is evidence that Google uses its trademark as a trademark. Section B(1), titled "The use of a trademark as a keyword trigger is in a source signifying way," relies on the survey's conclusion that people are confused about the source of the Sponsored Links at issue to argue that, as a result, Google must use the links in a source-identifying way.[8] CNG asks this Court to skip the use inquiry and simply conclude that because there supposedly is confusion there must be use.

CNG's description of the use requirement is wrong and the evidence it attempts to inject into the use analysis is improper. Ruling on Google's Motion For Judgment On The Pleadings, this Court held that use is "the threshold issue in this case" and that CNG must demonstrate use "*before an inquiry into a likelihood of confusion becomes relevant.*"[9] The Court's ruling was unambiguous and mirrors the Sixth Circuit's equally unambiguous rulings that a plaintiff must prove use before "argui[ng] that a likelihood of confusion exist[s]"[10] and that if there is no trademark use it is "unnecessary for the district court to examine the eight factors traditionally used to determine likelihood of confusion."[11]

---

[7] Opp'n 11.

[8] Opp'n 12-13.

[9] Order (D.I. 35) at 16 (emphasis added).

[10] *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 625 (6th Cir. 1996).

[11] *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 698 (6th Cir.

As a result, survey evidence about a likelihood of confusion is not evidence that a defendant used a plaintiff's trademark as a trademark. In *1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400, 412 (2d Cir. 2005), which involved a similar infringement theory regarding Internet pop-up advertising, the plaintiff attempted the exact strategy that CNG employs here. It argued that the defendant's conduct "is 'use' because it is likely to confuse []users as to the source of the ad."[12] And it "buttress[ed] this claim with a survey it submitted to the district court that purportedly demonstrates … that … a majority of []users believe that pop-up ads that appear *on* websites are sponsored by those websites[.]"[13] The Second Circuit rejected mixing and matching trademark infringement elements, explaining that "this rationale puts the cart before the horse. Not only are 'use,' 'in commerce,' and 'likelihood of confusion' three distinct elements of a trademark infringement claim, but 'use' must be decided as a threshold matter because, while any number of activities may be 'in commerce' or create a likelihood of confusion, no such activity is actionable under the Lanham Act absent the 'use' of a trademark."[14] The Sixth Circuit takes a similarly dim view of incorporating evidence related to a likelihood of confusion into the use analysis.[15] And in *Rock & Roll Hall of Fame and Museum, Inc. v. Gentile Productions*, 71 F. Supp. 2d 755, 764 (N.D. Ohio 1999), when the plaintiff tried to use confusion evidence to support its trademark use argument, the court simply ruled that "there is no evidence that defendants' [sic] used plaintiffs' [asserted trademark] as a trademark."

Courts emphasize that use is a threshold issue because it plays a critical gate-keeping role in Lanham Act cases. As the Supreme Court long ago explained, a trademark "is not taboo" and it "does not confer a right to prohibit the use of the word or words."[16] Instead it "only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of

---

2003).

[12] *1-800 Contacts*, 414 F.3d at 412.

[13] *Id.*

[14] *Id.*

[15] *Holiday Inns*, 86 F.3d at 625-26 (when considering trademark use, it is irrelevant that defendants intended to intercept calls meant for plaintiff even though intent is a *Frisch* factor).

[16] *Prestonettes v. Coty*, 264 U.S. 359, 368 (1924) (Holmes, J.).

another's product as his."[17]  If a defendant is not using a trademark to identify the source of a product or service, then trademark laws are not implicated in the first place and a creative plaintiff should not be allowed to argue otherwise simply because it claims to have evidence of consumer confusion.  Consumers could be confused for many different reasons, but a defendant is liable only if the confusion occurs because it has used the plaintiff's trademark as a brand.

This case demonstrates the importance of the use requirement.  Google does not brand its search engine or advertising services with "Check 'N Go."  Nor do its advertisers use "Check 'N Go" to brand their services.  But because CNG has evidence that purportedly shows that some Internet users might be confused about the source of ads displayed on Google, it insists that it is entitled to a trial about whether Google has infringed its trademarks.  This is no different than requiring a trademark infringement trial because some drug store shoppers think that a generic pain killer that does not bear Tylenol's trademark was sponsored or authorized by Tylenol's maker simply because the generic sat next to Tylenol on a drugstore shelf.  The Court should deny CNG's bid to rewrite the law of this case and this circuit, and ignore CNG's supposed evidence of confusion when considering whether Google uses CNG's trademark as a trademark.

### 2.    CNG's argument for a new definition of "relevant" is not evidence of use.

CNG does not stop at trying to rewrite the law; it also attempts to rewrite the definition of "relevant."  Google's opening brief explains that the appearance of a Sponsored Link in response to a query for "Check 'N Go" does not signify that CNG is the source of that link, given the undisputed facts that Google is a website that returns relevant, and not solely affiliated, search results and that the link appears with other links that connect to all kinds of different websites.  CNG responds by arguing that a new definition of "relevant" applies, making the incredible claim that links to CNG's competitors "are not relevant to that term in any way understood by the typical internet user seeking to obtain a payday loan from the Check 'N Go[.]"[18]  As a result, according to CNG, when a Sponsored Link to one of its competitors appears, that link is so unexpected that a user will conclude that CNG is the source.  But CNG is wrong about the

---

[17] *Id.*

[18] Opp'n 3.

definition of relevance and, in any event, it has no evidence to support its theory.

First, CNG is wrong about what it means for one thing to be relevant to another. Things are relevant to one another if they have a logical connection to one another. CNG's competitors have a logical connection to the phrase "Check 'N Go" because, like the company operating under that name, the competitors offer short term loans. In the same vein, consumers searching for Tylenol at a drug store often will find generic pain killers sitting next to Tylenol on the shelf to be relevant to their search, and may even end up purchasing the generic instead. Although established brands such as Tylenol and CNG would dearly love to preclude their potential customers from considering upstart competitors' offerings as well, the law does not grant such sweeping power to dictate what consumers may find relevant or useful.

CNG tries to lend credibility to its effort by sometimes referring to the presumably narrower concept of "search engine relevance" or alluding to the results that "internet users familiar with genuine search engine methodology" might expect to see.[19] According to CNG's explanation of "search engine relevance," a search for "Check 'N Go" should return listings for CNG's website, a link to an Irish Airline's electronic check-in information, a link to a site describing a golf gadget, and even links to CNG competitors that compare themselves to CNG. But users "familiar with genuine search engine methodology" viewing the 99,600,000 links would not (according to CNG's unsupported speculation) expect to see links to CNG's other competitors. In making this argument, CNG ignores the purported theme of its brief—that the law is supposed to protect the public and not just experts—by basing its argument on an explanation of what people versed in "genuine search engine methodology" would think. More importantly, CNG offers no support for its definition of "search engine relevance"; instead it discusses this whole-cloth creation as though it were established fact.

The only "evidence" that CNG proffers does not advance its theory. CNG points to (1) Google's designation of advertisements as "Sponsored Links" and third party reports about consumers' reactions to search engine advertising, (2) Sponsored Links that use phrases in their ads, such as "Checkin Go," that are similar to CNG's trademark, and (3) its employee

declarations containing inadmissible and irrelevant assertions, such as that the competitive

Sponsored Links are for services offered by "fly by night" companies.

Calling an ad a "Sponsored Link" does not signify that a trademark owner whose name

does not appear in the ad is the source of that ad. CNG ignores the Federal Trade Commission's

guidance that using the phrase "Sponsored Links" clearly indicates to consumers that the links

are advertisements.[20] Moreover, the Consumer Reports study that CNG cites *refutes* CNG's

argument that Google suggests that CNG is the source of the Sponsored Links. That study

singles out Google for clearly signaling the difference between paid advertisements and search

results. Indeed, one of the report's "KEY FINDINGS" is that "Google...took pains to visually

segregate paid results from non-paid results."[21] And CNG does not respond to Google's

evidence showing that it segregates Sponsored Links from search results, either by placing them

in a shaded box or separating them with a grey line.[22] CNG also ignores Google's evidence that

it requires advertisers to use one line of their four-line advertisements to provide the address (in a

different colored font) for the website that they are promoting, or Google's evidence that this in

fact takes place. In short, rather than signify that a trademark owner is the source of a Sponsored

Link, the term "Sponsored Link"[23] and the Sponsored Links' visual segregation from search

results signifies that they are ads, and the requirement that a Sponsored Link display the

advertised website's address provides users with information about the source of the ad.

---

[19] Opp'n 14.

[20] Hamm Decl. Ex. E.

[21] Declaration of Barry D. Hunter In Support of Plaintiff CNG Financial Corporation's Opposition to Google's Inc.'s Motion for Summary Judgment ("Hunter Decl.") Ex. A at 6-7. The report also notes that in the industry "there was little attempt—with Google as a notable exception—to distinguish between paid and non-paid placement listings." *Id.* at 11. The other reports cited by CNG do little search engine-by-search engine analysis, lumping them together instead. As a result, the findings provide little information about Google—particularly because Google does things differently than the rest of the industry—and should be ignored.

[22] Hamm Decl. Exs. A-D.

[23] Google's Web Search Help Center defines Sponsored Links as advertisements. *See* http://www.google.com/support/bin/answer.py?answer=27035&query=sponsored+link&topic=&type= (last visited April 30, 2007). Given that Google quoted this definition on page 5 of its opening brief, CNG's repeated assertion that "Google does not define 'Sponsored Links' anywhere on its website" is curious. Opp'n 8; *see also id.* at 14 ("Sponsored Links (which Google nowhere defines)").

CNG's focus on Sponsored Links with the titles "Check in Go," "Checkingo.com," "Check nGo," "Check + Go," and "Check Go" (none of which are CNG's trademarks) is equally unavailing. CNG has not complained to Google about these words and phrases even though Google has honored every reasonable request made by CNG to block ad text confusingly similar to CNG's mark.[24] CNG may not claim now for the first time that these titles violate its trademark rights when it is aware that Google has a procedure available to it for requesting Google to stop their display and it has not attempted to use it. In any case, this argument affects only those ads that have these titles; the vast majority of ads that CNG complains about do not.

The Court similarly should ignore CNG's contentions that its competitors are "fly by night" companies.[25] Not only is the evidence supporting these contentions inadmissible, but whether these are "legitimate" companies has no bearing on whether their advertising is permitted by the Lanham Act. State banking laws are unrelated to the trademark law issues in this case.[26] Moreover, it is not Google's job to enforce lending laws. If CNG has a problem with these companies, it should sue them or contact state law enforcement agencies. In other words, CNG's contentions are completely unrelated to this trademark infringement suit.

### 3.  The only case with similar facts decided under Sixth Circuit precedent favors Google.

CNG makes much of the fact that although the law on trademark use is unsettled more cases come out its way than Google's way. The Court already has rejected a "counting cases" approach in favor of carefully analyzing the issues, holding that regardless of the "weight of authority" outside of the Sixth Circuit it "is not convinced . . . that Google's sale of CNG's marks is an unlawful trademark 'use' for which CNG is entitled to protection under the [Lanham] Act."[27] Nevertheless, CNG emphasizes the recent Northern District of California decision in *Google Inc. v American Blind & Wallpaper Factory, Inc.* even though Judge Fogel

---

[24] *See* pages 8-9 of Google's opening brief and the evidence cited therein.

[25] Opp'n 13.

[26] As explained in Google's accompanying motion to strike and evidentiary objections, CNG's declaration in support of this claim is inadmissible.

emphasized that he "necessarily must be guided by the leading Ninth Circuit case in this area,"
while acknowledging that "Google's analogies to trademark infringements outside the digital
realm are attractive."[28]  And, of course, CNG neglects to mention a case decided the same day
which held "Case law makes it clear that merely displaying alternative products in response to a
computer search on a tradename is not a Lanham Act use."[29]  Instead of tallying cases, it makes
more sense to focus on the one case decided under Sixth Circuit precedent, *Wells Fargo & Co. v.
WhenU.com, Inc.*  As detailed in Google's prior briefing, the *Wells Fargo* court correctly held
that keyword triggered pop-up advertising is not trademark use.[30]

**B.**     **CNG has not come forward with evidence that consumers are likely to be confused
           about the source of Sponsored Links advertising its competitors.**

         **1.     Without actual confusion evidence, CNG cannot prove a likelihood of
                  confusion.**

         Without evidence that any consumers have ever been confused by Google's practices, no
reasonable jury could conclude that it is likely that consumers will be confused by Google's
practices.  CNG argues that it is possible to establish a likelihood of confusion without evidence
of confusion.  While that may be true in some cases, it is not possible in this one.  In this case,
CNG has sued Google based on a trademark theory for which no court has ever found a
likelihood of confusion to exist.  Google does not offer any products or services under CNG's
trademarks, and neither does any of its advertisers.  As a result, to have any chance of convincing
a fact-finder that Google's keyword triggering creates a likelihood of confusion that CNG is the
source of Sponsored Links, CNG must present evidence of actual confusion.  But it has none,
which is damning "when the particular circumstances indicate such evidence should have been
available."[31]  It concedes that is has "no such evidence" that any actual consumer has ever been

---

[27] Order (D.I. 35) at 36.

[28] Hunter Decl. Ex. AA at 7, 10.

[29] *Hamzik v. Zale Corp.*, 2007 U.S. Dist. LEXIS 28981, at *8 (N.D.N.Y. 2007).

[30] *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 744 & 762 (E.D. Mich. 2003)

[31] *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 284 (6th
Cir. 1997).

confused[32] and, as explained below, CNG's survey is not evidence of actual confusion either. The court in *Government Employees Ins. Co v. Google Inc.*, 2005 WL 1903128, at *7 (E.D. Va. 2005), held *as a matter of law* that without a relevant survey there is not "sufficient evidence" that triggering Sponsored Links with trademarks "create[s] a sufficient likelihood of confusion to violate ... the Lanham Act." This Court should make the same holding, for the same reason.

In any case, most of the *Frisch* factors aside from evidence of actual confusion do not favor CNG. First, CNG has not provided evidence that its mark is strong. The Sixth Circuit Court of Appeals has stated that a mark's strength is based on its distinctiveness.[33] The Check 'N Go mark is descriptive of CNG's services, and while CNG offers an employee declaration containing the vague assertions that "CNG spends millions of dollars per year promoting its Check N Go trademark," there is no evidence about how it spends this money, in which markets it spends this money and, importantly, whether and to what extent this promotion is successful. CNG has not conducted (or at least has not proffered) any survey regarding recognition or fame of its mark. Second, CNG's assertion that it offers the same payday lending service as its competitors misses the mark, since this comparison does not consider the services that *Google* offers. CNG does not explain why the supposedly "pertinent comparison" is between CNG's and the third party advertisers' services,[34] rather than between CNG's and Google's services. Perhaps if CNG was suing Google only for contributory infringement or the third party advertisers for direct infringement, CNG would be correct about the pertinent comparison. But CNG is suing only Google, and it is suing Google for direct infringement, so the pertinent comparison is between CNG's and Google's services, which are completely different.[35] And of course, if the pertinent comparison were between CNG and its competitors, there is no evidence of any similarity between "Check 'N Go" and the names of any competitors. Third, CNG offers

---

[32] Hamm Decl. Ex. M.

[33] *Audi AG v. D'Amato*, 469 F.3d 534, 543 (6th Cir. 2006).

[34] Opp'n 19 n. 27.

[35] *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 797 (6th Cir. 2004) ("if *the parties* compete directly, confusion is likely if the marks are sufficiently similar ... if the products are unrelated, confusion is highly unlikely") (emphasis added).

no evidence for its assertion regarding the degree of customer care in the payday lending industry. It cites the observation of one of its employees that there is "impulse buying in the payday lending industry" and "customers will be more likely to stick on a website once they are diverted there."[36] But this statement suggests only that customers might like what the competition offers, not that they will mistake the competitor for CNG. Finally, Google does not intend to mislead the public into thinking that CNG is the source of either its or its advertisers' services. Instead, it is Google's belief that its practices are perfectly legal—that is why is adopted them in the first place.[37] Moreover, as is the case with the other factors, the Court should focus on whether Google intended to create confusion regarding its own services, not those of its advertisers: the *Frisch* intent factor focuses on whether "a party chooses a mark with the intention of creating confusion between its products and those of another company."[38]

### 2.    Because CNG's survey did not test for a likelihood of confusion, CNG does not have likelihood of confusion evidence.

CNG argues that, despite its flaws, its survey is sufficient to survive summary judgment, as those flaws go only to the "weight" to be afforded the evidence, not its admissibility. But "[t]he court need not and should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than to its admissibility."[39] Here, CNG's argument fundamentally misapprehends the difference between a survey that is methodologically flawed, and one that does not present *any relevant evidence at all*. This survey is in the latter category. As set forth in our opening brief, this is not a case of doing a bad job of answering the right question. This is a case of not asking the right question at all. To be admissible, a survey must fit the issue before the fact finder.[40] CNG's survey fails that test.

---

[36] As set forth in Google's accompanying evidentiary objections, this "testimony" lacks foundation, is improper lay opinion, and argumentative, and thus inadmissible.

[37] As CNG points out, Google intended to create a policy within the bounds of the law. Opp'n 9 n. 13.

[38] *Therma-Scan, Inc v. Thermoscan, Inc.*, 295 F.3d 623, 638 (6th Cir. 2002).

[39] *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 778-79 (W.D. Mich. 2006) (quoting *Simon Property Group L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000)).

[40] *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 591 (1993).

Without a proper control, Dr. Mazis' survey is not just suspect: as a matter of basic scientific method, it is of no probative value. Scientific method consists of (1) identifying an hypothesis, and then (2) devising a replicable experiment to test that hypothesis. To expand on the example from our opening brief, suppose the hypothesis one wishes to test is "aspirin cures headaches." In order to test that hypothesis, one must build an experiment to test the results in two groups: one group that takes aspirin, and another that does not. Both groups are otherwise treated identically, including being placed in rooms of identical lighting and noise. If, after an hour, 40% of the aspirin group reports relief, while 20% of the placebo group reports relief, we can conclude that (if all other variables remained constant) aspirin cured 20% of the headaches, while the simple passage of time cured another 20%.

But suppose instead that *both* groups get aspirin, but the test group is exposed to loud noise while the control group is exposed to soothing sounds. Suppose the same 40%/20% result obtains. Can we conclude *anything* about the effects of aspirin? Of course not. There is a control, but it has controlled for the wrong thing, and as a result the experiment tested the wrong hypothesis. It has probative weight, but for the wrong question: the hypothesis has been changed to "soothing sounds cure headaches," and that very different hypothesis has been proven true in 20% of the cases. But for the *other* 20% reporting relief regardless of noise, we cannot say whether they were all cured by aspirin, or all cured by passage of time, or somewhere in between. If we are to take that experiment as probative of the "aspirin cures headaches" hypothesis, we must *also* take it as equally probative of the "passage of time cures headaches" hypothesis, which results in the obvious error of concluding that 20 plus 20 plus 20 equals 40.

Similarly, Dr. Mazis' survey may be probative of something, but it is directed at the wrong hypothesis. Because both the test and the control cells conducted identical searches for CNG's trademark, that variable was removed from the analysis entirely. What *varied* between the two groups was the text of the ads to which they were exposed. As a result, if one assumes that the survey did not have any other flaws, it has some probative value for the following hypothesis: "Users are more likely to be confused by ads for similar services with similar names than by ads for different services with different names." And indeed, that is precisely what Dr.

Mazis' survey concludes: users entering Check 'n Go as a keyword were "confused" 27.3% of the time by ads for similar competitors, but only 5.8% of the time by other ads. From this data, it might be valid to conclude that the variable that was *changed*—the text of the ads—causes 21.5% confusion. But it is impossible to calculate the percentage of users confused by the use of the search term "Check 'N Go," because that variable was constant. What we can conclude, however, is that the *upper* limit on that figure is 5.8%, because we know that the *total* confusion in the control group, *caused by all factors including the trademarked search term*, is 5.8%. We cannot tell what portion of that total is caused by the search term, but we can certainly conclude that a single variable cannot cause more than the total caused by all variables!

CNG, in a footnote, dismisses this logic as "sheer sophistry," but cannot explain why.[41] It is nothing of the sort. CNG argues that the confusion it alleges is not caused solely by the search term, but also by the types of advertisements and websites its competitors offer. Indeed, CNG's discussion of its survey repeats this diversion often, as when it argues that its "control was appropriate to separate out the *effects* of legally irrelevant confusion from the *effects* of the confusion about which CNG complains in this case."[42] Close, but wrong. The point of a control in this case is to separate and quantify the various possible *causes* of the alleged confusion, in order to determine whether anything *Google* does contributes to that confusion. CNG's survey fails utterly to do this, leaving the only factor that can be laid at Google's doorstep—the fact that Google allows advertisers to use trademarks as keywords—in both the test and control cells.

More to the point, the relevant question is not what confusion CNG "complains" about, but what confusion Google *causes*. CNG contends—perhaps correctly—that there are other causes of confusion about which it is entitled to complain. The similarity of its competitors' services and names, the fungibility of services in the same market, the allegedly deliberate crafting of competitors' sites to mimic CNG's, the generic and descriptive nature of CNG's own trademark—all of these likely add to consumer confusion. *But Google doesn't cause any of that confusion.* Evidence about those factors might well be relevant in a lawsuit against CNG's

---

[41] Opp'n 23 n. 35.

[42] Opp'n 23 (emphasis added).

competitors, but CNG has elected not to sue them, and instead is suing only Google, based on Google's policy of allowing ads to be keyed off trademarked terms. The only evidence relevant to *that* claim would be evidence that using a trademarked keyword causes *more* confusion than using a generic keyword. CNG has no evidence to offer on that point.

It is the Court's duty to "ensure that scientific testimony or evidence is not only relevant, but reliable."[43] That duty is not—as CNG argues—exercised only in a "Daubert hearing" on the eve of trial. Where—as here—discovery has closed and the plaintiff has no admissible evidence on a central element of its claim, there is no procedural bar to entering summary judgment, and no reason to prolong the litigation. A motion filed after all discovery and expert reports at the deadline for summary judgment cannot possibly be—as CNG claims—"premature." If it were, it would be impossible to *ever* move for summary judgment, so long as the testimony of a single expert is proffered: after all, *Daubert* motions are *in limine* motions almost always heard on the eve of trial, long after the deadline for summary judgment motions. It is well established that "[t]he decision to hold a Daubert hearing rests in the sound discretion of the district court."[44] As the Court has no obligation to conduct a *Daubert* hearing at all, *a fortiori* it cannot be required to defer summary judgment pending such a hearing.[45] For example, affirming summary judgment of noninfringement in *Autozone*, the Sixth Circuit disregarded an expert survey because no aspect of it "actually tested whether randomly chosen survey participants were confused between the two marks."[46] In other words, CNG's expert report is just like any other piece of evidence offered in support of a motion: it can create a triable issue of fact only if it is admissible, and there is no procedural bar to this Court concluding that it is not.

The case law cited by CNG is not to the contrary. CNG offers *Martin* for the proposition

---

[43] *Daubert,* 509 U.S. at 589.

[44] *Martin v. Blaser Swisslube, Inc.*, 2005 U.S. Dist. LEXIS 33859, at *21 (D. N.J. 2005); *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999).

[45] Of course, should the Court decide it needs live testimony to decide the admissibility of Dr. Mazis' testimony, Google will be happy to participate. We submit, however, that the issue here is an uncontroversial one of basic scientific methodology, unlikely to benefit from live testimony.

[46] *AutoZone, Inc.* 373 F. 3d at 799.

that the Court cannot rule on a summary judgment motion brought before a *Daubert* hearing has been held. In fact, the *Martin* court *granted* the motion for summary judgment by one defendant and denied the motion by the other, both on grounds unrelated to the admissibility of expert testimony. As it could decide both motions without reaching *Daubert* issues at all, it deferred consideration of the issue: "To the extent that [defendants'] challenges to Martin's expert reports can be considered a motion for a Daubert hearing, the motion is denied without prejudice."[47] In *Connectel, LCC v. ITXC, Inc.*, 2004 U.S. Dist. LEXIS 4628 (E.D. Penn. 2004), the court was asked to enter summary judgment at the conclusion of a *Markman* hearing. Because the court felt it needed testimony concerning both *Daubert* issues and allegations of discovery abuse, it dismissed the summary judgment motion without prejudice, scheduled a *Daubert* hearing, and instructed the defendant to refile the summary judgment motion after the *Daubert* hearing.[48]

Contrary to CNG's intimations, courts frequently find survey evidence inadmissible when it fails to satisfy standards of scientific reliability. We need look no further than the cases in CNG's own brief. For example, the court in *Merisant Co. v. McNeil Nutritionals LLC*, 2007 U.S. Dist. LEXIS 27681 (E.D. Pa. April 12, 2007), threw out as inadmissible no fewer than *three* separate trademark surveys. Remarkably, CNG cites this case for the proposition that survey flaws go only to weight, not admissibility, based on a fourth survey the court allowed into evidence. In *Prudential Ins. Co. v. Gibraltar*, 694 F.2d 1150 (9th Cir. 1982), the court of appeals affirmed a summary judgment ruling in which a trademark survey was excluded. In *Spraying Systems Co. v. Delavan, Inc.,*, 975 F.2d 387 (7th Cir. 1992), the court similarly affirmed summary judgment where the district court excluded a trademark survey. And in *Whirlpool Properties Inc. v. LG Electronics U.S.A.*, 2006 U.S. Dist. LEXIS 1378, at *9 (W.D. Mich. 2006), the court reiterated that "[s]urvey evidence that is so flawed that it renders the results unreliable must be excluded"; *see also Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984). And, as *Ironclad L.P. v.Poly-America, Inc.*, 2000 U.S. Dist. LEXIS 10728 (N.D.

---

[47] *Martin,* 2005 U.S. Dist. LEXIS 33859, at *22.

[48] The case settled before the subsequent hearings were held.

Tex), noted, "[m]any courts have required control questions" for a survey to be admissible.[49]

Finally, CNG seeks to rely on the recent "not designated for publication" decision of Judge Fogel in the *American Blind v. Google* litigation.[50]  Google raised similar criticisms to the survey in that case, which also failed to include a meaningful control.  Judge Fogel declined to exclude the survey in that case, a decision that, although within his discretion, we (predictably) think was wrong.  Regardless, this Court should not blindly follow Judge Fogel's one-sentence treatment of the issue.  Although the underlying facts of both cases are quite similar, the procedural postures are different in a crucial respect.

In *American Blind*, the plaintiff is seeking damages, and thus the matter will be tried to a jury.  Judge Fogel is understandably loath to usurp the jury's role in any but the most clear-cut circumstances.  Here, by contrast, CNG has affirmatively waived its damages claims, recognizing that any alleged actual damage it has suffered is vanishingly small.[51]  As a result, there are no remaining claims for the jury, and this Court will be the trier of fact.  As courts have recognized, "the gatekeeping function is less critical in the context of a bench trial."[52]

In a bench trial, it makes little difference whether this Court rejects Dr. Mazis' survey as "inadmissible" or as of "little weight," as the end result is the same (other than the considerable extra time and expense involved in returning months from now to present the same survey evidence and arguments to the same Court at trial).[53]  This Court does not have to tread carefully

---

[49] Id. at *24 (citing *Conagra, Inc. v. Hormel & Co.*, 784 F. Supp. 700, 728 (D. Neb. 1992); *National Football League Properties, Inc. v. ProStyle, Inc.*, 57 F. Supp. 2d 665, 8 (E.D. Wis. 1999); *Major League Baseball Properties, Inc. v. Sed Non Olet Denarius Ltd.*, 817 F. Supp. 1103, 1123-24 (S.D.N.Y. 1993)).

[50] We do not suggest that there is anything improper in citing that order, notwithstanding Judge Fogel's admonition that it "may not be cited."  But a district judge's suggestion that his opinion should not be given even persuasive effect by others should not be ignored in assessing it.

[51] In light of the absence of damages, and given the number of nearly identical suits Google faces with similarly small claims, CNG's suggestion that Google should do its own survey in every case, on an issue on which it does not bear the burden of proof, is outlandish.  Competent trademark surveys by established experts can cost well into six figures each; Google should not face the Hobson's choice of either incurring that cost in every one of the many cases filed against it or else be barred from challenging the admissibility of the plaintiffs' evidence.

[52] *Whirlpool*, citing *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004) (gatekeeping function "largely irrelevant in the context of a bench trial").

[53] Indeed, this was precisely the result in the *Geico* case, where Geico's similarly flawed survey

in deciding whether a jury is entitled to assess what little weight Dr. Mazis' survey might have. CNG has the burden of establishing the admissibility of its survey, and it has not met it.[54] As a result, this Court should reject that survey now, as devoid of any scientific validity.

**C.    CNG is not entitled to an injunction because it cannot show that it suffers irreparable harm.**

CNG does not dispute that much of the traffic it receives comes free from search engines such as Google. Instead of causing CNG irreparable harm, Google boosts CNG's online presence, and it does so without charging CNG a dime. CNG's only complaint is that it should receive even more free traffic when someone searches for "Check 'N Go." But because CNG is not entitled to free traffic from Google in the first place, it cannot argue that a reduction in this windfall is irreparable harm. Nor does the fact that Google benefits by providing a free search engine to the public mean that CNG is entitled to the traffic that Google provides to it. CNG thus cannot show that it suffers irreparable harm, and it is not entitled to an injunction.[55]

**D.    The CDA preempts CNG's state law claims.**

CNG argues that the Communications Decency Act ("CDA") protection for publishers of information "provided by another information content provider"[56] should not apply to Google, even though Google's advertisers and not Google provide the text of the Sponsored Links at issue. CNG tries to get around this part of the Act by arguing that its claims focus not on the publication of the Sponsored Links but instead on "Google's own illegitimate activities outside of any publisher role," *i.e.*, "Google's own illegitimate marketing of CNG's marks in its keyword bidding."[57] But this is simply not true. It is the publication of the Sponsored Links—whose content Google does not provide—that CNG claims constitutes trademark use and confuses users. Because CNG's claims treat Google as a publisher of content provided by a third party,

---

was admitted into evidence in a bench trial, only to have Judge Brinkema grant Judgment as a Matter of Law immediately after cross examination of Geico's survey expert, because he had also failed to use the right control. *Government Employees Ins. Co.*, 2005 WL 1903128.

[54] *Leelanau Wine Cellars*, 425 F. Supp. 2d at 778.

[55] *See Audi AG*, 469 F.3d at 550.

[56] 47 U.S.C. § 230(c)(1).

[57] Opp'n 33.

CNG's state law claims must be dismissed under section 230 of the CDA.[58]

The Court also should reject CNG's argument that its claims for unjust enrichment and misappropriation do not fall with its trademark claims.[59] To prove unjust enrichment, CNG must show it provided Google a benefit and that Google retains the benefit "under circumstances where it would be unjust to do so without payment."[60] Google's advertising practices are no different than a drugstore allowing product placements. If there is any injustice, it would be allowing CNG to obtain advertising revenues earned by Google. As for misappropriation, CNG provides no explanation whatsoever of why this theory applies; indeed, it does not even cite any cases applying misappropriation. CNG has not provided any evidence in support of its state law claims and this Court should grant summary judgment.

## IV.    CONCLUSION

For the reasons expressed above, and in Google's opening brief, this Court should grant Google summary judgment on all its claims.

Dated:  May 4, 2007

Of Counsel:

Michael H. Page (pro hac vice)
Klaus H. Hamm (pro hac vice)
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94107
(415) 391-5400

/s/ Michael H. Page
Kenneth F. Seibel (0025168)
Jacobs, Kleinman, Seibel and McNally
1014 Vine Street, Suite 2300
Cincinnati, OH 45202
(513) 281-6600

Attorneys for Defendant and Counterclaim-Plaintiff Google Inc.

---

[58] See Perfect 10, Inc. v. CCBill LLC, 2007 U.S. App. LEXIS 7238 (9th Cir. 2007).

[59] CNG concedes that its Ohio trademark infringement and common law trademark infringement claims' fate rests with its other trademark infringement claims.

[60] Wright v. Dayton, 814 N.E.2d 514, 520 (Ohio App. 2004).