UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CNG FINANCIAL CORPORATION,

    Plaintiff/Counterclaim-Defendant,

v.

GOOGLE, INC.,

    Defendant/Counterclaim-Plaintiff.

Case No. 1:06cv040

Chief Judge Sandra S. Beckwith
Magistrate Timothy S. Black

## Expert Report of Michael B. Mazis, Ph.D.

**December 2006**

Dockets.Justia.com

## EXPERT REPORT OF MICHAEL B. MAZIS

1.      I was asked by Frost Brown Todd, LLC, to provide expert testimony in CNG

Financial Corporation v. Google, Inc., about whether consumers who seek to access CNG

Financial Corporation's ("CNG") Check 'n Go website though Google's search engine

are likely confused as to the source of the sponsored links for payday loan services that

appear on the Google search results page.  As a result, I conducted a survey to determine

whether prospective users of Google's search engine perceive that CNG, though its

Check 'n Go mark, is sponsoring, has authorized, or is somehow affiliated with the

payday loan advertised on Google's search engine.  A summary of my qualifications and

anticipated testimony follow.

## QUALIFICATIONS AND EXPERIENCE

### Credentials and Expertise

2.      I am Professor of Marketing at the Kogod School of Business, American

University.  I have been a faculty member at American University for over 25 years,

serving over 10 years as chair of the Department of Marketing.  For over a decade, I have

taught undergraduate and graduate courses in marketing research.  These courses focus

on research methodology, questionnaire development, sampling, and data analysis.  I

have also taught a graduate course in qualitative marketing research, which focuses

primarily on focus group research.  In addition, I have taught courses in consumer

behavior, principles of marketing, marketing management, and Internet marketing.

Attached to this report is a current copy of my curriculum vitae, which contains a

complete description of my professional background. (See Exhibit A.)

3.      I received my B.S. degree in Economics from the University of Pennsylvania, my

M.B.A. degree from New York University, and my Ph.D. degree in Business Administration from Pennsylvania State University.

4.     From 1976 to 1979, I served as an in-house marketing expert at the Food and Drug Administration ("FDA") and at the Federal Trade Commission ("FTC"), where I evaluated consumer perception of companies' advertising and other promotional materials, designed and conducted consumer research surveys, and evaluated surveys submitted by companies seeking to substantiate advertising claims. I continue to serve as a consultant for the FTC, having served as the FTC's principal marketing witness in FTC vs. Novartis in 1997, FTC vs. Trans Union in 1998, FTC vs. Mercury Marketing in 2003, and FTC vs. Telebrands in 2004. I have also served as a consultant on consumer behavior for the FDA, Consumer Product Safety Commission, Department of Justice, U. S. Mint, Bureau of Alcohol, Tobacco, and Firearms, and the State of California. (See Exhibit B for a list of cases in which I have testified in the last four years.)

5.     I have also worked as a marketing research analyst for the Warner-Lambert Pharmaceutical Company. In this position, I designed marketing research surveys and focus group studies.

6.     I am a member of the American Marketing Association and a member and former director of the Association for Consumer Research. I was editor of the *Journal of Public Policy & Marketing* from 1992 to 1995, and I was Associate Editor of *The Journal of Consumer Affairs* from 1998 to 2001.

7.     I have published over 60 articles in academic journals and conference proceedings. My research has been published in the *Journal of Marketing, Journal of Consumer Research, Journal of Marketing Research, Journal of Public Policy & Marketing, The Journal of Consumer Affairs, Journal of Personality and Social*

*Psychology, Journal of Experimental Social Psychology,* and *Journal of the American Medical Association.* I was principal investigator on a three-year grant from the National Institute on Alcohol Abuse and Alcoholism to study consumer perception of alcohol warning labels. In addition, I have spoken on designing consumer perception surveys at conferences sponsored by the American Marketing Association, American Bar Association, and Better Business Bureaus (National Advertising Division).

## Compensation

8.    My work on this case is being billed at $500 per hour.

## SUMMARY OF EXPERT OPINION

9.    I conducted a survey in ten cities among 308 people who were Google users, who had applied for or had planned to apply for a payday loan, who would search the Internet for information about companies offering payday loans, and who would consider taking out a loan from Check 'n Go. My survey focused on whether the sponsored links on a Google results page that were paid for by Check 'n Go's competitors would be mistakenly clicked on by consumers seeking to apply for a payday loan or cash advance from Check 'n Go. In my survey, respondents typed "Check n Go" into a Google search engine window, and they saw a results page with sponsored links and search results. Then, respondents were asked to point to the listing or listings on the results page that they would be likely to click on if they wanted to apply for a payday loan or cash advance from Check 'n Go. The results of my survey revealed that prospective Google users who were likely to search for information about Check 'n Go over the Internet were confused about the sponsored links on the Google search results page. Adjusting for the "control" cell, 21.5% of respondents pointed first to a sponsored link and 29.2% pointed to a

4

sponsored link as the first or second listing that they would be likely to click on a if they wanted to apply for a payday loan from Check 'n Go.

## LIKELIHOOD OF CONFUSION SURVEY

### Objective

10.    The objective of my survey was to assess the likelihood of confusion caused by Google's "AdWords" policy, which permits competitors of Check 'n Go to select the term "Check 'n Go" as a keyword trigger for advertisements that appear as sponsored links on the Google search results page.  As a result, when the term "Check 'n Go" is typed into the Google search window, the competitors' advertisements will appear on the "Check 'n Go" Google search results page.  My survey focused on whether a sponsored link (rather than a natural search listing) would be clicked on first by prospective users of Google's search engine who wanted to apply for a loan or cash advance from Check 'n Go.  In addition, my survey assessed to what extent prospective users of Google's search engine would be likely to click on other sponsored links when they wanted to apply for a loan or cash advance from Check 'n Go.  Finally, my survey assessed to what extent survey respondents perceived that the sponsored links on the Google search results page were associated or connected to the company that puts out the Check 'n Go website.

### Universe and Sample Selection

11.    The universe for a survey consists of all persons whose perceptions the study is designed to represent.  In my study, I focused on individuals 18 years of age or older who had used the Google search engine in the last six months, who had in the last year applied for a payday loan or intended in the next year to apply for a payday loan, who would use the Internet to search for information about payday loans, and who would consider taking out a payday loan or cash advance from Check 'n Go.

12.    Interviews were conducted in shopping malls in states across the U. S. in which Check 'n Go had a substantial number of active customers. These shopping malls were located in the following ten cities:

- Akron, OH
- Hurst, TX
- Lewisville, TX
- Lincolnwood, IL
- Port Richey, FL
- Riverside, CA
- Taylor, MI
- Tracy, CA
- Tulsa, OK
- Woodbridge, VA

13.    Interviews were conducted January 27-February 24, 2006. The study was "double blind." Neither the interviewer nor the respondent was aware of the identity of the client or the purpose of the study.

## Survey Design

14.    Survey respondents were assigned randomly into one of two cells – a "test" cell or a "control" cell. Respondents in the test cell were shown on a computer a recreation of a Google search results page that appeared when "Check n Go" was typed into the Google search engine window. On the results page, there appeared two sponsored links ("Payday Check to Go" and "Check City Payday Loans") above the search results and eight sponsored links (including "Payday Loans to $1500," "No Fax Cash Advance," and "Cash and Go") to the right of the search results. Respondents in the control cell were also shown on a computer a recreation of a Google search results page. The search results shown were exactly the same as those shown to respondents in the control group. However, the sponsored links were changed. Sponsored links shown

were financial services links (including "New Penny Stock Soaring," "Life Insurance Quotes," "INVESTools," and "Hot Penny Stocks Featured").

15.     The purpose of using a control cell was to determine whether the presence of a sponsored link for companies offering payday loans (such as, "Payday Check to Go") was a key reason for consumers' responses or whether "noise" was the likely cause of consumers' responses. "Noise" refers to factors, such as guessing or question wording, which may interfere with the researcher's accurate assessment. "Noise" is reduced or eliminated by <u>subtracting</u> the proportion of respondents in the <u>control cell</u> selecting a sponsored link (such as, "New Penny Stock Soaring") as the listing they would click on first <u>from</u> the proportion of respondents in the <u>test cell</u> selecting a sponsored link (such as, "Payday Check to Go"). Thus, the purpose of the control cell was to reduce or eliminate "noise" as an explanation for the findings. The advisability of using a control cell or control group is mentioned in the "Reference Guide on Survey Research":

> It is possible to adjust many survey designs so that causal inferences about the effect of a trademark or an allegedly deceptive commercial become clear and unambiguous. By adding an appropriate control group, the survey expert can test directly the influence of the stimulus. In the simplest version of a survey experiment, respondents are assigned randomly to one of two conditions. For example, respondents assigned to the experimental condition view an allegedly deceptive commercial, and respondents assigned to the control condition either view a commercial that does not contain the allegedly deceptive material or do not view any commercial.[1]

### Screening" Questionnaire

16.     Interviewers used a "screening" questionnaire, which consisted of questions to determine whether potential respondents were qualified to participate in the study. (See Exhibit C.) A potential survey participant had to have in the last six months used the

---

[1] Shari Seidman Diamond, "Reference Guide on Survey Research" in *Reference Manual on Scientific Evidence, Second Edition,* Federal Judicial Center, 2000 (hereafter referred to as "Reference Guide") at 257.

Google search engine, had to have applied for in the past year or would intend to apply for in the next year a payday loan or cash advance, would use the Internet to search for information about companies offering payday loans or cash advances, and would consider taking out a payday loan or cash advance from Check 'n Go. Potential respondents were excluded from participation if they were likely to possess some specialized knowledge, such as if they or members of their households worked in advertising or public relations, in marketing research, for a financial services company, or for an Internet company. In addition, potential respondents were excluded if they had participated in a marketing research survey other than a political poll during the past three months. They were also excluded if they wore eyeglasses or contact lenses for reading but did not have their corrective eye wear with them at the time of the interview. Those potential respondents who were qualified to participate in the study based on their responses to the "screening" questionnaire were invited to participate in the study and were administered the "main" questionnaire.

### "Main" Questionnaire

17.    Respondents were taken into a room and seated in front of a computer. A CD-ROM disk was placed in the computer, and the Google search window appeared on the screen in front of the respondent. At the start of the "main" questionnaire (See Exhibit D), the interviewer said:

> In this survey, I'm going to ask you to enter the name of a company that you might search for information about using Google.
>
> Please type CHECK N GO – Type as three words, spelled C H E C K space N space G O) – and click on the GOOGLE SEARCH button.

> Now, please look at the search results the way you normally would. It's okay to scroll up and down but don't click on anything. After you are done looking at the search results, I'm going to ask you a few questions. For any of my questions, please give me your opinion if you have one. If you don't have an opinion or you don't know, please don't guess. "I don't know" is a perfectly acceptable answer.

After the respondent had an opportunity to look at the search results, the interviewer

asked:

> If you wanted to apply for a payday loan or a cash advance from CHECK N GO which listing or listings on this page would you be most likely to click on first. Please point to the listing or listings you would be most likely to click on first. (Q1)

The interviewer was instructed to circle on a print out of the search results page

> all the listings on which respondent would click. If more than one listing mentioned, designate each A, B, C, etc. in the order they are mentioned [A=1st, B=2nd, etc]

Then, for each listing mentioned in Q1, the interviewer asked:

> "Why would you click on this listing?"  (Q2)

18.    Next, the interviewer asked:

> If you have an opinion, <u>do you</u> or <u>don't you</u> think there are other listings on this screen that you would be likely to click on if you wanted to submit an application to CHECK N GO. (Q3)

For respondents answering affirmatively to Q3, the interviewer asked:

> What other listing or listings on this screen would you be likely to click on if you wanted to submit an application to CHECK N GO. Please point to the listings you would be likely to click on. (Q4)

Then, for each listing mentioned, the interviewer asked:

> "Why would you click on this listing?"  (Q5)

19.    Finally, the interviewer pointed to one of the sponsored links on the computer screen.

For respondents in the test group, the interviewer pointed either to the sponsored link titled

"Payday Check to Go" (version one) or to the sponsored link titled "Payday Loans to $1,500"

(version two).   For respondents in the control group, the interviewer pointed either to the sponsored link titled "New Penny Stock Soaring" (version one) or to the sponsored link titled "INVESTools" (version two).

Then, the interviewer asked:

> Now, if you clicked on this listing (POINT TO LISTING AT TOP OF THE PAGE) what company or companies' websites would you expect to go to?  (Q6)

For each company mentioned, the interviewer asked:

> If you have an opinion, do you or don't you think that (COMPANY  MENTIONED) is associated or connected with any other company or companies?  (Q7)

> What company or companies do you think it is associated or connected with?  (Q8)

> Why do you say that it is associated or connected (COMPANY MENTIONED)?  (Q9)

### Survey Administration Procedures

20.    International Communications Research (ICR), under my supervision, prepared instructions for the interviewers. (See Exhibit E.)   Before starting work on the study, each interviewer was required to read the instructions and to attend a personal briefing at which interviewing procedures were discussed in detail.  After arriving at ICR, the 322 completed questionnaires were checked for accuracy and completeness.  The responses to all questions were then entered into a data file using 100% keypunch verification – that is, all data were keypunched twice to avoid any errors.

21.    Validation was conducted by attempting to re-contact respondents to verify that they participated in the study and that they met key screening criteria.  The names and telephone numbers of all respondents who had provided this information were sent to an interviewing service not affiliated with the ICR to conduct telephone validation.  They attempted to validate 100% of the interviews, using a validation questionnaire that I had developed.  (See Exhibit F.)   In conducting the validation telephone calls, a minimum of

ten attempts were made to re-contact all respondents who had provided telephone numbers. A total of 322 interviews were completed, and 200 respondents were contacted. Fourteen of the 200 respondents contacted failed validate either because they claimed not to have participated in the survey or because they did not meet established screening criteria. These 14 respondents were removed from the data base. Following standard industry practice, the 186 interviews (58%) that were successfully validated[2] and the 122 interviews from respondents who could not be reached were included in the survey data base. Of the 308 interviews in the final data base, there were 154 interviews in the test cell and 154 interviews in the control cell.

## Results

22.    In Q1, respondents were asked to indicate which listing or listings on the search results page, they would be most likely to click on first if they wanted to apply for a payday loan or cash advance from Check 'n Go. For the 154 respondents in the test cell, 42 (27.3%) pointed first to a sponsored link (such as, "Payday Check to Go"), and for the 154 respondents in the control cell, 9 (5.8%) pointed first to a sponsored link (such as, "New Penny Stock Soaring"). Thus, adjusting for the control cell, 21.5% (27.3% - 5.8% = 21.5%) of respondents were confused by the presence of links sponsored by competing companies offering payday loans. (See Exhibit G for complete tabulations.)

23.    In addition, I analyzed the first two listings on the search results page that respondents pointed to when they were asked which listing or listings that they would be most likely to click on first if they wanted to apply for a payday loan or cash advance from Check 'n Go. For the 154 respondents in the test cell, 61 (39.6%) pointed to a sponsored link as the first or second listing they would click on if they wanted to apply

---

[2] According to the Reference Guide, independent validation of at least 50% of the interviews by a third-party "increases the trustworthiness of the survey results," p. 267.

for a payday loan or cash advance from Check 'n Go. In addition, for the 154 respondents in the control cell, 16 (10.4%) pointed to a sponsored link the first or second listing they would click on. Thus, adjusting for the control cell, 29.2% (39.6% - 10.4% = 29.2%) of respondents were confused by the presence of links sponsored by competing companies offering payday loans.

24.    Finally, I analyzed <u>all</u> of the listings on the search results page that respondents pointed to when they were asked which listing or listings that they would be most likely to click on first if they wanted to apply for a payday loan or cash advance from Check 'n Go. For the 154 respondents in the test cell, 64 (41.6%) pointed to a sponsored link as one of the first listings they would click on if they wanted to apply for a payday loan or cash advance from Check 'n Go. In addition, for the 154 respondents in the control cell, 19 (12.3%) pointed to a sponsored link as one of the listings they would click on. Thus, adjusting for the control cell, 29.2% (41.6% - 12.3% = 29.2%) of respondents were confused by the presence of links sponsored by competing companies offering payday loans.

25.    In Q4, respondents were asked to indicate what other listings they would be likely to click on if they wanted to submit an application to Check 'n Go. Therefore, by examining the responses to Q1 and Q4, I was able to determine all of the listings that respondents indicated that they would be likely to click on if they wanted to apply for a payday loan or cash advance from Check 'n Go. For the 154 respondents in the test cell, 75 (48.7%) pointed to a sponsored link as one of the listings they would click on if they wanted to apply for a payday loan or cash advance from Check 'n Go. In addition, for the 154 respondents in the control cell, 44 (14.3%) pointed to a sponsored link as one of the listings they would click on. Thus, adjusting for the control cell, 34.4% (48.7% -

14.3% = 34.4%) of respondents were confused by the presence of links sponsored by competing companies offering payday loans.

26.    In the final section of the questionnaire (Q6 and Q8), respondents were asked to focus on a particular sponsored link. For respondents in the test cell, half were asked about the listing titled "Payday Check to Go" and half were asked about the listing titled "Payday Loans to $1500." For respondents in the control cell, half were asked about the listing titled "New Penny Stock Soaring" and half were asked about the listing titled "INVESTools." Respondents were asked what company or companies' websites they would expect to go to if they clicked on the listing they were being asked to focus on and what company or companies' websites, if any, they thought the website was associated or connected with. When I added the number of respondents who mentioned "Check 'n Go" in Q6 and Q8 to the number of respondents who mentioned a sponsored link in Q1 and Q4, I was able to calculate an overall confusion rate. For the 154 respondents in the test cell, 102 (66.2%) pointed to a sponsored link in Q1/Q4 or mentioned Check 'n Go as being the source or associated with a sponsored link in Q6/Q8. In addition, for the 154 respondents in the control cell, 44 (28.6%) pointed to a sponsored link in Q1/Q4 or mentioned Check 'n Go as being the source or associated with a sponsored link in Q6/Q8. Thus, overall, adjusting for the control cell, 37.6% (66.2% - 28.6% = 37.6%) of respondents were confused by the presence of links sponsored by competing companies offering payday loans.

## CONCLUSIONS

27.     My survey was designed to determine whether sponsored links paid for by

competing companies would be mistakenly clicked on by consumers seeking to apply for

a payday loan or cash advance from Check 'n Go.  Adjusting for the control cell, 21.5%

of respondents (mistakenly) pointed first to a sponsored link when they were asked to

indicate the listing or listings they would be likely to click on first if they wanted to apply

for a payday loan or cash advance from Check 'n Go.  In addition, adjusting for the

control cell, 29.2% of respondents pointed to a sponsored link as the first or second

listing they would be likely to click on.  Finally, the number or respondents who said that

they would (mistakenly) click on a sponsored link when they wanted to go the Check 'n

Go website and the number of respondents who (mistakenly) associated a sponsored link

with Check 'n Go were added together.   Adjusting for the control cell, 37.6% of

respondents were confused by the presence of competing sponsored links

_Michael B. Mazis_                                        _12-5-06_

Michael B. Mazis                                        Date

14

# TAB A

January 2006

## MICHAEL B. MAZIS

### WORK ADDRESS

Kogod School of Business
The American University
27 Kogod School of Business
4400 Massachusetts Avenue, N.W.
Washington, D.C.  20016-8044
(202) 885-1972
(202) 885-2691 (FAX)
e-mail address: mmazis@american.edu

### EDUCATION

B.S. in Economics, June, 1964
University of Pennsylvania, Wharton School

Master of Business Administration (M.B.A.) June 1966
New York University, Graduate School of Business Administration

Ph.D. in Business Administration, December 1971
The Pennsylvania State University
Major Field: Marketing
Minor Fields: Social Psychology/Quantitative Business Analysis

### CURRENT POSITION

Professor of Marketing, August 1981 - present
Chair, Department of Marketing, June 1980 - August 1989; May 1998 - May 1999;
        September 2004 - current
Associate Professor of Marketing, September 1979 - August 1981
The American University
Kogod School of Business
Washington, D.C.

## PREVIOUS POSITIONS

Chief, Marketing and Consumer Research, July 1977 - August 1979
Office of Policy Planning and Evaluation
Federal Trade Commission
Washington, D.C.

Resident Consultant, February 1977 - July 1977
Division of National Advertising
Bureau of Consumer Protection
Federal Trade Commission
Washington, D.C.

Economist, June 1976 - February 1977
Division of Drug Advertising
Bureau of Drugs
Food and Drug Administration
Rockville, Maryland

Assistant Professor of Marketing, September 1971 - August 1974
Associate Professor of Marketing, September 1974 - June 1976
University of Florida
Gainesville, Florida

Marketing Research Analyst, September 1965 - August 1968
Warner-Lambert Pharmaceutical Company
Morris Plains, New Jersey

## EDITORSHIPS

Editor, *Journal of Public Policy & Marketing*, 1992-1995

Michael B. Mazis., ed., *Journal of Public Policy & Marketing*, Vol. 10 (Number 1, 1991), special conference issue

Associate Editor, *The Journal of Consumer Affairs*, 1998-2001.

Michael B. Mazis, ed., Proceedings of 1982 American Psychological Association Conference, Division 23 (Consumer Psychology).

Louis Morris, Michael Mazis and Ivan Barofsky, eds., *Product Labeling and Health Risks*, Banbury Center, Cold Spring Harbor Laboratory, New York, 1980, 328 pages.

## GRANTS

Michael B. Mazis, "Evaluating Health Warning Labels for Alcoholic Beverages," National Institute on Alcohol Abuse and Alcoholism, September 1989-September 1992 ($700,000) and grant supplement, 1990-1992 ($65,000).

Michael B. Mazis, "Marketing and Public Policy: Issues for the 1990's," American Marketing Association, to fund workshop in Washington, D.C., August 1990 ($500).

## PROFESSIONAL PUBLICATIONS

1.  Stephen Miller, Michael B. Mazis and Peter L. Wright, "Perceptual Distortion in the Development of Brand Attitudes: A Cognitive Model," in David L. Sparks (ed.), *Broadening the Concept of Marketing*, American Marketing Association, 1970, p. 119 (abstract).

2.  Michael B. Mazis and Robert Green, "Implementing Social Responsibility," *MSU Business Topics*, Vol. 13 (Winter 1971), pp. 68-76 (Reprinted in W. P. Anthony, J.B. Haynes and P. L. Wilkens (eds.) *Social Responsibility of Business*, General Learning Press, 1972 and A.B. Carroll (ed.), *Managing Corporate Social Responsibility* Little, Brown and Company, 1977).

3.  Stephen Miller, Michael B. Mazis, and Peter L. Wright, "The Influence of Brand Ambiguity on Brand Attitude Development," *Journal of Marketing Research*, Vol. 8 (November 1971), pp. 447-9.

4.  Michael B. Mazis, "Decision-Making Role and Information Processing," *Journal of Marketing Research*, Vol. 9 (November 1972), pp. 447-9.

5.  Michael B. Mazis, and Timothy W. Sweeney, "Novelty and Personality with Risk as a Moderating Variable," in Boris W. Becker and Helmut Becker (eds.) *Marketing Education and the Real World*, American Marketing Association, 1972, pp. 406-11.

6.  Michael B. Mazis and R. Eugene Klippel, "Variable Modular Testing: A New Method for Increasing Student Motivation and Learning in Large Classes," in Boris W. Becker and Helmut Becker (eds.), *Marketing Education and the Real World*, American Marketing Association, 1972.

7.  Michael B. Mazis and Robert B. Settle, "Consumer Reaction to Restriction of Choice Alternatives," in M. Venkatesan (ed.), *Proceedings*, Third Annual Association for Consumer Research Conference, 1972, pp. 417-27.

8.  Michael B. Mazis and Marilyn Beutenmuller, "Attitudes Toward Women's Liberation and Perception of Advertisements," in M. Venkatesan (ed.), *Proceedings*, Third Annual Association for Consumer Research Conference, 1972, pp. 428-35.

9.  Michael B. Mazis, "Cognitive Tuning and Receptivity to Novel Information," *Journal of Experimental Social Psychology*, Vol. 9 (July 1973), pp. 307-19.

10. Michael B. Mazis, Robert B. Settle and Dennis C. Leslie, "Elimination of Phosphate Detergents and Psychological Reactance," *Journal of Marketing Research*, Vol. 10 (November 1973), pp. 390-5.

11. Michael B. Mazis, Dan M. Smith and Kenneth C. Cosgrove, "The Influence of Personality, Interviewer Race and Respondent Race on Responses to a Racially-Oriented Questionnaire," in Thomas V. Greer (ed.), *Combined Proceedings*, American Marketing Association, 1973, pp. 309-13.

12. Michael B. Mazis and Dan M. Smith, "A Comparison of General and Product Specific Risk Measures in the Prediction of Gasoline Purchases," in Robert L. King (ed.), *Advances in Consumer Proceedings*, American Marketing Assoc., 1973, pp. 309-13.

13. Michael B. Mazis and R. Eugene Klippel, "Instrumentality Theories and Consumer Attitudes:  Comparing Alternative Models," in Peter L. Wright (ed.), *Advances in Consumer Research*, Vol. 1, Association for Consumer Research, 1973, pp. 346-7 (abstract).

14. Michael B. Mazis and John Faricy, "Consumer Response to the Meat Boycott," in Ronald C. Curhan (ed.), *Combined Proceedings*, American Marketing Association, 1974, pp. 329-33.

15. Michael B. Mazis, "Anti-Pollution Measures and Psychological Reactance: A Field Experiment," *Journal of Personality and Social Psychology*, Vol. 31 (April 1975), pp. 654-60.  (Abstract published in *Psychology Today* and *Human Behavior*; conducted radio interview on Canadian Broadcasting Corporation's "As It Is" concerning the article.  Reprinted in *Exploring Social Psychology: The Readings*, Steve L. Ellyson and Amy Halberstadt, editors, McGraw-Hill, 1994.)

16. Michael B. Mazis, Review of David A. Aaker and George S. Day eds., *Consumerism:  Search for the Consumer Interest, Journal of Marketing*, Vol. 39 (April 1975), p. 113.

17. Michael B. Mazis, Olli T. Ahtola and R. Eugene Klippel, "A Comparison of Four Multi-Attribute Models in the Prediction of Consumer Attitudes," *Journal of Consumer Research*, Vol. 2 (June 1975), pp. 38-52.

4

18. John Faricy and Michael B. Mazis, "Personality and Consumer Dissatisfaction: A Multivariate Approach," in Edward M. Mazze (ed.), *Combined Proceedings*, American Marketing Association, 1975, pp. 202-5.

19. Dan M. Smith and Michael B. Mazis, "Racial Self-Identification and Self-Concept by Means of Unobtrusive Measures," *The Journal of Social Psychology*, Vol. 98 (1976), pp. 221-8.

20. Michael B. Mazis and Janis Adkinson, "An Experimental Evaluation of a Proposed Corrective Advertising Remedy," *Journal of Marketing Research*, Vol. 13 (May 1976), pp. 178-83 (Reprinted in Richard J. Lutz, editor, *Contemporary Perspectives in Consumer Research*, Kent Publishing Company, 1981).

21. Michael B. Mazis and John H. Faricy, "Teaching the Consumer Behavior Course: A Proper Blend of Theory, Applications and Presentation," for Special Education Issue of *Marketing News* (July 30, 1976).

22. Joel B. Cohen, Olli T. Ahtola, Michael B. Mazis and Lawrence J. Severy, "Extended Expectancy-Value Approach to Contraceptive Alternatives" in *Proceedings of the 84th Annual American Psychological Association Convention*, American Psychological Association, 1976 (abstract).

23. Peter H. Rheinstein and Michael B. Mazis, "Regulation of OTC Advertising: The FDA 'Prescription'," *Journal of the American Pharmaceutical Association*, Vol. 16 (September 1976), pp. 505-6, 524-5.

24. Louis A. Morris, Michael B. Mazis and Evelyn Gordon, "A Survey of the Effects of Oral Contraceptive Patient Information," *Journal of the American Medical Association*, Vol. 238 (December 5, 1977), pp. 2504-8.

25. Michael B. Mazis, Louis A. Morris and Evelyn Gordon, "Patient Recall and Attitudes about Two Forms of Oral Contraceptive Patient Information," *Medical Care*, Vol. 16 (December 1978), pp. 1045-54.

26. Albert Wildt and Michael B. Mazis, "Determinants of Scale Response: Label vs. Position," *Journal of Marketing Research*, Vol. 15 (May 1978), pp. 261-7.

27. Michael B. Mazis and Dennis McNeill, "The Use of Marketing Research in FTC Decision making," Subhash C. Jain (ed.), *Research Frontiers in Marketing: Dialogues and Directions*, American Marketing Association, 1978, pp. 308-11.

28. Michael B. Mazis, "Overview of 'Can and Should the FTC Restrict Advertising to Children's Workshop'," in William L. Wilkie (ed.), *Advances in Consumer Research*, Vol. 6, Association for Consumer Research, 1978, pp. 3-6.

29. Kenneth L. Bernhardt and Michael B. Mazis, "Evaluating Consumer Protection Programs," in Thomas C. Kinnear, et. al. (eds.), *Public Policy Issues in Marketing*, Division of Research, Graduate School of Business Administration, University of Michigan, 1979, pp. 48-62.

30. Michael B. Mazis, "Effects of Information on Product-Related Perceptions," in Jerry C. Olson, ed., *Advances in Consumer Research*, Vol. 8, Ann Arbor, Michigan: Association for Consumer Research, 1980, pp. 538-40.

31. Michael B. Mazis and Louis A. Morris, "Evaluation of the Food and Drug Administration's Patient Package Insert Program," *Proceedings*, 1980 American Psychological Association, Division 23.

32. Michael B. Mazis, "The Future of Consumer Protection Regulation" in Kent B. Monroe, ed., *Advances in Consumer Research*, Vol. 9, Ann Arbor, Michigan: Association for Consumer Research, 1981, pp. 455-7.

33. Kenneth Bernhardt, Thomas Kinnear, Michael Mazis and Bonnie B. Reece, "Impact of Publicity on Corrective Advertising Effects," in Kent B. Monroe, ed., *Advances in Consumer Research*, Vol. 9, Ann Arbor, Michigan: Association of Consumer Research, 1981, pp. 414-15.

34. Michael B. Mazis, "An Overview of Product Labeling and Health Risks," in Louis Morris, Michael Mazis and Ivan Barofsky, eds., *Labeling and Health Risks*, Banbury Center, Cold Spring Harbor Laboratory, Cold Spring Harbor, New York, 1980, pp. 1-9.

35. Michael B. Mazis, Richard Staelin, Howard Beales and Steven Salop, "A Framework for Evaluating Consumer Information Regulation," *Journal of Marketing*, Vol. 45 (Winter 1981), pp. 11-21.

36. Howard Beales, Michael B Mazis, Steven C. Salop and Richard Staelin, "Consumer Search and Public Policy," *Journal of Consumer Research*, Vol. 8, (June 1981), pp. 11-22.

37. Michael B. Mazis and Richard Staelin, "Information Processing Principles for Public Policy Making," *Journal of Public Policy & Marketing*, Vol. 1 (1982), pp. 3-14.

38. Michael B. Mazis, "Effectiveness of Required Information Disclosures to Consumers," in Paul N. Bloom, ed., *Consumerism and Beyond: Research Perspectives on the Future Social Environment*, Cambridge, Mass.: Marketing Science Institute, 1982, pp. 75-8.

39. Michael B. Mazis, Dennis McNeill and Kenneth Bernhardt, "Day-After Recall of Listerine Corrective Commercials," *Journal of Public Policy & Marketing*, Volume 2 (1983), pp. 29-37.

40. William L. Wilkie, Dennis McNeill and Michael Mazis, "Marketing's 'Scarlet Letter': The Theory and Practice of Corrective Advertising," *Journal of Marketing*, Vol. 48 (Spring 1984), pp. 11-31.

41. Michael B. Mazis, "Analysis of Medical Consumer Behavior," in Thomas Kinnear, ed., *Advances in Consumer Research*, Vol. 11, Ann Arbor, Michigan: Association for Consumer Research, 1984, pp. 235-7.

42. Ronald Hill and Michael B. Mazis, "Measuring Emotional Responses to Advertising," in Richard Lutz, ed., *Advances in Consumer Research*, Vol. 13, Association for Consumer Research, 1986, pp. 164-69.

43. Kenneth Bernhardt, Thomas Kinnear, and Michael Mazis, "A Field Study of Corrective Advertising Effectiveness," *Journal of Public Policy & Marketing*, Vol. 5, (1986), pp. 146-62.

44. Michael Mazis, "Overlooked Mechanisms for Conveying Information to Consumers" in E. Scott Maynes, ed. *The Frontier of Research in the Consumer Interest*, Columbia, Missouri: American Council on Consumer Interests, 1988, pp. 225-230.

45. Louis A. Morris, Michael B. Mazis and David Brinberg, "Risk Disclosures in Televised Prescription Drug Advertising to Consumers," *Journal of Public Policy & Marketing*, Vol. 8 (1989), 64-80.

46. Michael B. Mazis, "The Marketing of Alcohol: A Spirited Debate," in William L. Wilkie and Patrick E. Murphy, eds., *The Federal Trade Commission in the 1990's*, University of Notre Dame Press, 1990, 221-233.

47. Michael B. Mazis, "Priority Public Policy Research Needs for the 1990's," in William L. Wilkie and Patrick E. Murphy, eds., *The Federal Trade Commission in the 1990's*, University of Notre Dame Press, 1990, 369-373.

48. Michael B. Mazis, Louis A. Morris and John L. Swasy, "An Evaluation of the Alcohol Warning Label: Initial Survey Results," *Journal of Public Policy & Marketing*, Vol. 10 (Spring 1991), 229-41.

49. Michael B. Mazis, Review of Jef I. Richards, *Deceptive Advertising: Behavioral Study of a Legal Concept, Journal of the Academy of Marketing Science*, Vol. 20 (Winter 1992), 99-100.

50. Michael B. Mazis, Debra Jones Ringold, Elgin S. Perry, and Daniel W. Denman, "Perceived Age and Attractiveness of Models in Cigarette Advertisements," *Journal of Marketing*, Vol. 56 (January 1992), 22-37.

51. Louis A. Morris, John L. Swasy, and Michael B. Mazis, "Accepted Risk and Alcohol Use During Pregnancy," *Journal of Consumer Research*, Vol. 21 (June 1994), 135-144.

52. Manoj Hastak, Romana L. Horst, and Michael B. Mazis, "Consumer Perceptions About and Comprehension of Environmental Terms: Evidence From Survey Research Studies" in Debra Jones Ringold, ed., *Proceedings of the Marketing and Public Policy Conference*, Vol. 4, Baltimore, MD, May, 1994, 94-108.

53. Michael B. Mazis, "The Cellular Telephone Cancer Scare," in *When Lightning Strikes: A How-To Crisis Manual with Classic Case Studies*, Wayne L. Pines, ed., Washington, DC: Washington Business Information, Inc., 1994, 279-290.

54. Michael B. Mazis, "Conducting Research on Nontraditional Media in the Marketing of Alcoholic Beverages," Susan Martin, ed., *The Effects of the Mass Media on the Use and Abuse of Alcohol*, Research Monograph No. 28, NIH Publication 95-3743, Washington, DC: U. S. Department of Health and Human Services, 1995, 239-244.

55. Louis A. Morris, Manoj Hastak, and Michael B. Mazis, "Consumer Comprehension of Environmental Advertising and Labeling Claims," *Journal of Consumer Affairs*, Vol. 29 (Winter 1995), 328-350.

56. Gary T. Ford and Michael B. Mazis, "Informing Buyers of Risks: An Analysis of the Marketing and Regulation of All-Terrain Vehicles," *Journal of Consumer Affairs*, Vol. 30 (Summer 1996), 90-123.

57. Michael B. Mazis, "Copy-Testing Issues in FTC Advertising Cases," in Ronald Paul Hill and Charles R. Taylor, eds., *Proceedings of the Marketing and Public Policy Conference*, Vol. 6, Chicago, IL: American Marketing Association, 1996, 122-130.

58. Michael B. Mazis, Louis A. Morris and John L. Swasy, "Longitudinal Study of Awareness, Recall, and Acceptance of Alcohol Warning Labels," *Applied Behavioral Science Review*, 4 (1996, Number 2), 111-120.

59. Michael B. Mazis and Mary Anne Raymond, "Consumer Perceptions of Health Claims in Advertisements and on Food Labels," *Journal of Consumer Affairs*, Vol. 31 (Summer 1997), 10-26.

60. Michael B. Mazis, "Marketing and Public Policy: Prospects for the Future," *Journal of Public Policy & Marketing*, Vol. 16 (Spring 1997), 139-143.

61. Michael B. Mazis and Louis A. Morris, "The Channel," in Michael S. Wolgalter, John W. Brelsford, David M. DeJoy, and Kenneth R. Laughery, eds., *Warnings and Risk Communication*, London, England: Taylor & Francis, 1999, pp. 99-122.

62. Michael B. Mazis, "*FTC v. Novartis*: The Return of Corrective Advertising?," ***Journal of Public Policy & Marketing***, Vol. 20 (Spring, 2001), 114-122.

63. Manoj Hastak, Michael B. Mazis, and Louis A. Morris, "The Role of Consumer Surveys in Public Policy Decision Making," ***Journal of Public Policy & Marketing***, Vol. 20 (Fall 2001), 170-185. (Recipient of Thomas C. Kinnear/*Journal of Public Policy & Marketing* Outstanding Article Award presented by American Marketing Association for articles published 1999-2001.)

PROFESSIONAL ACTIVITIES

Editorial Review Board, *Journal of Public Policy & Marketing*, 1982-present.
Editorial Review Board, *The Journal of Consumer Affairs*, 1998-present.
Editorial Review Board, *Journal of Current Issues & Research in Advertising*,
      2002-present
Editorial Review Board, *Journal of Marketing*, 1991-1996.

Board of Directors, Association for Consumer Research (ACR), 1979-81.

Leadership Board, "Marketing and Society," American Marketing Association (AMA)
Special Interest Group, 2003-present.

Manuscript reviewer for AMA Educator's Conferences, 1976-2005; ACR Conference,
1978-1996; Marketing and Public Policy Conference, 1992-2005; Academy of Marketing
Science Conference, 1994; American Academy of Advertising Conference, 1994; ACCI
Conference, 2004-2005; *Journal of Consumer Research*, 1980, 1985-1990, 2000;
*Decision Sciences*, 1977 and 1980; *Journal of Marketing*, 1981, 1987, 1990-1991, 1999,
2001-2004; *Journal of* **Advertising**, 2002 and 2004; **Journal** *of Marketing Research*,
1985-1987, 1992; *Journal of Consumer Affairs*, 1989, 1991-1992, 1995, 1997; *Journal
of* **Macromarketing,** 2005; **Psychology** *and Marketing*, 1990 and 1997; *Journal of
Business Research*, 1991; *Journal of the Academy of Marketing Science,* 1991;
*International Journal of Research in Marketing*, 1992; *Safety Science*, 1992;
*Alcoholism: Clinical and Experimental Research*, 1994; *Journal of Business Ethics*,
1997; *American Business Law Journal*, 1998, .

Conference Co-chair, Marketing and Public Policy Conference, Washington, DC, 2003.

Conference Director, AMA Workshop, "Marketing and Public Policy: Issues for the
1990's," Washington, D.C., August 1990.

Proposal reviewer for the National Science Foundation, 1978.  Discussant at AMA
Educators' Conference, 1976 and ACR Conference, 1979, 1981, and 1983.  Session
Chair, AMA Educators' Conference, 1981 and 1988.  Discussant at International
Conference on Research in the Consumer Interest, 1987 and at American Psychological
Association Conference, 1986.

Invited lecturer at University of Kentucky, University of South Carolina, Duke
University, University of Maryland, George Washington University, Penn State
University, Georgetown University, and Queen's University.

Presented papers at AMA Educators' Conference, 1970, 1975, 1978, 1988, 1992, and
1994; ACR Conference, 1972-1973, 1977, 1979-1980, 1983, 1985, 1992, and 1994;
Marketing and Public Policy Conference, 1990, 1992-2003; American Public Health
Association Conference, 1991; Southern Marketing Association Conference, 1972 and
1973; American Psychological Association Conference, 1976 and 1980; Academy of

Marketing Science Conference, 1992; AMA Doctoral Consortium, 1992 and 1993; AMA Faculty Consortium on Ethics and Social Responsibility, 1995; AMA mini-conference on Environmental Issues, 1996; AMA mini-conference on Teaching of Public Policy, 1997.

Presented papers at American Assembly of Collegiate Schools of Business, 1979; Association of National Advertisers' Annual Meeting, 1979; J.C. Penney Consumer Affairs Forum, 1979; American Marketing Association (Washington Chapter), 1979; U.S. Regulatory Council's Innovative Techniques Workshop, 1980; MSI Conference: "Consumerism and Beyond: Research Perspectives on the Future Social Environment," 1982; American Advertising Federation Spring Government Affairs Conference, 1989; "The Federal Trade Commission in the 1990's," University of Notre Dame, 1989; Federal Trade Commission Marketing Symposium, 1991 and 1992; Drug Information Association, 1992; American Bar Association Conference: "How to Launch or Defend Against Competitive Challenges to Advertising Claims," 1995; National Advertising Division Workshop on Consumer Perception Communications Surveys, Council of Better Business Bureaus, 1996.

Organized special sessions at ACR Conference on children's advertising regulation, 1978, and on corrective advertising, 1980.  Organized pre-conference workshop "Current Developments at the FTC and FDA" for 2000 Marketing and Public Policy Conference. Organized panel on disclosure research at FTC/NAD Conference "Disclosure Exposure," 2001.

Participated in writing, "Review of the Research Literature on the Effects of Health Warning Labels: A Report to the United States Congress," June 1987.

Wrote "The Effects of the FTC's Listerine Corrective Advertising Order" for Federal Trade Commission, 1981; "An Analysis of Homeowner Experiences with Ward-Corporation-Built Homes" for Federal Trade Commission, 1983; "An Analysis of All-Terrain Vehicle Advertising 1980-87" for Consumer Product Safety Commission, 1988; and "Summary and Analysis of Consumer Surveys on Environmental Claims in Advertising and Labeling" for Federal Trade Commission, 1992 (with Manoj Hastak and Romana Horst); "Consumers' Interpretation of Alternative Environmental Claims" for Federal Trade Commission, 1996 (with Manoj Hastak and Thomas J. Maronick).

Member of Advertising and Marketing Panel of the Surgeon General's workshop on Drunk Driving, 1989; Member of Working Group on the Effects of the Mass Media on the Use and Abuse of Alcohol, 1992.

CONSULTANCIES

Served as the FTC's principal marketing witness in *FTC vs. Novartis* in 1997, *FTC vs. Trans Union* in 1998, *FTC v. Mercury Mark*eting, 2003, and *FTC v. Telebrands*, 2004. Served also as a consultant on marketing issues for Federal Trade Commission, Food and Drug Administration, Department of Justice, Consumer Product Safety Commission, and the State of California.

## HONORS

The American University Award as Outstanding Faculty Administrator (1985) and for
    Academic Program Development (1984)
Nominated for Teacher-Scholar Award (1983, 1985, 1989, and 1993)
Kogod College Award for Scholarship (1991)
Beta Gamma Sigma and Phi Kappa Phi
AACSB Federal Faculty Fellow, 1976-77

## COURSES TAUGHT

Undergraduate:  Consumer Behavior, Advanced Consumer Behavior, Marketing
Research, and Principles of Marketing.

Graduate:  Consumer Behavior, Marketing Research, Marketing Management, Doctoral
Seminar in Consumer Research, Marketing and Public Policy, and Internet Marketing.

## UNIVERSITY SERVICE

Elected to University Senate, 1980-1986, 1994-95.

University Senate Vice Chair, 1982-83, Parliamentarian, 1981-82, Nominating
Committee, 1982-83, Executive Committee, 1981-83, Chair, Summer Sessions
Committee, 1984-85, Secretary, The American University Club, 1988-89, Finance
Committee, 1991-93.

AU 85 Committee on Faculty Utilization and Development, 1981-82
AU 100 Ad Hoc Committee, 1987; AU Smoking Task Force, 1988-92

Kogod College of Business Administration Faculty Evaluation Committee, 1979-80,
Strategic Planning Committee, 1984-85, Chair, M.B.A. Committee, 1984-85, Rank and
Tenure Committee, 1989-91 (chair), 2001-2004, Chair, Educational Policy Committee,
1991, MBA Task Force, 1991-1992 (chair) and 1994-96, Research Committee, 1993,
1996-98 (chair), MBA Oversight Committee, 1994-95, Member, Graduate Educational
Policy Committee, 1996-1997, Member, Dean Search Committee, 1995-1996, Member,
MBA Admissions Committee, 1995-98, Member, Search Committee for IT Center
Director, 2001, Dean's Committee on Communication, 2001-2002.

Developed "Marketing Week," 1981-1983.

Developed "Marketing Career Extravaganza," a networking event for students at five
Washington, DC area universities, 2001.

**TAB B**

## DEPOSITION AND TRIAL TESTIMONY
## FOR MICHAEL B. MAZIS
## IN LAST FOUR YEARS

- Gibson v. Nissan Motor Company, et al., 2002 – U.S. District Court for the District of Colorado (Civil Action No. 00-M-1819) (deposition) – products liability case

- FTC v. Stephen Patrick Garvey, et al., 2002 – U.S. District Court for the Central District of California (Civil Action No. 00-09358) (trial) – deceptive advertising case

- FTC v. Speedway Motorsports, Inc. and Oil-Chem Research Corp., 2002 – U.S. District Court for the Middle District of California (Civil Action No. 1:00CV00126) (deposition) – deceptive advertising case

- Victoria Stuart v. Consumers Paint Factory, et al., 2002 – Superior Court of the State of California in and for the County of San Luis Obispo (Civil Action No. CV 980999) (deposition and trial) – Proposition 65 case (warnings)

- Maui Pineapple Company v. Del Monte Fresh Produce, et al., 2002 – United States District Court Northern District of California (San Francisco Division) (Case No. C 01-1449 CRB) (deposition) – Lanham Act case

- Michael DiPirro v. Macy's West, Inc. and J.C. Penney Company, Inc., 2002 – Superior Court of the State of California in and for the County of San Francisco (Case Nos. 407150 and 407058) (deposition and trial) – Proposition 65 case (warnings)

- FTC v. Mercury Marketing, et al., 2003 – U.S. District Court for the Eastern District of Pennsylvania (Civil Action No. 00-CV-3281) (deposition and trial) – deceptive advertising case

- Monsanto Company v. Oakhurst Dairy, Inc., 2003 – U.S. District Court for the Eastern Division of Massachusetts (Civil Action No. 03-11273 RCL) (deposition) – Lanham Act case

- McNeil-PPC, Inc. and Johnson & Johnson Hemisferica S.A. v. Merisant Company and Merisant Puerto Rico, Inc., 2004 – U.S. District Court for the District of Puerto Rico (Civil Action No. 04-1090 JAG) (trial) – Lanham Act case

- FTC v. Telebrands, et al., 2004 – Federal Trade Commission proceeding (Docket No. 9313) (deposition and trial) – deceptive advertising case

- Robert P. Heffner, et al. v. Blue Cross Blue Shield of Alabama, 2004 – U.S. District Court for the Middle District of Alabama, Northern Division (deposition) – class action suit

- The Steak n Shake Company v. Burger King Corporation, 2004 – U.S. District Court for the Eastern District of Missouri (Case No. 4:04CV00525TCM) (trial) – Lanham Act case

- Kathleen McCormack, et al. v. Wyeth, et al., 2004 – Superior Court of the District of Columbia (Civil No. 02-CA-6082) (deposition) – products liability case

- Pilot Corporation of America v. Fisher-Price, Inc. and Mattel, Inc., 2004 – U.S. District Court for the District of Connecticut (Civil Case No. 3:04CV977 JBA) (trial) – Lanham Act case

- FTC v. Basic Research, LLC, et al., 2004 – Federal Trade Commission proceeding (Docket No. 9318) (deposition) – deceptive advertising case

- Lucent Technologies, Inc. v. Extreme Networks, Inc. and Foundary Networks, Inc., 2005 – U.S. District Court for the District of Delaware (C.A. No. 03-508) (deposition and trial) – patent case

- S&M NuTek v. T.F.H. Publications, 2005 – U.S. District Court for the Western District of Missouri Western Division (Case No. 03-1033-CV-W-NKL) (deposition) – Lanham Act case

- Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc., 2005 – U.S. District Court for the District of Kansas (Case No. 04-2419-JWL) (deposition) – Lanham Act case

- Ruth King, et al. v. McNeil Nutritionals LLC and McNeill PPC-INC, 2005 – Supreme Court of the State of New York, County of New York (Index No. 6001168/05) (deposition) – class action suit

- Celgene Corporation v. Centocor, Inc., 2005 – U.S. District Court for the Eastern District of Pennsylvania (Case No. 03-CV-05978) (deposition) – Lanham Act case

- Commonwealth of Pennsylvania v. Peoples Benefit Services, Inc., 2006 – U.S. Commonwealth Court of Pennsylvania (Case No. 557 M.D. 2005) (trial) – consumer protection case

- Prempro Products Liability Litigation (Wyeth), 2006 – E.D. Arkansas (Case No. 4:03-CV-1507-WRW) (deposition) – products liability case

- Bass Pro Trademarks, LLC v. Sportsman's Warehouse, Inc., 2006 – Cancellation Proceeding No. 92045000 (deposition and trial deposition)

- State of Vermont v. R.J. Reynolds Tobacco Company, 2006 – Superior Court State of Vermont, Chittenden, SS (Docket No. S1087-05 CnC) (deposition)

- Merisant Company v. McNeil Nutritionals LLC and McNeil PPC-INC., 2006 – United States District Court for the District of Pennsylvania (Case No. CIV 04CV5504) (deposition)

# TAB C

 **ICR**

1/26/2006
E1489_screener2  (1-5)
Job #E1489

## Computer Survey
### Screener

(6-9)

### Market

(10)

- ❑ 1-Riverside, CA
- ❑ 2-Tracy, CA
- ❑ 3-Port Richey, FL
- ❑ 4-Taylor, MI
- ❑ 5-Akron, OH
- ❑ 6-Tulsa, OK
- ❑ 7-Hurst, TX
- ❑ 8-Lewisville, TX
- ❑ 9-Woodbridge, VA
- ❑ 0-Lincolnwood, IL

---

**SIGHT SCREEN FOR MALES AND FEMALES
18 YEARS OF AGE OR OLDER**

---

Hello, I'm _____ from _____, a nationwide market research organization. We're conducting a survey, and I'd like to ask you a few brief questions. Let me assure you we are doing this for research purposes only and are not selling anything. We are only interested in your opinions, which will be held in the strictest confidence.

A.   Which, if any, of the following internet search engines have you used in the past six months? (READ LIST) (CIRCLE ALL THAT APPLY)

|  |  |  |
|---|---|---|
| AOL | 1 | (11) |
| Google | 2 | CONTINUE |
| MSN | 3 | |
| Netscape | 4 | |
| Yahoo | 5 | |
| (DO NOT READ) | | |
| NONE | 0 | |
| DON'T KNOW | 9 | |

---

**MUST BE "YES" TO "GOOGLE" IN Q.A TO CONTINUE,
IF OTHER, "NONE" OR "DON'T KNOW" THANK, TALLY, & TERMINATE.**

| (Not Google) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 | 23 | 24 | 25 | 2 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 |
| | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 |
| (None) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 | 23 | 24 | 25 | 2 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 |
| | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 |
| (Don't Know) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 | 23 | 24 | 25 | 2 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 |
| | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 |

International Communications Research
53 West Baltimore Pike • Media, PA 19063-5698 • 484-840-4300 • info@icrsurvey.com • www.icrsurvey.com

 CASRO