1

2

3                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
4                          WESTERN DIVISION

5

CNG FINANCIAL CORPORATION,              Case No. 1:06cv040
6
        Plaintiff/Counterclaim-Defendant,
7                                        Judge Beckwith
                                         Magistrate Judge Black
        v.
8                                        **REBUTTAL EXPERT REPORT OF DR.
GOOGLE INC.,                             ITAMAR SIMONSON**
9
        Defendant/Counterclaim-Plaintiff.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dockets.Justia.com

## EXPERT REPORT OF DR. ITAMAR SIMONSON

### BACKGROUND AND QUALIFICATIONS

1.      I am the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business, Stanford University.  A copy of my curriculum vitae, which includes a complete list of my publications, is attached as Exhibit A.

2.      I hold a Ph.D. in Marketing from Duke University, Fuqua School of Business, a Master's degree in business administration (MBA) from the UCLA Graduate School of Management, and a Bachelor's degree from The Hebrew University with majors in Economics and Political Science.

3.      My field of expertise is consumer behavior, marketing management, trademark infringement, survey methods, and human judgment and decision making. Most of my research has focused on buyers' purchase behavior, the effect of product characteristics (such as brand name, price, features), the competitive context, and marketing activities (such as promotions, advertising) on buying decisions, and trademark infringement.

4.      I have received several awards, including (a) the award for the Best Article published in the Journal of Consumer Research (the major journal on consumer behavior) between 1987 and 1989, (b) the "Ferber Award" from the Association for Consumer Research, which is the largest association of consumer researchers in the world, (c) the 1997 O'Dell Award, given to the Journal of Marketing Research (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years, (d) the 2001 O'Dell award, (e) the award for the Best Article published in the Journal of Public Policy & Marketing (the major journal on public policy and legal aspects of marketing) between 1993 and 1995, (f) the 2002 American

1

Marketing Association award for the Best Article in the area of services marketing, and (g) I was a winner in a competition dealing with research on the effectiveness of direct marketing programs, which was organized by the Direct Marketing Association and the Marketing Science Institute.

5.      I have published three articles relating to trademark surveys and trademark infringement from the customer's perspective, including two in the Trademark Reporter and one in the Journal of Public Policy & Marketing.  The two articles published in the Trademark Reporter were: "The Effect of Survey Method on Likelihood of Confusion Estimates:  Conceptual Analysis and Empirical Test,"[1] and "An Empirical Investigation of the Meaning and Measurement of Genericness".[2]  The Journal of Public Policy & Marketing article, titled "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications",[3] was selected (in 1997) as the Best Article published in that journal between 1993 and 1995.

6.      At Stanford University I have taught MBA and executive courses on Marketing Management, covering such topics as buyer behavior, developing marketing strategies, building brand equity, advertising, sales promotions, and retailing.  I also taught an MBA course on Marketing to Businesses and a course on High Technology Marketing.  In addition to teaching MBA courses, I have guided and supervised numerous MBA student teams in their work on company and industry projects dealing with a variety of markets.

7.      I have taught several doctoral courses.  One doctoral course examines methods for conducting consumer research.  It focuses on the various stages involved in a

---

[1]  Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," Trademark Reporter, 83 (3), 364-393.

[2]  Itamar Simonson (1994), "An Empirical Investigation of the Meaning and Measurement of Genericness," Trademark Reporter, 84 (2), 199-223.

[3]  Itamar Simonson (1994), "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications," Journal of Public Policy and Marketing, 13(2), 181-199.

research project, including defining the problem to be investigated, selecting and developing the research approach, data collection and analysis, and deriving conclusions. A second doctoral course that I have taught deals with buyer behavior, covering such topics as buyer decision making processes, influences on purchase decisions, and persuasion. A third doctoral course that I have taught deals with buyer decision making. Prior to joining Stanford University, during the six years that I was on the faculty of the University of California at Berkeley, I taught an MBA Marketing Management course, a Ph.D. course on buyer behavior, and a Ph.D. course on buyer decision making. I also taught in various executive education programs, including a program for marketing managers in high technology companies.

8.    After completing my MBA studies and before starting the Ph.D. program, I worked for five years in a marketing capacity in a subsidiary of Motorola Inc., serving in the last two years as the product marketing manager for two-way communications products. My work included (a) defining new products and designing marketing plans for new product introductions, (b) customer and competitor analysis, and (c) sales forecasting.

9.    I have conducted, supervised, or evaluated well over 1,000 marketing research studies, including many related to trademark, branding, marketing strategies, and advertising-related issues. I serve on nine editorial boards, including leading journals such as the *Journal of Consumer Research, Journal of Marketing Research, Journal of Consumer Psychology,* and *Journal of Marketing.* I am also a frequent reviewer of articles submitted to journals in other fields, such as psychology, decision making, and economics. As a reviewer, I am asked to evaluate the research of scholars wishing to publish their articles in leading journals. I have also worked as a consultant for companies and organizations on a variety of marketing and buyer behavior topics. A list of cases in which I provided sworn testimony during the past four years is included in Exhibit B. I am being compensated at my standard rate of $650 an hour.

3

10.    I was asked by counsel for Google, Inc. to evaluate the survey conducted by Dr. Michael Mazis (Mazis Survey) on behalf of CNG Financial Corporation (CNG). Documents that I reviewed in connection with the preparation of this report are listed in Exhibit C.

## SUMMARY OF CONCLUSIONS

11.    Contrary to a most basic survey principle, the Mazis Survey failed to include effective, relevant controls. Specifically, while the stated objective of the Mazis Survey involved testing the alleged confusion created by sponsored links that are triggered when a consumer enters the keyword "Check 'n Go," the Mazis survey failed to include any control to assess the impact, if any, of entering that keyword. Thus, the same results might have been obtained if respondents entered generic keywords (e.g., payday loans, cash checks), which would indicate that the "evidence of confusion" was produced by the artificial survey and/or respondents' misinterpretation of their task (as explained below), rather than by any relevant confusion. Furthermore, the Mazis Survey failed to include a control in which the same questions were asked about another payday loan company (again, using the identical search results), to examine whether similar "confusion" results are obtained regardless of the company to which respondents presumably apply.

12.    Instead of including relevant controls, the Mazis survey tested whether respondents click on links related to penny stocks or life insurance when looking to apply for a cash advance. Thus, there was no real control in the Mazis survey, which made it fatally flawed with respect to any conclusions regarding "confusion" produced by the effect of triggering sponsored links on the "Check 'n Go" keyword.

13.    The Mazis Survey respondents were asked about the listing or listings (in plural) on which they would click "first," and they were later asked about other listing/s on which they would click. These leading questions greatly enhanced the likelihood that respondents would also point to sponsored links. However, when searching for information in the real world, consumers can click "first" on just one listing (e.g., on the www.checkngo.com listing).

14.    Dr. Mazis interpreted any case where a respondent pointed to a sponsored link as an indication that the respondent believed that the sponsored link would allow him

or her to apply for a cash advance from Check 'n Go. However, an examination of the explanations provided by respondents who pointed to sponsored links shows that virtually none of them understood the survey questions to mean that these links would take them to Check 'n Go. Instead, explanations such as "no credit checks" indicate that respondents were focused on the links they would find most attractive if they wanted to apply for a cash advance, regardless of the company from which they would receive the money. While Dr. Mazis suggested during his deposition that such respondents could be counted as confused because confusion could not be ruled out, the standard criterion for estimating confusion is observations of confusion (at least in the context of the survey), rather than merely cases where confusion could not be ruled out.

15.     The relevant universe for the survey included consumers/respondents who were likely to use the Google search engine for the purpose of applying for payday loans from Check 'n Go within the foreseeable future. However, the Mazis Survey failed to ascertain that respondents (a) belonged to the small minority of Check 'n Go customers who apply for a cash advance through the Internet, (b) would use the Google search engine for that purpose, (c) planned to apply for a cash advance from Check 'n Go within any specified period (e.g., three months, a year), and (d) had heard about Check 'n Go before the survey. As a result, the Mazis Survey universe was grossly over-inclusive, which means that its results were based in large part on the answers of irrelevant respondents.

16.     Each one of the above flaws makes it impossible to rely on the Mazis Survey to reach any conclusion regarding the effect of triggering sponsored links on the keyword "Check 'n Go." The combination of such fatal flaws indicates that the Mazis Survey cannot be relied upon and fails to provide any relevant information regarding CNG's allegations in this case.

## INTRODUCTION

17.    The stated objective of the Mazis Survey (Mazis Report, page 2) was to determine "whether consumers who seek to access CNG Financial Corporation's (CNG) Check 'n Go website though [through] Google's search engine are likely confused as to the source of the sponsored links for payday loan services that appear on the Google search results page." The Mazis Report then states the following conclusion (page 4): "The results of my survey revealed that prospective Google users who were likely to search for information about Check 'n Go over the Internet were confused about the sponsored links on the Google search results page."

18.    Consistent with the stated objective and conclusion, the key question that needs to be examined is whether the Mazis Survey actually tested and established, as it claims, that entering the term "Check 'n Go" in the Google search engine causes confusion; that is, the key question is whether the fact that the sponsored links were triggered by the key words "Check 'n Go" caused survey participants to believe that CNG sponsored, authorized, and/or was affiliated with the advertised links/websites. Another implicit assumption in the reported survey and conclusions was that (a) survey participants (and consumers) were likely to try to apply for payday loans from CNG using the Google search engine, and (b) respondents interpreted the questions to mean that any listing they point to is one that would allow them to apply for a loan from CNG, as opposed to any other source of payday loans.

19.    Assuming that CNG does not generally object to the existence of Internet search engines (e.g., Google) or to the right of such search engines to charge advertisers for sponsored links that are tied to keywords, a central question is whether the search term at issue, Check 'n Go, caused the "confusion" referred to in the Mazis report. Thus, including proper controls is absolutely essential for our ability to derive any conclusions from the Mazis Survey. For instance, if respondents in a control group were to provide similar answers after entering a generic term such as "cash checks" or 'payday loans"

(and seeing the same search results and sponsored links), then the obtained results in the group that presumably entered the keywords "Check 'n Go" could not be attributed to the search term at issue and likely reflected merely the survey methodology.  These and other issues are addressed in more detail below.

  20.  My evaluation of the Mazis Survey will focus on the following issues:

 (a) whether proper controls were employed.

 (b) whether the questions asked properly examined the stated objective of the survey and were interpreted by respondents as they were interpreted in the Mazis Survey report.

 (c) whether the survey approximated marketplace conditions.

 (d) whether the survey respondents were representative of the relevant population of consumers.

## DID THE MAZIS SURVEY INCLUDE PROPER CONTROLS?

21.    As explained above, without proper controls, the results of the Mazis
Survey are uninterpretable and cannot support its stated conclusions. An examination of
the Mazis Report shows that the "control" used in the Mazis Survey consisted of a
webpage that included sponsored links promoting investments in penny stocks, bonds, or
life insurance.

22.    The Mazis Report explains the choice of a control as follows (page 7): "The
purpose of using a control cell was to determine whether the presence of a sponsored link
for companies offering payday loans (such as, 'Payday Check to Go') was a key reason
for consumers' responses or whether 'noise' was the likely cause of consumers'
responses." As should have been clear to Dr. Mazis, the stated "purpose" of the control
was completely misguided; this purpose would have made sense only if CNG were
claiming that Google should not allow competitors of Check 'n Go to advertise on any
webpage with search results. That is, if Check 'n Go could support a claim that none of
its competitors should be allowed to advertise on any Google webpage, then presenting a
"control" webpage with unrelated sponsored links might have made sense.

23.    However, although CNG might wish that its competitors would not be
allowed to advertise their services on the Internet or on any Google webpage, that is not
the basis for its current Complaint and was not the purpose of the Mazis survey. Instead,
the survey should have tested whether triggering the sponsored links of competing
services on the search term "check 'n go" causes the alleged confusion. That is, given the
survey objective, the survey controls had to be selected such that one could determine
whether or not (a) entering the term "check n go," as opposed to another term to which
CNG does not object, was responsible for any response to the sponsored links at issue,
and (b) whether or not similar results would be obtained if the same survey questions
were asked about another company offering similar services to those of Check 'n Go.

24.    However, instead of using relevant controls, the Mazis survey used as its measure of "noise" the percentage of respondents who indicated that they would select sponsored links promoting penny stocks and life insurance. Considering that penny stocks and life insurance are quite different from the type of payday loan services at issue, it is unclear in what way such a "control" could serve any relevant purpose. The only conceivable value of such a "control" is to account for respondents who acted randomly and clicked on just any sponsored link, regardless of whether it had anything to do with what respondents were presumably searching for.

25.    In some cases, identifying a proper control may be difficult. In the present case, however, it was quite simple. For example, to determine whether respondents would have been as likely to click on the presented sponsored links after entering a search term other than "Check 'n Go," the Mazis Survey could have simply asked a control group to enter a generic search term such as "payday loans," "cash checks," or "cash advance"). If the percentage of respondents in that control group (presented with the same sponsored links and asked the same questions), who indicated they would click on one of the sponsored links, were similar to the corresponding percentage in the "test group" (i.e., the group that entered the search term "Check 'n Go"), then we would conclude that the search term did not create confusion. Unfortunately, the Mazis Survey failed to include such a straightforward control.

26.    Additional controls could have provided further tests of whether entering the search term "Check 'n Go" leads to confusion among consumers who seek information about Check 'n Go rather than about other similar companies. In particular, given the survey methodology employed in the Mazis survey (as discussed below), it is quite possible that survey respondents would have been just as likely to select a presented sponsored link if they had been told to assume that they wished to apply for a cash advance from another company (i.e., one that had not been entered as the search term). If that were the case, then we could reject the hypothesis that triggering these sponsored

10

links on the "Check 'n Go" keywords caused confusion. Thus, another control group should have been asked the same questions regarding a different cash advance service (keeping the "Check 'n Go" and sponsored links the same). Again, such a control was not included in the Mazis Survey.

27.    In summary, instead of including relevant, essential controls, the Mazis Survey used an irrelevant and ineffective control. The failure to include relevant controls is a fatal flaw of the Mazis Survey. In other words, that flaw by itself makes it impossible to base any conclusions on the Mazis Survey and makes the survey results irrelevant to the alleged confusion.

## DID THE MAZIS SURVEY QUESTIONS PRODUCE RELEVANT AND RELIABLE RESULTS?

28.    Search engine users do not and cannot simultaneously click on multiple listings. Instead, during the information search process, consumers may select just one website first. If that site satisfies their needs, the search process often ends. If they wish to return to a site or a webpage visited previously, they can simply hit the "back" button; or if they wish to look for further information, that can similarly be done very easily on the Internet. Accordingly, it is unrealistic and not meaningful to ask survey respondents about the listings (in plural) they would click on "first" if they wanted to apply for a cash advance from CNG. Similarly, if the search process ends after the first choice, it is not meaningful and misrepresents reality to invite survey respondents to select all those links they are "likely" to select. The most relevant question relates to the one listing on which they would click first.

29.    As I teach my doctoral students, if one wants respondents to focus on a particular aspect, the question must be worded accordingly, with a clear and unambiguous emphasis on that aspect. Otherwise, the respondents may miss the point of the question and answer a different question that is driven by the stimulus shown to them. Consider Question 1 in the Mazis Survey, which was asked while respondents were shown a webpage with organic search results and sponsored links generated by the keyword "check n go." The question was phrased as follows:

"If you wanted to apply for a payday loan or a cash advance from CHECK N GO, which listing or listings on this page would you be most likely to click on first. Please point to the listing you would be most likely to click on first."

30.    As phrased, the question failed to focus the respondents' attention on what was presumably its main objective, that is, identifying the listing that would be selected if respondents wanted to apply for a loan specifically from the company called Check 'n Go, rather than from any other company. Instead, the question invited respondents to

12

select one or a menu of listings on which they might click "first," and an examination of the questionnaires indicates that many of the respondents indeed selected multiple listings when answering this question. Again, as is obvious, respondents (and consumers) can click "first" on only one listing. Thus, as phrased, the question suggested to respondents that there was no limit on the number of listings on which they might click first. This bias was likely to increase greatly the likelihood of selecting multiple listings, including sponsored links.

31.    When asked during his deposition how it was possible that consumers would click "first" on more than one listing, Dr. Mazis said (rough transcript, p. 33): "A lot of times people, they may have more than one listing in mind. Maybe I would click on this one or maybe I would click on this one. It basically gives people the option and not force them to pick one thing." This explanation appears to avoid the obvious impossibility of clicking on more than one listing "first." While consumers might consider more than one listing, they cannot click on more than one listing first (and, often, last). Accordingly, respondents had to be asked to select the one listing on which they would click first. Similarly, in studies of consumer choice,[4] respondents are typically asked about the one option they would choose, even though they often consider and debate among multiple options.

32.    During his deposition (rough transcript, p. 49-50), Dr. Mazis was asked about the unrealistic "confusion" produced by the wording of the questions:

"Q.    In the real world, if he was at a screen and actually had to click one or another link first, he might very well have clicked Check 'n Go first, correct?

A.    I couldn't tell. I don't know.

Q.    But you counted him as confused, correct?

---

[4] See, e.g., Itamar Simonson and Amos Tversky (1992), "Choice in Context: Tradeoff Contrast and Extremeness Aversion," Journal of Marketing Research, 29 (August), 281-295.

A.    I counted him in [as] confused because he mentioned three sponsored links …

Q.    … even though … in the real world his first choice might have taken him to Check 'n Go?

A.    We don't know. We have no idea."

Thus, even when the survey results did not support the existence of confusion and Dr. Mazis had "no idea" if the respondent was confused, he just counted those responses as reflecting confusion.

33.    Given the explicit mention of the option to select multiple listings on which one would click first, many respondents were likely to assume that they were expected to select more than one listing. Furthermore, as discussed further below, because respondents in the Mazis Survey received an unusually high monetary compensation for their participation, they were particularly likely to follow the leads of the questions presented to them (related to the concept of survey "demand effects"). This effect was likely to contribute to respondents' willingness to indicate multiple listings on which they would click "first."

34.    If, as CNG apparently suggests, everyone who enters the "check 'n go" keyword has already decided that he or she wants to apply for a loan from CNG, then these consumers (and the Mazis Survey respondents) will go to the CNG site and stop there. However, in the Mazis Survey, respondents were asked in Question 1 to select multiple listings on which they would click "first" and were then invited in Question 4 to select additional listing or listings on which they were likely to click if they wanted to apply for a cash advance from CNG. As indicated, assuming consumers entered the Check 'n Go keyword and then clicked, for example, on the www.checkngo.com link, they would have had no reason to look for other listings. However, since respondents were likely to cooperate with the demands and suggestions of the survey questions, this question guaranteed that more respondents would select additional listings that appeared

14

on the search results page. Again, these biased and unrealistic questions produced the obtained results and, therefore, cannot be relied upon.

35.     The Mazis Report relied on answers to questions regarding the links that respondents said they would click on to produce its estimate of confusion. Thus, respondents who indicated that they would click first on sponsored links were counted as confused. However, a closer examination of the questions and web page shown to respondent suggests that many of the respondents could have interpreted and, in fact, did interpret the questions as referring to the sites they would go to if they wanted a cash advance regardless of the particular source (i.e., ignoring the reference to CNG). In other words, there is no evidence that these respondents, including almost all of those who were counted by Dr. Mazis as confused, believed that the sponsored links they pointed to were related to CNG. That is, as shown below, the explanations provided by the great majority of those counted as confused did not support the claim that they were confused or believed that the sponsored links were related to CNG.

36.     Thus, the Mazis Report interpreted any answer pointing to a sponsored link as evidence of confusion, that is, a respondent who mistakenly believed that the sponsored link represented a website where they could apply for a cash advance from a company called Check 'n Go, as opposed to applying for a cash advance from another company. If that interpretation of answers pointing to sponsored links is correct, then we would expect respondents to explain their answers based their reasons for believing that the selected listing would take them to the Check 'n Go website.

37.     However, an examination of the explanations actually provided by respondents who pointed to sponsored links indicates that almost all of them referred to the advertised advantages of that site, such as "No fax, no credit checks." Such answers make no sense if respondents accepted the assumption that they had already decided to apply for a cash advance from a company called Check 'n Go. That is, if the respondents accepted the premise that they had already decided to get a cash advance from CNG, then

there was no need to mention the advantages of the sponsored link.  Thus, the fact that respondents who pointed to sponsored links (and were therefore counted by Dr. Mazis as confused) explained their answer based on the advertised features of the site indicates that respondents did not understand the question.

38.    It is noteworthy that, unlike virtually all reports describing likelihood of confusion surveys, the Mazis Report did not discuss or present any analysis of the respondents' explanations, because Dr. Mazis "didn't find them particularly helpful" (rough transcript, p. 53).  Furthermore, during his deposition, Dr. Mazis conceded that respondents whom he had counted as confused might not have been confused, though he could not rule out that they were confused (rough transcript, p. 46: "All I can say is that I wouldn't rule it out").  And since confusion could not be ruled out (based on the survey questions), Dr. Mazis counted these respondents as confused.

39.    Before explaining why such misunderstandings by respondents were quite possible and even likely, it should be noted again that a proper control would have allowed us to examine whether misinterpretations of the Mazis Survey questions were responsible for answers referring to sponsored links.  For example, if respondents in a control group were asked about the listings they would click on if they wanted to apply for a cash advance from a different company such as "Check into Cash" (after entering the search term "Check 'n Go"), one could compare the percentages of respondents pointing to a sponsored link in the control group versus the test group.  Since such a control was not included, we have to rely on the respondents' explanations to try to understand how they interpreted the questions they were asked.

40.    Furthermore, considering that the survey was presumably designed to assess whether respondents, who understood that "Check 'n Go" was one particular company, mistakenly believed that a sponsored link would allow them to apply for a cash advance from that company, the questions should have been phrased in a clear and unambiguous manner.  However, the above Question 1 did not mention that Check 'n Go

16

was a company, with the last sentence of that question merely asking, "Please point to the listing you would be most likely to click on first." Accordingly, it is reasonable to assume that a significant portion of the respondents (a) might not have known what Check 'n Go stood for, such as whether it was a particular company or a generic term for a cash advance service, and (b) assumed that the interviewer was interested in the listing/s that respondents found most attractive, whether or not it was associated with a particular company.

41.    As indicated, considering that the survey participants were prospective customers of a cash advance service like CNG, one can reasonably assume that they were willing to go to great lengths to obtain monetary rewards. It is thus rather peculiar that Dr. Mazis chose to give participants an unusually high compensation, $10, for their participation in a rather short survey. While a small compensation (e.g., $2-4) is not uncommon and often does not raise any concerns, a $10 compensation, especially for this survey universe, had the potential to encourage misrepresentations and overly cooperative responses (i.e., strong demand effects). In theory, the respondents were informed of the generous $10 compensation only after they had qualified for participation. However, given such a high compensation and the particular respondent universe, there was a high likelihood that interviewers informed prospective respondents as soon as they were approached that, if they qualified, they would receive $10.

42.    Furthermore, prospective respondents, who were hoping to qualify for the $10 survey, were likely to say "yes" when answering the screening questions. In particular, instead of asking prospective respondents to name all the cash advance companies they might consider or had heard about (i.e., an open-ended question format), which would have guaranteed at least that respondents had indeed heard of CNG and might consider it, the Mazis Survey screener provided three names, including CNG, and asked respondents if they would consider them for a cash advance. It is noteworthy that, according to CNG's Complaint, it has had 1.8 million customers (perhaps including

17

repeat customers) over a period of five years (and only a small minority of them applied for a loan online, as discussed below). Thus, it is reasonable to assume that many consumers in the relevant universe had not heard of CNG, did not know what it stood for, and would not consider getting a cash advance from that company. However, given the promise of $10 for a short survey, they were likely to say "Yes" in response to the screening questions (e.g., whether they would consider CNG). It is also noteworthy that, except for item D in the Screener, nowhere else in the Mazis Survey questionnaire was there a reference to Check 'n Go as a specific company, as opposed to a service to which one goes to cash checks.

43.    It was easy to phrase the key questions in the Mazis Survey, those that served as the basis for its confusion estimate, more clearly and in a less ambiguous way. For example, Questions 1 and 2 could have been phrased as follows:

"1. If you wanted to apply for a payday loan or a cash advance from the company called CHECK N GO, which listing on this page would you click on. Please point to the listing you would click on if you wanted to apply for a cash advance from the company CHECK N GO."

[for the indicated listing, respondents could then be asked]

2. What makes you say that this listing would allow you to apply for a cash advance from the company CHECK N GO?"

Such phrasing of the questions would have made it clear to respondents that the question focused on the link they would select to obtain a cash advance from the named source, CHECK N GO, as opposed to another company.

44.    Furthermore, even respondents who understood the question as interpreted by Dr. Mazis might have pointed first to a sponsored link despite being fully aware that that listing was not connected in any way to Check 'n Go. That is, if respondents found the description of the sponsored link attractive, they could have selected that link to explore the possibility of getting cash advance from another source, even if they did not

18

associate it with CNG. Because, as explained above, the source of the cash advance is likely to make little difference to the person receiving that money, a consumer and a survey respondent would be wise to seek the best terms available regardless of the source. This process is consistent with the manner in which consumers generally seek information about options, and the Internet makes it particularly easy and virtually costless to obtain more information before committing to a particular option such as the CNG website. Of course, the consumer can then easily return to the previous site by hitting the Backspace key. If respondents interpreted the question regarding the listing they would click on first in this manner, instead of the way Dr. Mazis presumed (or could not rule out), they would have explained their decision to select the sponsored links based on the advertised advantages of the listing (e.g., "no credit checks"), without offering any explanation as to why they believed the sponsored link would take them to CNG.

45.    As indicated, an examination of the explanations provided by respondents who pointed to sponsored links shows that the overwhelming majority of them referred to the attractive, advertised features of those links. Such explanations are nonresponsive to the question if one assumes that the question focused on the reasons for believing that the selected links would allow the respondents to apply for a cash advance from Check 'n Go.

46.    In addition to the ambiguity of the Mazis Survey questions, they were leading. In particular, after respondents answered the questions regarding the listings they would click on, they were directed (in Question 6) to a particular listing, a sponsored link, and asked about the company that listing would take them to. This question was highly leading and suffered from strong demand effects (i.e., respondents were likely to guess what the "right" or expected answer was). That is, considering that this question came after respondents had been asked where they would go if they wanted to submit an application to Check 'n Go, it was reasonable to assume that the interviewer was giving them the correct answer – why else would the interviewer select that listing from all those

on the page?  Of course, if the listing about which they were asked clearly had nothing to do with cash advance applications, as was the case with the Mazis Survey "control" (e.g., "New Penny Stock Soaring" or Life insurance"), respondents were highly unlikely to assume that that listing would take them to a cash advance provider.  Thus, because Question 6 was so clearly leading and suffered from demand effects, the answers provided no relevant information.

## DO THE MAZIS SURVEY RESULTS SUPPORT THE STATED CONCLUSION THAT TRIGGERING SPONSORED LINKS ON THE "CHECK 'N GO" KEYWORD CREATES CONFUSION?

47.     As already explained above, the stated objective of the Mazis Survey was (Mazis Report, page 5): "to assess the likelihood of confusion caused by Google's 'AdWords' policy, which permits competitors of Check 'n Go to select the term 'Check 'n Go' as a keyword for advertisements that appear as sponsored links on the Google search results page." Given this objective, one would have expected Dr. Mazis to analyze the explanations provided by respondents and count the number of respondents who (a) selected a sponsored listing, and (b) mentioned the fact that the selected listing was triggered by (or appeared on the search results page) the search term "Check 'n Go" and, at the very least, would take them to a site from which they could obtain a CNG payday loan.

48.     Surprisingly, no such analysis was reported, and Dr. Mazis simply ignored the explanations because he did not find them "particularly helpful." An examination of the explanations may provide some insight as to why they were deemed not very helpful. Virtually none of the respondents who pointed to a sponsored link offered any reason as to why that listing was connected in any way to CNG. In fact, virtually none of the explanations of those respondents who Dr. Mazis counted as confused even mentioned CNG or that they pointed to a listing because Check 'n Go was the search term. Instead, the typical explanations simply referred to the advantage/s highlighted in the listing, such as "no credit checks." As Dr. Mazis testified (rough deposition transcript, p. 45-46), when he could not rule out that respondents were confused, he simply assumed (and reported) that they were. Such an approach is extremely unusual. In previous cases I have been involved in pertaining to likelihood of confusion, the evidence relied upon consisted of responses indicating confusion, not cases where confusion could not be ruled out.

49.     Thus, results of the Mazis Survey do not support the hypothesis that confusion is "caused by Google's 'AdWords' policy, which permits competitors of Check 'n Go to select the term 'Check 'n Go' as a keyword for advertisements that appear as sponsored links on the Google search results page."

50.     Finally, it is noteworthy that the listings that respondents selected most often were those linking to CareerBuilder.com websites.  While Dr. Mazis explained that one could link to the CNG website by first going to the CareerBuilder.com site, the fact that these job search sites were the most commonly selected listings is a further indication of the high level of "noise" in this survey.

DID THE MAZIS SURVEY APPROXIMATE MARKETPLACE CONDITIONS?

51.    Although the earlier discussion already referred to different ways in which the Mazis Survey violated the standard that a survey should approximate marketplace conditions as closely as possible, it is important to expand on that important rule.  Indeed, one of the most basic principles of surveys conducted in a litigation context is that, although a survey typically cannot replicate marketplace conditions, the survey should be designed so that it approximates the essential characteristics of the marketplace as closely as possible.  As Professor McCarthy points out, "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."[5]

52.    Dr. Mazis testified (rough transcript, p. 26) that he did not know what percentage of prospective CNG customers applied for payday loans online or what percentage of those who visit the CMG website proceed to apply for a loan.  My understanding is that the overwhelming majority of CNG customers do not apply for a cash advance using the Internet or an Internet search engine.  Accordingly, the procedure used in the Mazis survey did not attempt to approximate the typical way in which consumers in the marketplace apply for CNG loans.

53.    Furthermore, considering that only a relatively small minority of CNG customers apply for loans online, one would have expected the Mazis survey to screen respondents on that basis.  However, the Mazis Survey Screener did not even try to find out if respondents belonged to that select group, apparently assuming that those using the Internet to apply for CNG services are not more sophisticated with respect to usage of the Internet than those who do not use the Internet to apply for loans.  For example, in reality, those using the Internet to apply for loans might be more likely to recognize that,

---

[5] McCarthy at §32:163.

whenever they search for information about a particular product/service type, there is a high likelihood of encountering ads by various providers of related products/services, consistent with the basic marketing concepts of customer segmentation and targeting. Accordingly, to the extent that the Mazis Survey intended to assess the likelihood of confusion among those who might use the Internet to apply for a CNG cash advance, it was essential to confirm that the respondents were indeed likely to use the Internet and a search engine for that purpose.

54.    However, respondents were never asked if they would or might use the Internet or an Internet search engine to apply for a cash advance.  Instead, respondents were merely asked about information search.  Moreover, as detailed below, respondents were never asked if they had ever heard of CNG before the survey.  Since only those who had heard of the company might apply for a cash advance from that company, many of the respondents are unlikely to consider applying for a CNG cash advance (on or off the Internet).

## DID THE MAZIS SURVEY RESPONDENTS REPRESENT THE RELEVANT
## CONSUMER UNIVERSE?

55.     As Professor McCarthy points out,[6] "The first step in designing a survey is to determine the 'universe' to be studied. The universe is that segment of the population whose perceptions and state of mind are relevant to the issues in the case. Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant."

56.     Considering that the stated objective of the Mazis Survey (Mazis Report, page 4) referred to potential confusion among consumers who use the Google search engine to apply for a cash advance from Check 'n Go, the relevant respondent universe should have included consumers who expected to use Google for that purpose. Limiting the respondent universe to that group was important because such respondents were likely to be better familiar with the types of information and links that are triggered when one uses the Google search engine to seek information about companies such as "Check 'n Go." Conversely, consumers who have not used Google for that purpose and would not seriously consider applying for a cash advance using the Internet are likely to be less experienced with the Internet marketplace and the use of advertising and sponsored links on the Internet.

57.     As indicated, it appears that relatively few consumers have applied for a CNG cash advance using the Internet, and the overwhelming majority of customers rely instead on the CNG brick-and-mortar stores. Accordingly, it appears highly unlikely that the Mazis Survey sample included many respondents who had had actual experience using Google to apply for a CNG cash advance. Moreover, although candidate respondents may very well say that they might search for information about cash advance

---

[6] McCarthy at §32:159.

services, it is reasonable to assume that relatively few of the respondents would actually do that in the foreseeable future.

58.    The Mazis Survey respondents were not screened based on whether they would apply for a cash advance on the Internet or whether they might use the Google search engine for that purpose.  Instead, they were merely asked if they would use the internet to search for information about payday loans or cash advance services.  No time frame was provided, so prospective respondents could have assumed that the question referred to any potential future search.

59.    Asking about a future search about a particular company type is also not a meaningful question, because it is unreasonable to expect that consumers plan their Internet searches in advance or have any specific idea as to whether they would or would not perform an Internet search about a particular company.

60.    Consumers who might enter the search term "Check 'n Go" in order to apply for a cash advance from CNG have presumably heard previously about the company.  Accordingly, one would have expected prospective respondents to be screened based on prior familiarity with CNG.  However, no such familiarity or even awareness test was measured (which could have been easily done, using proper controls, such as by including "phantom" names).  Instead, respondents were merely asked if they would consider taking a cash advance from CNG.  Since one does not need to know CNG in order to "agree" to accept money from it, this question could not be relied upon to provide any indication of prior familiarity or likelihood of actually considering applying for a cash advance from CNG.

61.    Furthermore, many of those who might use the Internet to apply for a cash advance from Check 'n Go are likely to be sufficiently sophisticated to anticipate that entering the URL www.checkngo.com will take them to Check 'n Go.  Thus, as indicated, the Mazis Survey screener should have qualified respondents by identifying the (small) subset of consumers who are likely to apply for a cash advance from CNG on the

Internet and would use the Google search engine for that purpose.  However, the Mazis Survey screener failed to include questions that could identify such relevant respondents.

62.     Based on these failures to screen prospective respondents based on the relevant criteria, we can conclude that the Mazis Survey universe was greatly over-inclusive and, in all likelihood, did not include a sufficient number of qualified respondents.  As Professor McCarthy points out,[7] "if the wrong persons are asked, the results are likely to be irrelevant."  In particular, an over-inclusive universe skews the results by introducing irrelevant data.  As indicated, the failure to limit the respondents to those in the relevant universe was likely to be material, because those likely to use the Google search engine to apply on the Internet for a payday loan are likely to be more sophisticated and knowledgeable and more likely to make informed decisions regarding their choice of the listing on which to click.

2/14/2007

**Date**

I. Simonson

**Itamar Simonson, Ph.D.**

---

[7] 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition [McCarthy] §32:159 (June 2002). While I am not an attorney or an expert on legal matters, I find it useful to refer to legal authorities and prior court decisions to illustrate the types of issues and principles that have come up in connection with the evaluation of likelihood of confusion and other surveys.

# Exhibit A

# Itamar Simonson

## ADDRESSES

January  2007

Home:

  1044 Vernier Place

  Stanford, CA 94305

    (650) 857-9038

  Cell: (650) 387-7677

  Fax: (650) 857-9090

Office:

    Graduate School of Business

    Stanford University

    Stanford, CA 94305-5015

      (650) 725-8981

      itamars@stanford.edu

## EDUCATION

| | |
|---|---|
| Ph.D. | Duke University, Fuqua School of Business<br>Major: Marketing;  May 1987 |
| M.B.A. | UCLA,  Graduate School of Management<br>Major: Marketing;  March 1978 |
| B.A. | Hebrew University, Jerusalem, Israel<br>Major: Economics, Political Science;  August 1976 |

## ACADEMIC POSITIONS

| | |
|---|---|
| July 1987 - June 1993 | University of California, Berkeley<br>Haas School of Business<br>Assistant Professor |
| July 1993 – Aug. 1996 | Stanford Graduate School of Business<br>Associate Professor of Marketing |
| Sept. 1996 – Aug. 1999 | Stanford Graduate School of Business<br>Professor of Marketing |
| Sept. 1999 – | Stanford Graduate School of Business<br>Sebastian S. Kresge Professor of Marketing |
| 1994 – 2000 | Stanford Graduate School of Business<br>Marketing Group Head |
| Fall 2000 | MIT Sloan School of Management<br>Visiting Professor of Marketing |

**AWARDS**

- Best Article in the *Journal of Consumer Research* during the period 1987-1989.
- The 1997 O'Dell Award (for the *Journal of Marketing Research* article that has had the greatest impact on the marketing field in the previous five years).
- The 2001 O'Dell Award.
- Best Article in the *Journal of Public Policy & Marketing* during the period 1993-1995.
- The 2002 American Marketing Association Award for the Best Article in the area of Services Marketing.
- The Association for Consumer Research 1990 "Ferber Award."
- Runner-up/Finalist for the O'Dell Award: 1995; 2002; 2004; 2005; 2007.
- Finalist for the 2003 Paul Green Award (for the *Journal of Marketing Research* article with the greatest potential to contribute to the practice of marketing research).
- Runner-up for the 2005 *Journal of Consumer Research* Best Article Award.
- Winner in the Marketing Science Institute and Direct Marketing Association competition on "Understanding and Measuring the Effect of Direct Marketing."
- Runner-up for the 1993 *California Management Review* Best Article Award.
- National Science Foundation Grant (for 1996-8).
- Outstanding Reviewer Award, *Journal of Consumer Research*, 2005.
- Honorable Mention for the Sloan Executive Program Teaching Award (Fall 1995).
- Five years in the Berkeley School of Business "6-Point Club" (instructors with teaching ratings of 6 or more on a 7-point scale).

**TEACHING EXPERIENCE**

Stanford University:

      Marketing Management  (for MBAs)
      Marketing Management  (the Sloan Executive Program)
      Marketing to Businesses (for MBAs)
      Technology Marketing  (for MBAs)
      Research Methods for Studying Buyer Behavior  (a Ph.D. Course)
      Decision Making  (a Ph.D. Course)
      Buyer Behavior (a Ph.D. course)

University Of California, Berkeley:

      Marketing Management (for MBAs - day and evening programs)
      Consumer Behavior and Decision Making (a Ph.D. Course)
      Various Marketing Executive Education Programs.

**BUSINESS EXPERIENCE**

October 1978-August 1983    Motorola, Inc.
Worked in an international subsidiary; responsibilities included marketing research and customer analysis, definition of new products, pricing, analysis of sales force performance, competitive intelligence, and forecasting.  Conducted studies of markets for various communications products.  Last two years served as Product Marketing Manager for communications products.

**Consulting**:

Consulted for clients from the communications, services, and manufacturing sectors. Expert witness assignments in the areas of trademark infringement, deceptive advertising, market surveys, buyer behavior, marketing management, brand equity, retailing and distribution, and other aspects of marketing.


# PUBLICATIONS

Jonah Berger, Michaela Draganska, and Itamar Simonson, "The Influence of Product Variety on Brand Perceptions, Choice, and Experience," <u>Marketing Science</u>, forthcoming.

Itamar Simonson, "Decision Making," <u>Encyclopedia of Social Psychology</u>, In press.

Nathan Novemsky, Ravi Dhar, Norbert Schwarz, and Itamar Simonson (2006), "Preference Fluency in Context," <u>Journal of Marketing Research</u>, forthcoming.

Chezy Ofir and Itamar Simonson (2006), "The Effect of Stating Expectations on Customer Satisfaction and Shopping Experience," <u>Journal of Marketing Research</u>, February, 164-174.

Raymond Fisman, Sheena Iyengar, Emir Kamenica, and Itamar Simonson (2006), "Gender Differences in Mate Selection: Evidence from a Speed Dating Experiment," <u>Quarterly Journal of Economics</u>, 121 (2), 673-697.

Donnel Briley, Michael Morris, and Itamar Simonson (2005), "Cultural Chameleons: Biculturals, Conformity Motives, and Decision Making," <u>Journal of Consumer Psychology</u>, 15 (4), 351-362.

Itamar Simonson (2005), "In Defense of Consciousness:  The Role of Conscious and Unconscious Inputs in Consumer Choice," <u>Journal of Consumer Psychology</u>,15(3), 211-217.

Uptal Dholakia and Itamar Simonson (2005), "The Effect of Explicit Reference Points on Consumer Choice and Online Bidding Behavior," <u>Marketing Science</u>, 24, 206-17.

## PUBLICATIONS  (continued)

Itamar Simonson (2005), "Determinants of Customers' Responses to Customized Offers:  Conceptual Framework and Research Propositions," Journal of Marketing, 69 (January), 32-45.

Itamar Simonson, Thomas Kramer, and Maia Young (2004), "Effect Propensity," Organizational Behavior and Human Decision Processes, 95 (November), 156-74.

Itamar Simonson and Aimee Drolet (2004), "Anchoring Effects on Consumers' Willingness-to-Pay and Willingness-to-Accept," Journal of Consumer Research, 31 (December), 681-90.

Ran Kivetz and Itamar Simonson (2003) "The Idiosyncratic Fit Heuristic: The Role of Effort Advantage in Consumer Response to Loyalty Programs," Journal of Marketing Research, 40 (November), 454-67.

Ravi Dhar and Itamar Simonson (2003), "The Effect of Forced Choice on Choice," Journal of Marketing Research, 40 (May), 146-60.

Dan Ariely and Itamar Simonson (2003), "Buying, Bidding, Playing, or Competing? Value Assessment and Decision Dynamics in Online Auctions," Journal of Consumer Psychology, 13(1&2), 113–123.

Ran Kivetz and Itamar Simonson (2002), "Self Control for the Righteous: Toward a Theory of Luxury Pre-Commitment," Journal of Consumer Research, 29 (September), 199-217.

Ran Kivetz and Itamar Simonson (2002), "Earning the Right to Indulge:  Effort as a Determinant of Customer Preferences Toward Frequency Program Rewards," Journal of Marketing Research, 39 (May), 155-70.

Chezy Ofir and Itamar Simonson (2001), "In Search of Negative Customer Feedback: The Effect of Expecting to Evaluate on Satisfaction Evaluations," Journal of Marketing Research, 38 (May), 170-82.

Itamar Simonson, Ziv Carmon, Ravi Dhar, Aimee Drolet, and Stephen Nowlis (2001), "Consumer Research: In Search of Identity," Annual Review of Psychology, 52, 249-275.

Donnel Briley, Michael Morris, and Itamar Simonson (2000), "Reasons as Carriers of Culture:  Dynamic Vs. Dispositional Models of Cultural Influence on Decision Making," Journal of Consumer Research, 27 (September), 157-178.

Aimee Drolet, Itamar Simonson, and Amos Tversky (2000), "Indifference Curves that Travel with the Choice Set," Marketing Letters, 11(3), 199-209.

Stephen Nowlis and Itamar Simonson (2000), "Sales promotions and the Choice Context as Competing Influences on Consumer Decision Making," Journal of Consumer Psychology, 9(1), 1-17.

## PUBLICATIONS (continued)

Ran Kivetz and Itamar Simonson (2000), "The Effect of Incomplete Information on Consumer Choice," Journal of Marketing Research, 37(4), 427-48.

Itamar Simonson and Stephen Nowlis (2000), "The Effect of Explaining and Need for Uniqueness on Consumer Decision Making:  Unconventional Consumer Choices Based on Reasons," Journal of Consumer Research, 27 (June), 49-68.

Itamar Simonson (1999), "The Effect of Product Assortment on Consumer Preferences," Journal of Retailing, 75(3), 347-70.

Ravi Dhar and Itamar Simonson (1999), "Making Complementary Choices in Consumption Episodes:  Highlighting Versus Balancing" Journal of Marketing Research, 36 (February), 29-44.

Houghton, David, ..., and Itamar Simonson (1999), "Correction Processes in Consumer Choice," Marketing Letters, 10(2),107-112.

Ziv Carmon and Itamar Simonson (1998), "Price-Quality Tradeoffs in Choice Versus Matching:  New Insights into the Prominence Effect," Journal of Consumer Psychology, 7(4), 323-343.

Stephen Nowlis and Itamar Simonson (1997), "Attribute–Task Compatibility as a Determinant of Consumer Preference Reversals," Journal of Marketing Research, 34 (May), 205-218.

Joel Huber, ..., and Itamar Simonson (1997), "Thinking About Values in Prospect and Retrospect:  Maximizing Experienced Utility," Marketing Letters, 7, 324-334.

Stephen Nowlis and Itamar Simonson (1996), "The Impact of New Product Features on Brand Choice," Journal of Marketing Research, 33 (February), 36-46.

Itamar Simonson (1994), "Trademark Infringement from the Buyer Perspective:  Conceptual Analysis and Measurement Implications," Journal of Public Policy and Marketing, 13(2), 181-199.

Itamar Simonson (1994), "An Empirical Investigation of the Meaning and Measurement of Genericness," Trademark Reporter, 84 (2), 199-223.

Itamar Simonson, Ziv Carmon, and Suzanne O'Curry (1994), "Experimental Evidence on the Negative Effect of Product Features and Sales Promotions on Brand Choice," Marketing Science, 13 (1), 23-40.

Itamar Simonson (1993), "Get Closer to Your Customers by Understanding How They Make Choices," California Management Review, 35 (4), 68-84.

Itamar Simonson, Stephen Nowlis, and Katherine Lemon (1993), "The Effect of Local Consideration Sets on Global Choice Between Lower Price and Higher Quality," Marketing Science, 12 (4), 357-377.

**PUBLICATIONS  (continued)**

Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion Estimates:  Conceptual Analysis and Empirical Test," Trademark Reporter, 83 (3), 364-393.

Itamar Simonson, Stephen Nowlis, and Yael Simonson (1993), "The Effect of Irrelevant Preference Arguments on Consumer Choice," Journal of Consumer Psychology, 2 (3), 287-306.

Eldar Shafir, Itamar Simonson, and Amos Tversky (1993), "Reasons-Based Choice," Cognition, 49, 11-36.

Amos Tversky and Itamar Simonson (1993), "Context-Dependent Preferences," Management Science, 39 (10), 1179-1189.

Itamar Simonson (1992), "Influences of Anticipating Regret and Responsibility on Purchase Decisions," Journal of Consumer Research, 19 (June), 105-118.

Itamar Simonson and Peter Nye (1992), "The Effect of Accountability on Susceptibility to Decision Errors", Organizational Behavior and Human Decision Processes, 51 (3), 416-446.

Itamar Simonson and Barry Staw (1992), "De-Escalation Strategies: A Comparison of Techniques for Reducing Commitment to Losing Courses of Action," Journal of Applied Psychology, 77 (4), 419-426.

Itamar Simonson and Amos Tversky (1992), "Choice in Context: Tradeoff Contrast and Extremeness Aversion," Journal of Marketing Research, 29 (August), 281-295.

Itamar Simonson and Russell S. Winer (1992), "The Influence of Purchase Quantity and Display Format on Consumer Preference for Variety", Journal of Consumer Research, 19 (June), 133-138.

Ravi Dhar and Itamar Simonson (1992), "The Effect of the Focus of Comparison on Consumer Preferences," Journal of Marketing Research, 29 (November), 430-440.

William T. Ross and Itamar Simonson (1991), "Evaluations of Pairs of Experiences: A Preference for Happy Endings," Journal of Behavioral Decision Making, 4(4), 273-282.

## PUBLICATIONS  (continued)

Itamar Simonson (1991), "The Effect of Buying Decisions on Consumers' Assessments of Their Tastes", <u>Marketing Letters</u>, 2, 1, 5-14.

Itamar Simonson (1990), "The Effect of Purchase Quantity and Timing on Variety Seeking Behavior," <u>Journal of Marketing Research</u>, 27 (May), 150-162.

Itamar Simonson (1989), "Choice Based on Reasons: The Case of Attraction and Compromise Effects," <u>Journal of Consumer Research</u>, 16 (September), 158-174.

Itamar Simonson, Joel Huber, and John Payne (1988), "The Relationship Between Prior Brand Knowledge and Information Acquisition Order", <u>Journal of Consumer Research</u>, (March), 14,4, 566-78.


## ARTICLES  UNDER  REVIEW

Aimee Drolet, Dale Griffin, Mary Frances Luce, and Itamar Simonson, "The Influence of Cognitive Load on Consumer Choice Processes."

Raymond Fisman, Sheena Iyengar, Emir Kamenica & Itamar Simonson, "Racial Preferences in Dating: Evidence From Speed-Dating Events."

Song-Oh Yoon and Itamar Simonson, "The Context of Construction As a Determinant of the Stability of Consumer Preferences."

Stephen Nowlis, Ravi Dhar, and Itamar Simonson (2006), "The Effect of Decision Order on Purchase Quantity Decisions."

**EDITORIAL ACTIVITIES**

Editorial Boards: *Journal of Consumer Research, Journal of Marketing Research, Journal of Consumer Psychology, Journal of Marketing, Journal of Behavioral Decision Making, International Journal of Research in Marketing, Review of Marketing Research, Marketing Letters, Review of Marketing Research.*

Reviewer for *Marketing Science, Journal of Economic Behavior and Organization, Management Science, Journal of Retailing and Consumer Services, Journal of Marketing, Journal of Retailing, Organizational Behavior and Human Decision Processes, Journal of Experimental Psychology, Psychological Review, Psychological Bulletin, Journal of Personality and Social Psychology, Psychological Science, California Management Review, Journal of Economic Psychology, European Journal of Social Psychology,* and *Medical Decision Making.*

**PROFESSIONAL AFFILIATIONS**

American Marketing Association
Association for Consumer Research
Judgment and Decision Making Society
American Psychological Society

**PERSONAL DATA**

Birth Date:          December 25, 1951
Marital Status:      Married, 2 children

# Exhibit B

EXHIBIT B

**Cases in which Dr. Itamar Simonson Testified as an Expert at Trial (including written expert reports submitted to the court) or by Deposition in the Past Four Years**

1. M2 Software v. Madacy, Inc.

2. Oracle v. Light Reading

3. R.J. Reynolds Tobacco Company v. Cigarettes Cheaper

4. Empresa Cubana Del Tabaco v. General Cigar

5. BattleBots v. Anheuser-Busch

6. Kal Kan Foods v. Iams and Procter & Gamble

7. Coffee Bean & Tea Leaf v. Starbucks

8. Starbucks v. Sambuck's Coffeehouse

9. Visa International v. VeriSign; VeriSign v. Visa International

10. Trek Bicycle v. Thane International

11. We've Only Just Begun Wedding, Inc. v. The Little White Wedding Chapel, Inc.

12. Kubota Corporation v. Daedong – USA

13. ZonePerfect Nutrition Company v. Hershey Foods and Mr. Barry Sears

14. Verizon Directories v. Yellow Book

15. CipherTrust, Inc. v. IronPort Systems, Inc.

16. GEICO v. Google et al.

17. Lucent v. Foundry Networks

18. T. Rowe Price v. Schwab

19. Photographic Illustrators Corp. v. The Gillette Company

20. KCI et al. v. BlueSky et al.

21. BTA Branded v. Syngenta Seeds and Tanimura & Antle

22. Markwins Beauty Products v. Mirage Cosmetics

23. Nissan Motors v. VW and Audi of America

24. Met-Rx Substrate Technology v. Champion Nutrition

25. FTC v. QVC et al.

26. Classic Foods v. Kettle Foods

27. Allergan v. Klein-Becker

28. CollegeNET, Inc. v. XAP Corp.

29. Enterprise Rent-A-Car v. U-Haul International

30. Nautilus v. ICON

31. Newport Pacific v. Moe's Southwestern Grill

32. American Blinds & Wallpaper Factory v. Google Inc.

33. WG Security Products, Inc. v. Tyco International

34. Kargo Global, Inc. v. Advance Magazine Publishers, Inc.

35. Ann Castello et al. v. Allianz Life Insurance

36. Dyson v. Maytag

37. Talwar et al. v. Creative Labs

38. Bare Escentuals Beauty v. MD Skin Care

# Exhibit C

EXHIBIT C

Documents Reviewed:

Mazis Expert Report and exhibits thereto

Documents produced by Dr. Mazis (MAZIS000001 – 5105)

CNG presentation re demographics (CNG002823-2856)

Rough transcript of Mazis Deposition

## PROOF OF SERVICE

I am employed in the City and County of San Francisco, State of California in the office

of a member of the bar of this court at whose direction the following service was made. I am

over the age of eighteen years and not a party to the within action. My business address is Keker

Van Nest, LLP, 710 Sansome Street, San Francisco, California 94111.

On February 15, 2007, I served the following document:

### REBUTTAL EXPERT REPORT OF DR. ITAMAR SIMONSON

by regular **UNITED STATES MAIL** by placing a true and correct copy in a sealed envelope
addressed as shown below. I am readily familiar with the practice of Keker & Van Nest, LLP for
collection and processing of correspondence for mailing. According to that practice, items are
deposited with the United States Postal Service at San Francisco, California on that same day
with postage thereon fully prepaid. I am aware that, on motion of the party served, service is
presumed invalid if the postal cancellation date or the postage meter date is more than one day
after the date of deposit for mailing stated in this affidavit.

and

by **EMAIL PDF,** by personally emailing a true and correct copy addressed as shown below.

> Barry D. Hunter
> Frost Brown Todd LLC
> 250 West Main Street, Suite 2700
> Lexington, KY 40507
> bhunter@fbtlaw.com

I, declare under penalty of perjury under the laws of the State of California that the above

is true and correct. Executed on February 15, 2007, at San Francisco, California.

_NOELLE NICHOLS_

373659.01