# Do Google's Sponsored Links Mislead or Confuse Prospective Geico Consumers?

Prepared for:

**Keker & VanNest**

**San Francisco, CA**

Prepared by:

**Jacob Jacoby, Ph.D.**
**New York, NY**

October 2004
JJ4039/2441



EXHIBIT

D

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058493

# BACKGROUND AND OBJECTIVE

**BACKGROUND:**

Google, Inc. ("Google") is a Delaware corporation with its principal place of business in Mountain View, California. Google operates an Internet search engine used by consumers to search the World Wide Web for, among other things, websites offering products and services. The objective results of such Internet searches are provided to consumers under the rubric "Web." Additionally, Google markets and sells to advertisers the ability to have their listings appear separated from the "Web" listings but alongside the results of the searches under the rubric "Sponsored Links."

Government Employees Insurance Company ("GEICO") is a Maryland corporation with its principal place of business in Chevy Chase, Maryland. GEICO is in the business of selling motor vehicle insurance. GEICO has alleged that "consumers using the GEICO Marks as search terms or keywords on [Google's] search engine are likely to be confused as to whether the 'sponsored listings' ... paid for by the advertisers have some connection or affiliation with GEICO, or are otherwise associated with GEICO."[1]

**OBJECTIVE:**

Counsel for Google contacted Jacob Jacoby,[2] the author of this report, with the request that he design and conduct a survey to determine whether (and, if so, to what extent) prospective GEICO consumers would be misled or confused, as alleged by

---

[1] First Amended Complaint. *Government Employees Insurance Co., v. Google, Inc and Overture Services, Inc.* U.S.D.C., E.D. Virginia (Alexandria Division). May 14, 2004. Paragraph 6.

[2] A description of Jacob Jacoby's credentials and qualifications for designing and conducting such research is provided in Appendix A. Provided under separate cover and incorporated herein by reference are a list of his publications for the last 10 years, a list of his courtroom and deposition testimony for the last four years, and a statement of the cost of this survey.

2

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058494

GEICO. This report describes the design, conduct and findings of the resulting investigation.

3

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058495

## PRINCIPAL FINDINGS AND CONCLUSIONS

**OVERVIEW:**

The investigation was conducted via a set of mall intercept surveys. A total of 329 individuals aged 16 or older, who said they searched for information or bought a product or service on-line in the past six months and used Google in the past six months, and either used or would consider using the Internet to get information about, or buy motor vehicle insurance, participated in the study. Those individuals who met the qualification criteria and consented to participate were brought to a shielded testing facility within the mall. At that point they were seated before a computer, asked to type in "GEICO" (or in the case of respondents in Control group 3, Nike), after which they saw a Google search results page displayed on the computer monitor. With the search result page and its contents visible directly in front of them, as would be the case while they consulted and interacted with a search results page under real-world circumstances, the respondents were asked questions to determine the extent (if any) to which they were misled or confused about selected web links on the page.

After eliminating 58 respondents that failed the post-survey validation (half of whom may have thought the purpose of the validation callback was to sell them insurance), data analysis was confined to the remaining 271 respondents.

**PRINCIPAL FINDINGS:**

The principal findings of this study can be summarized as follows:

1.      People who type "GEICO" on a Google start page and then generate a search results page that, in addition to the results of the organic search associated with the name GEICO, provides Sponsored Links to other auto insurance sites that do not

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058496

use the name GEICO in their heading or text, are not confused on how to get to get to GEICO's website or home page. Contrary to GEICO's allegations, they are not misled or hijacked by these Sponsored Links or confused into going to other insurance sites when they intend to go to GEICO.

    2.    Sponsored Links that do not use the name GEICO generate negligible levels of confusion as to affiliation with, authorization by, or offering products from GEICO.

**CONCLUSIONS:**

Based upon the data gathered in this investigation, in my opinion, a negligible percent of consumers using Google in the marketplace are likely to be misled or confused in a manner being alleged by plaintiff, GEICO.

5.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058497

## DESIGN PRINCIPLES AND STANDARDS

The study was designed and conducted in strict accordance with the seven-factor framework cited in the Federal Judicial Center's *Manual for Complex Litigation, Third* (Section 21.493, page 102; 1995), and with the greater amplification of this framework provided in the "Reference Guide on Survey Research" appearing in the FJC's 1994 *Reference Manual on Scientific Research.*[3] Also considered in the design of this investigation were the implications of the Supreme Court's opinion in *Daubert v. Merrell Dow.*[4]

The seven factors from the *Manual for Complex Litigation* are quoted verbatim below. The order in which they are cited departs from the original to more closely track the sequence of activities that typically occurs during the research process.

- ✓ The population was properly chosen and defined;
- ✓ The sample chosen was representative of that population;
- ✓ The questions asked were clear and not leading;
- ✓ The survey was conducted by qualified people following proper interviewing procedures;
- ✓ The data gathered were accurately reported;
- ✓ The data were analyzed in accordance with accepted statistical principles;
- ✓ The process was conducted so as to insure objectivity.

---

[3] At the request of the Federal Judicial Center, Jacob Jacoby served as a peer reviewer for the *Reference Guide on Survey Research* that appears in both the first (1994) and second (2000) editions of the *Reference Manual on Scientific Research.*

[4] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058498

How the seven *Manual for Complex Litigation* factors were applied in the current investigation is discussed below. The discussion departs from the listed order in three respects.

First, the researchers' qualifications (an element of Factor #4) are set forth in Appendix A.

Second, as exemplified throughout this report, Factor #7 -- the need to insure objectivity -- exerted a pervasive impact throughout the design, implementation and interpretation of all aspects of the investigation.

Third, discussion of the seven factors is preceded by a discussion of the logic of the research design and the controls used as part of that design to estimate the error rate (or "noise") associated with the test protocol.

## THE LOGIC OF THE RESEARCH DESIGN:

The study sought to determine the extent to which consumers who, having typed the term GEICO on a Google web search page and called for the results, then exhibited confusion in regard to a relationship between GEICO and sites appearing on the results page under the title "Sponsored Links."

A "Test group" of (160) respondents underwent an experience that simulated the real world that, under Google's current policies for Sponsored Links, Google users now experience. Specifically, respondents in the Test group first typed in the name GEICO and used the Google engine to generate a search results page that was displayed on screen. At this point, the respondents were asked questions to determine the extent (if

7

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058499

any) to which they were confused regarding possible relationships between GEICO and the three sites listed under "Sponsored Links."

The confusion found in a survey might be caused by a number of factors, not all of which necessarily reflect confusion for the reason(s) being alleged. As examples, some or all of the confusion may be caused by the questions asked, or may be a consequence of guessing by respondents. One way scientists adjust for and rule out such potential alternative explanations for empirical findings is to use both Test and Control conditions.[5] In the present matter, respondents were randomly assigned to either the Test group, or one of three Control groups.

Respondents assigned to Control group 1 also were instructed to type in GEICO. After the Google search results were displayed on screen, they were asked questions to determine the extent (if any) to which they were confused regarding possible relationships between Allstate (another motor vehicle insurance company) and the three sites listed under "Sponsored Links." The purpose of Control group 1 was to determine the extent to which consumers thought the sites listed under "Sponsored Links" offered automotive insurance from Allstate — even though the consumer had not typed in Allstate at the outset, nor seen that company's name anywhere on the search results page.

Respondents assigned to Control group 2 repeated what respondents in the Test group did, with one slight wrinkle. After typing in GEICO and having the Google search results page displayed on screen, not only were respondents in Control group 2 asked questions to determine the extent to which consumers thought the sites listed under

---

[5] An overview of the approach is provided in: Jacob Jacoby "Experimental design and the selection of controls in trademark and deceptive advertising surveys." 92 (4) *The Trademark Reporter.* (2002) Pages 890-956.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058500

"Sponsored Links" offered automotive insurance from GEICO, but were asked the same questions to determine the extent (if any) to which similar confusion would be associated an organic, *non-sponsored* link that mentioned GEICO, but did not offer GEICO insurance.

Respondents assigned to Control group 3 also repeated what respondents in the Test group did, this time, with a more substantial wrinkle having been introduced. Instead of being instructed to type in GEICO, respondents in Control group 3 were instructed to type in NIKE.[6] After the Google search results page – which had been programmed to supply the same three sites listed under "Sponsored Links" as were shown in the other conditions along side the organic links associated with the name Nike – were displayed on screen, the respondents were asked questions to determine the extent to which consumers thought the sites listed under "Sponsored Links" offered automotive insurance from GEICO. The purpose of this control was to parse out the influence, if any, of the respondent having typed in GEICO as the search term.

The table below summarizes the different conditions.

| Group | Typed in: | Entity named in questions: | Questions were asked regarding the: |
|-------|-----------|---------------------------|-------------------------------------|
| Test | GEICO | GEICO | Sponsored links |
| Control 1 | GEICO | Allstate | Sponsored links |
| Control 2 | GEICO | GEICO | Sponsored links and one organic link |
| Control 3 | NIKE | GEICO | Sponsored links |

[6] Nike was selected as a control only because it was used as the control in the survey conducted for plaintiff by its expert, Gary Ford, Ph.D. In point of fact, using Nike as a control is highly conservative as it favors plaintiff's interests (i.e., finding a low level of confusion with the control that would then be subtracted from the level of confusion found with the test, thereby yielding an inflated estimate of "net" confusion).

CONFIDENTIAL
ATTORNEYS' EYES ONLY        GGL-CNG058501

Collectively, these controls enable us to parse out whether the confusion evidenced with Test group respondents was due to the factors argued by plaintiff, GEICO, or were more readily explained by other factors.

## THE SEVEN *MANUAL FOR COMPLEX LITIGATION* FACTORS

### FACTOR #1: *THE UNIVERSE (OR POPULATION)*

To be useful, research needs to ensure that it focuses on the "proper respondents." For this research, the relevant population was defined as individuals, aged 16 or older, who said they had searched for information or bought a product or service on-line during the past six months, had used Google during the past six months, had used (or would consider using) the Internet to get information about, or buy motor vehicle insurance, and who came to the interview knowing of GEICO and its line of business.

### FACTOR #2: *SAMPLING PLAN*

Theoretically, it would appear best if one could take a census; that is, test all members of the relevant population. However, generally speaking, this is neither possible nor practical. Accordingly, researchers test only a subset (or "sample") of that population. Then, utilizing well-established, generally accepted methods, the findings from the sample are extrapolated to the relevant population as a whole.

The set of rules that one uses for selecting a sample is termed the sampling plan, and there are two broad categories of approaches: probability and non-probability plans.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058502

A probability sample is one in which every respondent has a known probability of being included in the sample. (For example, this would be equivalent to knowing that each specific card in a standard deck had a 1 in 52 chance of being selected on the first draw.) In a non-probability sample, one does not know the probability, or odds, of selecting any particular respondent.

In marketing and consumer research, non-probability sampling designs overwhelmingly are the designs of choice when physical objects or similar materials (such as products, product packaging, brochures or advertisements) need to be shown to respondents. Well-conducted non-probability samples are widely relied upon by both academic and commercial (e.g., marketing and advertising) researchers, and many business decisions of considerable consequence are predicated on results derived from studies that employ such plans.[7] The overwhelming majority of consumer reaction studies submitted for litigated matters are based on non-probability samples.

When applying non-probability sampling, so as to avoid including population members who might be atypically sensitized to the issue and therefore not representative of the population as a whole, it is generally considered good research practice to exclude people who, though otherwise qualified, live in households where someone works in:

- marketing research or advertising,
- an Internet company,
- a company that sells auto insurance,
- a store in the mall where the interview was being conducted.

---

[7] See Jacob Jacoby and Amy Handlin, 1991, "Non-probability designs for litigation surveys," *The Trademark Reporter*, Volume 81 (2), pages 169-179.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058503

**Market Selection.** The study was conducted in eight geographically dispersed markets, two in each of the four U.S. Census Regions. The regions and specific markets are noted below.

| Census Region | Markets |
|---|---|
| Northeast | Turnbull, CT; Erie, PA; |
| Midwest | Fairlawn, OH; Chicago Ridge, IL; |
| South | Louisville, KY; Montgomery, AL; |
| West | Northridge, CA; and Colorado Springs, CO. |

**Selection of Interviewing Services within Markets.** The local interviewing service used in each market was selected based on: (a) Princeton Research and Consulting Center's (PRCC's)[8] experience with or knowledge of them[9]; (b) their having the ability to recruit and interview qualified individuals for the study; (c) their having experienced professional interviewers available during the time period required for conducting the interviews; and, (d) their being able to conduct the study within the necessary time frame.

**Selection of Respondents.** The interviewers intercepted potential respondents in the shopping malls according to the standard procedure followed in their mall and then initiated conversations with these individuals in the manner specified at the beginning of the Screener Questionnaire.

---

[8]   The Princeton Research and Consulting Center, Inc. served as our principal subcontractor for this project. A brief description of their qualifications is provided in Appendix A.

[9]   Testing facilities that, in prior studies, failed to meet timetables, have high rates of rejected interviews, and/or were found to have conducted interviews that resulted in high invalidation rates were eliminated from consideration.

12

CONFIDENTIAL
ATTORNEYS' EYES ONLY    GGL-CNG058504

## FACTOR #3: *QUESTIONNAIRES*

As is customary practice, this study utilized two questionnaires, a "Screener" for identifying members of the previously defined universe, and a "Main Questionnaire" designed to assess the substantive questions at issue. Both questionnaires are produced in Appendix B. In constructing the questionnaires, close attention was paid to the wording and ordering of questions to ensure that the questions asked, and the order in which they were asked, were clear and not leading or otherwise biasing.

**Screener Questionnaire (Respondent Qualification).** The objective of a Screener is to ensure that interviews (as implemented through the Main Questionnaire) are conducted only with respondents who satisfy the universe definition. It does so, first, by making certain that the prospective respondent satisfies the universe definition and, second, by excluding from participation those considered likely to be highly atypical members of the universe.

There were two Screening questionnaires. Although respondents in all groups had to qualify on precisely the same criteria, one version of the Screener was used for respondents in the Test group and Control groups 1 and 2, with the other version of the Screener being used for respondents in Control group 3. The only difference between the two Screener questionnaires was that the latter had additional questions and instructions designed to make the "please type in Nike; now we ask questions about" manipulation appear reasonable. The following description is of the Screener used with respondents assigned to either the Test group or Control groups 1 or 2.

Question A of the Screening Questionnaire made sure the respondent was at least 16 years of age.

13

CONFIDENTIAL
ATTORNEYS' EYES ONLY        GGL-CNG058505

Next, the Question B series determined whether the respondent had searched for information in general or about products or services, or bought a product or service on-line in the past six months (Question B3), and if they had used Google in the past six months (Question B4). To qualify for the survey, a respondent had to answer "Yes" to both.

The Question C series established that the respondent was involved in selecting insurance for motor vehicles in their household (Question C2) and, if the need arose, would you consider using the Internet to get information about, or buy insurance for a motor vehicle (Question C4).

Individuals screened for Control cell 3 were also asked if they owned any sneakers or tennis shoes (Question C5), if they ever used the Internet to buy or get information about sneakers or tennis shoes (Question C6) and, if they had not, if they would consider using the Internet to buy or get information about sneakers or tennis shoes (Question C7.)

Additional questions focused on screening out people who were likely sensitized to the issue at hand, or who were likely to possess special familiarity that might yield atypical responses not representative of the population as a whole. Screener Question D excluded those who worked for (or lived with someone who worked for) a market research company, an advertising agency, an Internet company, a store in the mall where the interview was conducted, or a company that sold auto insurance.

Screener Question E eliminated those who, during the past three months, had participated in a market research study on the Internet. Because respondents were going to look at a computer monitor, Screener Question F2 excluded people who wore

14

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058506

eyeglasses when using a computer but did not have them available. Similarly, Screener Question G2 excluded people who wore contact lenses when using a computer but were not wearing them.

Individuals who satisfied all the screening criteria and agreed to participate were asked to accompany the interviewer to the interviewing facility.

**Main Questionnaire.** After being seated (and, if appropriate, asked to put on their eyeglasses), the interviewer said:

> *This is a nationwide survey on what people think about some of what they see when doing on-line searches. Different survey participants are being taken through different searches using different search engines. The people being interviewed today have been assigned to do a search using Google.*

To discourage guessing, the interviewer cautioned the respondent.

> *But before we begin, it is important for me to tell you to not guess at answers. For each of my questions, if you don't know or don't have an answer, that's O.K. Just tell me you "don't know" or "don't have an answer" and we'll go on to the next question.*

The respondent then was given one (or, depending upon the group to which the respondent was assigned, two) card(s) with a name appearing upon it (the cards). As described in greater detail below, the card(s) and name(s) varied depending upon the group to which the respondent had been assigned.

In large part, the questions asked of respondents in each of the groups were the same. What differed across the groups were the names and web sites that were the focus of the questions. To simplify discussion, the Main Questionnaire is described in two sections. Section 1 discusses the wording and procedures associated with Questions 1 and 2, separately for each of the four groups -- the Test group and Control

CONFIDENTIAL
ATTORNEYS' EYES ONLY    **GGL-CNG058507**

on the page was a site that referred to the lawsuit. For obvious reasons, this site was removed from the search results page. The remaining 13 links were listed, one under the other, down the left hand side of the page.

Under the rubric "Sponsored Links," the upper right quadrant of the search results page displayed links to the following three sites:

www.insureCom.com

www.insurancefinder.com

www.AutoandHome.com

Throughout the remainder of this report, the phrase "three sponsored links" refers to these three specific sites and to no others. The reason these sponsored links were selected for study is because they are the three advertisers mentioned in GEICO'S Complaint and are of the sort that GOOGLE's current trademark policy permits.

There were six versions of the search results page, each containing the same information. The only difference was that, to avoid order effects (a form of measurement error or "noise"), the sites under the Sponsored Links rubric appeared in different orders. A photocopy of one version of the "search results page" is also provided in Appendix C.

When the respondent indicated he/she was done reviewing the "search results page" displayed on the monitor, with the screen remaining visible then and throughout the remainder of the interview, the interviewer asked Question 2c.

*As you probably know, using your mouse to click on underlined words will take you to another website. Suppose you wanted to go directly to GEICO's website. Without clicking anything, which link on the page would you try first?*

17

The possible answers to this question included all thirteen sites under the "Web" rubric generated by the organic search, the three Sponsored Links and, "don't know."

*Control group 1.* Respondents in Control group 1 were given two cards, one with the name GEICO and the other with the name ALLSTATE. For each name, the interviewer asked "Have you ever heard of this company before today?" and, for those who answered Yes, "... what products or services do they sell or provide?"

The interviewer then turned on a computer monitor and, with the GEICO card in front of them, the interviewer told the respondents:

> *Okay, suppose you wanted to look up information about the company whose name appears on this card. Please type in the search term exactly as it appears on the card. When the screen comes up with the search results, take as much time looking at the screen as you normally would if you were doing a search like this. Feel free to scroll up or down if that's what you normally would do. Just tell me when you are done.*

After typing in GEICO, the monitor displayed a "search results page." When the respondent indicated he/she was done reviewing the "search results page" displayed on the monitor, with the screen remaining visible then and throughout the remainder of the interview, the interviewer asked Question 2c.

> *As you probably know, using your mouse to click on underlined words will take you to another website. Now I'm going to ask you some questions about ALLSTATE. Suppose you wanted to go directly to ALLSTATE's website. Without clicking anything, which link on the page would you try first?*

The possible answers to this question included all ten sites under the "Web" rubric generated by the organic search, the three Sponsored Links, "don't know" and "none of these".

*Control group 2.* As was so for respondents in the Test group, respondents in Control group 2 were given one card with the name GEICO appearing on it. From this point through Question 5, the procedure, questions and screens were the same as for

18

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058509

the Test group. In this regard, Control group 2 essentially replicates the Test group. As discussed in Section 2, below, the difference between Control group 2 and the Test group was that, in addition to being asked questions 5 through 8 about each of the Sponsored Links, respondents in Control group 2 were asked the same questions regarding an organic (i.e., non-sponsored) link.

*Control group 3.* Respondents in Control group 3 were given two cards. The first card contained six names -- Allstate, Burnwood (a fictitious company name), GEICO, Intel, Nike and Reebok. For each name, the interviewer asked "Have you ever heard of this company before today?" and, for those who answered Yes, "... what products or services do they sell or provide?"[10]

The interviewer then turned on a computer monitor and, via Question 2a, confirmed that the respondent was looking at the appropriate Google "web search page." Next, the respondent was given a card with the name NIKE[11] and, with that card in front of him/her, told:

> *Okay, please type in the company whose name appears on Card 53 Type in the search term exactly as it appears on the card. When the screen comes up with the search results, take as much time looking at the screen as you normally would. Feel free to scroll up or down if that's what you normally would do. Just tell me when you are done.*

Since respondents in Groups 3 typed in Nike on the "web search page," instead of displaying sites that come up when typing in and searching GEICO, the "search results page" that came up on the monitor showed a set of organic sites that surface when typing in Nike. Additionally, appearing under the Sponsored Links rubric were the

---

[10] For Control group 3, the wording was as follows: "Have you ever heard of this company before today?" and, for those who answered Yes, "...what products or services is ____(best) known for?"

[11] NIKE was selected as the control name because it was the control name used in the study being proffered by plaintiff's expert, Gary T. Ford, Ph.D.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058510

same three sites as appeared on the pages used for the Test group and Control groups 1 and 2.  The purpose of Control group 3 was to identify the degree of confusion that could be attributed to the respondent having typed in GEICO as the search term.  A photocopy of one version of the Nike "search results page" is also provided in Appendix C.

When the respondent indicated he/she was done, with the screen remaining visible then and throughout the remainder of the interview, the interviewer asked Question 2c:

> *As you probably know, using your mouse to click on underlined words will take you to another website.  Now I'm going to ask you some questions about GEICO.  Suppose you wanted to go directly to GEICO's website.  Without clicking anything, which link, if any, on the page would you try first?*  [Note that the non-italicized sentence was in addition to what was told to respondents in the three other groups.]

The possible answers to this question included all ten sites under the "Web" rubric generated by the organic search, the three Sponsored Links, "don't know" and "none of these".

Section 2: Questions 3 through 8

At this point in the interview, respondents in all four groups were asked Question 3: *"As best you recall, when you first looked at this page, did you pay attention to any of the listings in the section where it says 'Sponsored Links'?"*  This was followed by Question 4: *"If you think you know, what are 'Sponsored Links'?"*

At the start of Question 5, the interviewer drew attention to the sponsored links in the upper right quadrant of the search results page by saying:

> *As you can see, there are three "Sponsored Links" listed in the Sponsored*

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058511

*Links section on the right side of this page.*

Additionally, the respondents in Control group 2 were told:

> *I'm going to be asking you questions about these links as well as about one or two of the other links on this page.*

The respondents in all four groups then were asked a series of questions – Questions 5, 6, 7 8, along with their numerous sub-components. The purpose of these questions was to assess the extent to which the respondents exhibited confusion in regard to four issues – where clicking on a link would take them (Question 5), whether the source of the link did or did not offer insurance from the entity named in the question (Question 6), whether the source of that link did or did not have a business relationship with the entity named in the question (Question 7), and whether the source of that link had or had not been authorized by the named entity to offer that entity's insurance (Question 8). Although the questions asked of the respondents in the Test and three Control groups used the same phrasing, the entity named in the question, as well as the links about which the respondents were asked, varied across the four groups. The chart below summarizes these different conditions.

### SUMMARIZING THE VARIATIONS ACROSS GROUPS

| Group | Typed in: | Entity named in question: | Questions focused on the: |
|-------|-----------|---------------------------|----------------------------|
| Test | GEICO | GEICO | 3 Sponsored links |
| Control 1 | GEICO | Allstate | 3 Sponsored links |
| Control 2 | GEICO | GEICO | 3 Sponsored links + 1 organic link |
| Control 3 | NIKE | GEICO | 3 Sponsored links |

21

CONFIDENTIAL
ATTORNEYS' EYES ONLY    GGL-CNG058512

For respondents in the Test group and Control Groups 2 and 3, the Question 5 series asked the following about each of the three sponsored links:

> 5a.    *Do you think clicking on this link does take you to the GEICO website, does not take you to the GEICO website, or are you not sure about this?* [The order of the response options was rotated across respondents]

If the respondent answered "it does," the interviewer asked a follow-up question:

> 5b.    *What, in particular, makes you think that clicking the first sponsored link does take you to the GEICO website? (Probe:) Anything else?*

As indicated in the summary chart supplied above, for respondents in Control Group 1, the name of the entity in the question was Allstate, not GEICO. Thus, respondents in Control Group 1 were asked the following questions about each of the three sponsored links:

> 5a.    *Do you think clicking on this link does take you to the Allstate website, does not take you to the Allstate website, or are you not sure about this?*

If the respondent answered "it does," the interviewer asked a follow-up question:

> 5b.    *What, in particular, makes you think that clicking the first sponsored link does take you to the Allstate website? (Probe:) Anything else?*

As indicated in the summary chart, in addition to being asked Questions 5a and 5b about each of the three sponsored links, respondents in Control Group 2 also were asked these questions about a fourth link – the "Yahoo! GEICO Company Profile" link that came up as part of the organic search results.

For respondents in the Test group and Control Groups 2 and 3, the Question 6 series asked if the sponsored links offered GEICO insurance.

CONFIDENTIAL
ATTORNEYS' EYES ONLY            GGL-CNG058513

Q.6a1  *Do you think this link offers only GEICO insurance, offers GEICO insurance along with insurance from other companies, does not offer any GEICO insurance, or are you not sure about this?  Before you answer, let me read these choices again.  Do you think this link offers only GEICO insurance, offers GEICO insurance along with insurance from other companies, does not offer any GEICO insurance, or are you not sure about this?* [The order of the response options was rotated across respondents]

If the respondent said the link did offer GEICO insurance, either alone or along with other insurance, the interviewer asked Question 6a2.

6a2.    *What, in particular, makes you say that?  (Probe:) Anything else?*

As indicated in the summary chart supplied above, for respondents in Control Group 1, the name of the entity in Question 6 was Allstate, not GEICO.  Also as indicated in the summary chart, in addition to being asked Questions 6a1 and 6a2 about each of the three sponsored links, respondents in Control Group 2 also were asked these questions about a fourth link – the "Yahoo! GEICO Company Profile" link that came up as part of the organic search results.

For respondents in the Test group and Control Groups 2 and 3, the Question 7 series asked if the sponsored links had a business relationship with GEICO.

7a1.    *Do you think this link does have a business relationship with GEICO, does not have a business relationship with GEICO, or are you not sure about this?* [The order of the response options was rotated across respondents]

If the respondent said it did have a relationship, the interviewer asked Question 7a2.

7a2.    *What, in particular, makes you think the first sponsored link does have a business relationship with GEICO?  (Probe:) Anything else?*

As indicated in the summary chart supplied above, for respondents in Control Group 1, the name of the entity in Question 7 was Allstate, not GEICO.  Also as indicated in the summary chart, in addition to being asked Questions 7a1 and 7a2 about

23

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058514

each of the three sponsored links, respondents in Control Group 2 also were asked these questions about a fourth link -- the "Yahoo! GEICO Company Profile" link that came up as part of the organic search results.

For respondents in the Test group and Control Groups 2 and 3, the Question 8 series asked if the sponsored links had been authorized by GEICO to offer GEICO insurance.

> 8a1.  *Do you think this link has not been authorized by GEICO to offer GEICO insurance, has been authorized by GEICO to offer GEICO insurance, or are you not sure about this?* [The order of the response options was rotated across respondents]

If the respondent said it had been authorized, the interviewer asked Question 8a2.

> 8a2.  *What, in particular, makes you think the first sponsored link has been authorized by GEICO to offer GEICO insurance?  (Probe:) Anything else?*

As indicated in the summary chart supplied above, for respondents in Control Group 1, the name of the entity in Question 8 was Allstate, not GEICO.  Also as indicated in the summary chart, in addition to being asked Questions 8a1 and 8a2 about each of the three sponsored links, respondents in Control Group 2 also were asked these questions about a fourth link -- the "Yahoo! GEICO Company Profile" link that came up as part of the organic search results.

At this point, the interviewer took back the card, closed the computer file and turned off the monitor.

Finally, the interviewer had the respondent sign a statement certifying that she had been shown a web page and been asked questions about it and to provide

24

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058515

information necessary for validation. The interviewer then signed a statement certifying that the interview had been conducted according to the instructions.

## FACTOR #4: *INTERVIEWING PROCEDURES AND SUPERVISION*

Throughout the assignment, tight control and supervision were maintained over all aspects of the interviewing.

**Interviewers and Interviewer Training.** Customized, detailed Supervisor and Interviewer Instructions were prepared for this assignment. Copies of these instructions are provided in Appendix D.

Conference call briefings with the local field supervisors were held before they, in turn, briefed their interviewers. Before beginning work on this study, each interviewer was required to:

- read the interviewer instructions (*see* Appendix D);

- attend a personal briefing conducted by a member of the interviewing organization. (At this briefing, the interviewing procedures were reviewed in detail, question by question);

- complete two practice interviews, one as a respondent and another as an interviewer.

**Double Blind Interviewing.** In accordance with standard custom and practice for surveys conducted to be proffered as evidence, the study was administered under "double-blind" conditions. That is, not only were the respondents kept uninformed about the purpose and sponsorship of the study, but both the interviewers and field supervisors were similarly "blind" with respect to the purpose and sponsorship. Without such knowledge, the possibility that either some interviewer(s) or some respondent(s) might correctly guess the purpose and/or the sponsor of the investigation is minimized.

25

CONFIDENTIAL
ATTORNEYS' EYES ONLY    GGL-CNG058516

At no time were either the supervisors or interviewers told that the study might be used for purposes of litigation.

**Implementation Period**. Interviewing began on September 17, 2004 and ended on October 8, 2004.

### FACTOR #5: *INSURING ACCURATE DATA*

**Field Check-In**. When the 329 completed interviews were returned, they were reviewed to ensure that each respondent was qualified to participate in the study and that the questionnaires had been completed properly. No interviews were removed during field check-in.

**Respondent Validation**. This involved attempting to re-contact the respondents after they were interviewed to verify that they did indeed participate in the study. The validation effort began on October 6, 2004 and ended on October 15, 2004. A summary of the validation effort is as follows.

The names and phone numbers of the 329 respondents remaining after check-in were sent to an independent telephone interviewing service, The Pat Henry Group, for validation. This service was given the responsibility for attempting a 100% validation -- that is, for re-contacting, by telephone, each respondent to confirm that he/she had been interviewed for this study. Made at different times of the day and different days of the week, at least three validation calls were made in an attempt to reach each respondent.

A total of 179 respondents, representing 54.4% of the usable sample, were successfully reached and "positively validated." This percentage is well in excess of

26

CONFIDENTIAL
ATTORNEYS' EYES ONLY          GGL-CNG058517

common industry practice.[12]  Fifty-eight respondents (accounting for 17.6 percent) claimed not to have participated in the study or failed to meet the screening criteria.  As an exercise in caution, the data for these individuals were considered to be "invalid" and excluded from the analyses reported below.  Examination reveals that half (29, or 8.8%) of those considered as "invalid" said "no" or "don't know" or refused to answer validation Question 6 "Are you one of the people in your household who is involved in selecting insurance for any motor vehicle in your household?"   Most or all of these respondents may have thought the validation callback was an effort to sell them auto insurance.

Ninety-two respondents (representing 28.0%) could not be reached in the time available for validation.  In keeping with generally accepted procedure in the field, as there was no reason for excluding these respondents, the data for these people are included in the analyses.  Thus, the results of the validation effort were as follows:

|  | Total % |
| --- | --- |
| Base = | |
| Validated | 54.4 |
| Not reached and presumed valid | 28.0 |
| Reached and judged to be invalid | 17.6 |

Copies of the validation report and validation questionnaire are included as Appendix E of this report.

---

[12] When validation is done, higher-quality marketing research generally validates at a rate of 10% to 25%.  When conducted for the purpose of being proffered as evidence in a litigated matter, one feature of higher quality surveys is that they attempt 100% validation, typically retaining a completely independent firm for this purpose.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

GGL-CNG058518

In accordance with industry standards,[13] to safeguard respondent anonymity, all respondent-identifying information (i.e., names, addresses, phone numbers) was destroyed after validation.

## FACTOR #6: *DATA ANALYSIS*

To be classified as misled or confused, a respondent would have to say either:

   a) he/she would click on a sponsored link to get to the GEICO website, or

   b) he/she thought clicking on a sponsored link would take him/her to the GEICO website, or

   c) a sponsored link offered only GEICO insurance or offered GEICO insurance along with insurance from other companies, or

   d) a sponsored link had a business relationship with GEICO, or

   e) a sponsored link had been authorized by GEICO to offer GEICO insurance.

An error rate is associated with all forms of measurement. To obtain an estimate of the error rate operating in the present circumstances, the level of reported confusion associated with each of the three Control cells was determined. As described in greater detail in the Findings section, these error rates were then used to adjust the corresponding confusion level obtained with the Test group.

## FACTORS #7: *INSURING OBJECTIVITY*

As described herein, every aspect of the research process was designed to insure objectivity in the collection and interpretation of the data.

---

[13] Council of American Survey Research Organizations (often referred to as CASRO), *Code of Standards for Survey Research*, section 1.A.3.f.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

**GGL-CNG058519**