# EXPERT REPORT OF DR. ITAMAR SIMONSON

## BACKGROUND AND QUALIFICATIONS

1.      I am the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business, Stanford University. From November 1994 through August 2000 I served as the Head of the Stanford Marketing Group. A copy of my curriculum vitae, which includes a complete list of my publications, is attached as Exhibit A.

2.      I hold a Ph.D. in Marketing from Duke University, Fuqua School of Business, a Master's degree in business administration (MBA) from the UCLA Graduate School of Management, and a Bachelor's degree from The Hebrew University with majors in Economics and Political Science.

3.      My field of expertise is consumer behavior, marketing management, marketing aspects of trademark infringement, survey methods, and decision making. Most of my research has focused on buyers' purchase behavior, the effect of product characteristics (such as brand name, price, features), marketing activities (such as sales promotions and advertising), the competitive context on buying decisions, and issues related to trademark infringement.

4.      I have received several awards, including (a) the award for the Best Article published in the Journal of Consumer Research (the major journal on consumer behavior) between 1987 and 1989, (b) the "Ferber Award" from the Association for Consumer Research, which is the largest association of consumer researchers in the world, (c) the 1997 O'Dell Award, given to the Journal of Marketing Research (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years, (d) the 2001 O'Dell award, (e) the award for the Best Article published in the Journal of Public Policy & Marketing (the major journal on public policy and legal aspects of marketing) between 1993 and 1995, (f)

**EXHIBIT**

E

Dockets.Justia.com

the 2002 American Marketing Association award for the Best Article in the area of Services Marketing, and (g) I was a winner in a competition dealing with research on the effectiveness of direct marketing programs, which was organized by the Direct Marketing Association and the Marketing Science Institute.

5.    I have published three articles relating to trademark surveys and trademark infringement from the customer's perspective, including two in the Trademark Reporter and one in the Journal of Public Policy & Marketing.  The two articles published in the Trademark Reporter were: "The Effect of Survey Method on Likelihood of Confusion Estimates:  Conceptual Analysis and Empirical Test,"[1] and "An Empirical Investigation of the Meaning and Measurement of Genericness".[2]  The Journal of Public Policy & Marketing article, titled "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications",[3] was selected (in 1997) as the Best Article published in that journal between 1993 and 1995.

6.    At Stanford University I have taught MBA and executive courses on Marketing Management, covering such topics as buyer behavior, developing marketing strategies, building brand equity, advertising, sales promotions, and retailing.  I also taught an MBA course on High Technology Marketing.  In addition to teaching MBA Marketing Management and Technology Marketing courses, I have guided and supervised numerous MBA student teams in their work on company and industry projects dealing with a variety of markets.

7.    I have taught several doctoral courses.  One doctoral course examines methods for conducting buyer research.  It focuses on the various stages involved in a research project, including defining the problem to be investigated, selecting and

---

[1]  Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," Trademark Reporter, 83 (3), 364-393.

[2]  Itamar Simonson (1994), "An Empirical Investigation of the Meaning and Measurement of Genericness," Trademark Reporter, 84 (2), 199-223.

[3]  Itamar Simonson (1994), "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications," Journal of Public Policy and Marketing, 13(2), 181-199.

2

developing the research approach, data collection and analysis, and deriving conclusions. A second doctoral course that I have taught deals with buyer behavior, covering such topics as buyer decision making processes, influences on purchase decisions, and persuasion. A third doctoral course that I have taught deals with buyer decision making. Prior to joining Stanford University, during the six years that I was on the faculty of the University of California at Berkeley, I taught an MBA Marketing Management course, a Ph.D. course on buyer behavior, and a Ph.D. course on buyer decision making. I also taught in various executive education programs, including a program for marketing managers in high technology companies.

8.    After completing my MBA studies and before starting the Ph.D. program, I worked for five years in a marketing capacity in a subsidiary of Motorola Inc., serving in the last two years as the product marketing manager for 2-way communications products. My work included (a) defining new products and designing marketing plans for new product introductions, (b) customer and competitor analysis, and (c) sales forecasting.

9.    I have conducted, supervised, or evaluated well over 1,000 marketing research studies, including many related to trademark, branding, marketing strategies, and advertising-related issues. I have also worked as a consultant for companies and organizations on a variety of marketing and buyer behavior topics. A list of cases in which I provided sworn testimony during the past four years is included in Exhibit B. I am being compensated at my standard rate of $600 an hour.

10.    At the request of counsel for Google, Inc. I evaluated the survey conducted by Dr. Gary Ford ("Ford Survey") on behalf of Government Employees Insurance Company ("Geico"). Documents that I reviewed in connection with preparation of this report are listed in Exhibit C.

3

## AN ANALYSIS OF THE FORD SURVEY DESIGN AND RESULTS

A.    The Ford Survey Methodology:  Overview

11.    Respondents in the Ford Survey were told to enter the search term "GEICO," using the Google or Yahoo search engine, and to look at the provided search results.  They were then told to assume that they wanted to purchase automobile insurance from Geico and asked to indicate where on the webpage they would click first and to explain their answer.  Next, the interviewer pointed to a particular sponsored listing appearing on the page and asked about the company the respondent would expect to go to by clicking on that link.  Finally, respondents were asked whether the company using the (same) sponsored listing was associated or connected with another company, to identify that company, and to provide an explanation.

12.    I will examine the Ford Survey methodology, including also the survey's respondent universe.  First, however, it is necessary to review some basic survey principles, the same principles that I have emphasized in the doctoral courses that I have taught at Stanford.  In particular, I will briefly describe common survey flaws, referred to as "demand effects," "order effects," and leading questions.  Later in this report, I will also outline the criteria for selecting an experimental control.

B.    Demand and Order Effects and Leading Questions:  Basic Principles

13.    "Demand effects"[4] refers to the phenomenon whereby survey respondents use cues provided by the survey procedure and questions to figure out the purpose of the study and the "correct" answers to the questions they are asked.  The respondents then tend to provide (what they perceive as) the "correct" answers, to make sure that the results "come out right."  In the doctoral courses on consumer

---

[4] See, for example, "On the Social Psychology of the Psychological Experiment," M. Orne, American Psychologist, 17, 776-783.

behavior and research methods that I have taught at Stanford, I have spent a great deal of time on the conditions that produce such demand effects.

14.     Courts have also recognized the significance of demand effects, and such problems have contributed to the rejection of surveys.[5] For example, the Court in the *Simon Property Group v. mySimon*[6] case provided the following opinion with respect to a likelihood of confusion survey methodology: "The question about whether the two items are put out by the same or a related source is likely to generate so-called 'demand effects' that bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items. Other courts have identified similar problems in similar surveys. See, e.g., *Wuv's International, Inc. v. Love's Enterprises, Inc.*, 206 U.S.P.Q. 736, 755-56 (D. Colo. 1980) (survey question 'Do you believe that this restaurant is connected with or related to any other restaurants?' improperly suggested to respondent that another entity may be connected with or related to the party). …"

15.     As Professor McCarthy points out,[7] survey questions must not be slanted or leading, and "It is improper to suggest a business relationship where the respondent may previously have had no thought of any such connection." Relatedly, a survey designer should avoid "order effects," whereby the answers to one question effect the answers to subsequent questions, thereby making the latter answers invalid. The issue of order effects is perhaps the most studied topic in the general domain of survey

---

[5] While I am not an attorney or an expert on legal matters, I find it useful to refer to legal authorities and prior court decisions to illustrate the types of issues and principles that have come up in connection with the evaluation of likelihood of confusion and other surveys.
[6] *Simon Property Group L.P. v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1045 (S.D. Ind. 2000).
[7] 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition [McCarthy] §32:172 (June 2002).

research.[8] For example, in one study,[9] college students were asked two questions: "How happy are you?" and "How many dates did you have last month?" The correlation between answers to these questions depended on the order in which they were asked – the correlation was 0.12 when the question about happiness was asked first, and it increased to 0.66 when the question about the number of dates was asked first.

16.    As shown below, the Ford Survey provides an extreme illustration of demand and order effects and of leading questions. As a result, the survey produced very limited relevant information regarding the likelihood of confusion at issue.

## C.    The Ford Survey Screener and Respondent Universe

17.    As Professor McCarthy points out,[10] "The first step in designing a survey is to determine the 'universe' to be studied. The universe is that segment of the population whose perceptions and state of mind are relevant to the issues in the case. Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." In particular, a survey universe that is under-inclusive excludes the opinions of relevant consumers and is therefore unrepresentative of the marketplace.

18.    The Ford Survey universe included only respondents who indicated that they would consider purchasing insurance from Geico. It is noteworthy that the standard survey practice is to screen respondents based on whether they are prospective purchasers of the category at issue, rather than based on any intention to purchase a particular brand. Indeed, there is a great deal of evidence that consumers

---

[8] Various illustrations of order effects and the psychological factors underlying such effects are discussed, for example, in the book, Context Effects in Social and Psychological Research, by N. Schwarz and S. Sudman, (1992), Springer-Verlag.
[9] Described in N. Schwarz (1996), *Cognition and Communication: Judgmental Biases, Research Methods, and Logic of Conversation,* Hillsdale, NJ: Erlbaum.
[10] See McCarthy at §32:159.

6

often search for information and construct (or form) their brand preferences only when they actually need to make purchase decisions,[11] and many consumers would not know several months in advance which brands they might or might not consider. In other words, by excluding all those prospective respondents who "failed" to state that they would consider purchasing insurance from Geico in the future, the Ford Survey was likely to be significantly under-inclusive and unrepresentative of the relevant universe of respondents.

19.    A question that should have been addressed in the Screener was whether respondents were likely to use a search engine when looking for information about a *specific* car insurance company, as opposed to general information about various insurance providers. To make sure that the question was not leading, respondents could have been simply asked, for example, to indicate how they would search for information on the Internet about a particular car insurance company. If the respondents indicated that they would use a search engine, then they would meet this criterion for survey participation. However, prospective respondents in the Ford Survey (who might have been told up front by the screening interviewers about the $5 compensation for qualified participants) could qualify if they indicated that they would use the Internet to search for information about "auto insurance providers." This question provided no information regarding the manner in which respondents would search for information about a specific auto insurance provider. After all, consumers can simply enter Geico.com, without the use of a search engine.

20.    Finally, the fact that the Ford Survey Screener already referred to "Geico," combined with the later questions in the Main Questionnaire, was likely to convey to respondents that the survey was conducted for Geico. This explicit mention

---

[11] See, for example, J. Bettman, M.F. Luce, and J. Payne (1998), "Constructive Consumer Choice Processes," *Journal of Consumer Research*, 25 (December), 187-217; R. Dhar and I. Simonson (2003), "The Effect of Forced Choice on Choice," *Journal of Marketing Research*, XL (May), 146-160.

of Geico in the Screener and the subsequent questions (discussed below) violated the principle that a survey should make every effort to disguise the purpose and the sponsor of the survey.

D.    The Main Questionnaire:  Introduction

21.    It is well-established that survey respondents often provide answers even when they do not know the answer, based on their best guesses.  Accordingly, it is the standard survey practice to explicitly instruct respondents not to guess, and such an instruction decreases, though may not eliminate, the tendency to guess.  Although respondents in the Ford Survey were told that they had the option to say that they had no opinion, the survey failed to instruct them explicitly not to guess.

22.    More importantly, the survey relied on leading and ambiguous questions and suffered from strong demand and order effects.  One limitation of the survey, which might have been difficult to avoid in this case, was the fact that respondents were not given the opportunity to search for information about Geico auto insurance on the Internet as they normally do, and they were not given the freedom to choose the search term they wished to enter.  Instead, they were told to enter the term "GEICO" in the search box of the designated search engine (Google or Yahoo).  This deviation from the way many consumers search for information in the marketplace could only increase the measured likelihood of confusion.  For example, all those consumers who simply go to www.Geico.com when looking for information about Geico, without using any search engine (and without seeing any sponsored links), were ignored in the survey.  Although the objectives of the survey might have limited the ability to allow respondents to use the search terms of their choice, the more serious flaws of the Main Questionnaire noted below could have been easily avoided, as discussed next.

Question 1

23.    After respondents entered "GEICO" in the search box and saw the page

with search results that was presented to them, the first question they were asked was

phrased as follows:

"1a.    If you wanted to purchase automobile insurance from GEICO, where on this

        page would you click first?  Please point to the listing you would click.

1b.     Why do you say that?"

As discussed below, the wording of this question was highly ambiguous.  First,

however, it is clear that, based on the search term they were instructed to enter

("GEICO") and the wording of this question (and Question 2 discussed subsequently),

respondents could reasonably assume that the survey was conducted for Geico.  That

is, the most obvious conclusion from the search term and the wording of the questions

was that Geico was conducting a survey to find out whether consumers used the links

and ads that Geico had placed on the webpage of search engine results.  It is quite

striking that no attempt whatsoever was made to disguise the sponsor of the survey,

which could have been easily done, for example, by asking respondents first to search

for information about another company of by informing them that other respondents

were assigned to search for information about other companies.  As a result, similar to

the impact of demand effects in other (flawed) surveys that I have used as illustrations

in my doctoral courses, respondents were likely to try to provide the "correct" answers

that would please Geico, the survey's sponsor.  The implications of this key flaw of

the survey and its effect on the survey results are discussed below.

24.    The wording of Question 1a was ambiguous and did not support the

claims made in the Ford Report.  In particular, the fact that respondents might click

"first" on a particular sponsored link when considering purchasing auto insurance does

not mean that they believed that this site was owned by or represented a specific

company.  Indeed, one of the most important advantages of the Internet for consumers

9

is the ease with which they can obtain comparative information from multiple suppliers. Thus, for example, because it is so difficult for consumers to determine whether a particular company's rates are attractive without comparing them to other options,[12] many of them are likely to check first the insurance rates of other companies by going to websites that offer such comparative information. The Ford Survey could have greatly reduced the level of ambiguity of this question, for example, by simply asking where respondents would click to get to the Geico website or to purchase Geico auto insurance.

      25.    An examination of the respondents' answers to Questions 1a and 1b is informative and consistent with the above analysis. It is informative that only 1% of the respondents (i.e., two respondents) were classified as indicating that they would go first to the sponsored link InsureCom.com, which did not include the name "Geico" in the heading or text of the sponsored link. Although 1% is, of course, well below the "noise" level, it is noteworthy that even those two respondents did not appear to believe that clicking on that link would take them to the Geico website. Respondent number 3007, who was one of the two respondents classified as confused (Ford deposition, pages 128-131), explained his/her selection of the InsureCom.com website as follows: "I think that there will be at least a few companies who will give me a quote at the same time, so I can pick the cheapest one quickly and easily." This explanation, which provided no indication that the respondent believed that the InsureCom.com was a Geico website or necessarily provided Geico quotes, was quite consistent with the text of the sponsored link: "Free Insurance Quotes: Get insurance quotes. It's fast easy and always free." Dr. Ford explained the decision to classify this respondent as confused by saying that there was no indication that this respondent was not confused (deposition pages 128-131). I have reviewed many likelihood of

---

[12] See, for example, Stephen Nowlis and Itamar Simonson (1997), "Attribute–Task Compatibility as a Determinant of Consumer Preference Reversals," Journal of Marketing Research, 34 (May), 205-218.

confusion surveys and have published articles on likelihood of confusion survey formats,[13] but I have not yet encountered a claim that someone can be classified as confused until and unless it is proven that s/he is not confused. The second respondent that was apparently classified as confused regarding the InsureCom.com link was Respondent 86433. That respondent explained the choice of that link by saying: "It says free." Again, this response provided no evidence that the respondent believed that the InsureCom.com website was related to Geico or sold Geico insurance. As explained above, it would be very reasonable for consumers, even if they were thinking of buying insurance from Geico, to visit first websites that offer comparative rate information.

26.    My understanding is that Google's current policy does not allow sponsored links that include trademarks if the trademark's owner does not want such links to appear on search results pages. Accordingly, the four sponsored links that included the "Geico" name on the page used in the Ford Survey no longer appear on the Google page of search results for "Geico" (or any other Google webpage). However, it is noteworthy that, even among those respondents who indicated that they would click first on one of the sponsored links that included the name "Geico," a large majority explained their answers based on their desire to save money, get price quotes, and ease/convenience of the site (Ford Report, Table 10). These explanations suggest that most of the respondents who indicated they would go first to sponsored links that included "Geico" would do it regardless of whether these sites were connected to Geico or provided Geico quotes. Indeed, as indicated earlier, since the Internet makes information search and gathering comparative information so easy and quick, there is no reason for consumers looking for price or other information from any particular

---

[13] Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," <u>Trademark Reporter</u>, 83 (3), 364-393. Itamar Simonson (1994), "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications," <u>Journal of Public Policy and Marketing</u>, 13(2), 181-199.

company not to explore other options first. Such information, in turn, provides so-called "reference prices" and makes it much easier for consumers to assess the relative attractiveness of the rates of different insurance providers.

27.    In summary, although Question 1a was highly ambiguous, the obtained results indicate that (a) virtually none of the respondents, who were asked to assume they wanted to purchase insurance from Geico, indicated they would go first to a sponsored link that did not include the name "Geico," and (b) the great majority of those who chose one of the sponsored links that included the "Geico" name explained their responses based on their desire to save money and get price quotes. Indeed, as the Ford Report (page 6) noted in the summary of results pertaining to Question 1, "In total, 16.7% said that they would click first on a sponsored link for reasons other than that 'Geico' was mentioned, whereas only 2.0% cited mention of 'Geico' or 'Geico car insurance'."

Question 2

28.    As explained above, after respondents were told to search for information about "Geico" and were asked (Question 1) where they would click first if they wanted to purchase automobile insurance from Geico, it became obvious that the survey was conducted on behalf of Geico. As noted, the Ford Survey made no attempt to disguise the purpose of the study or the identity of its sponsor, for example, by asking respondents to search first for information about other companies or by informing them that other respondents were assigned to search for information about other companies. As explained further below, once respondents recognized why the study was conducted, they were likely to follow the provided leads, consistent with the behavior of respondents who participate in surveys that suffer from demand effects (as explained above). Thus, after recognizing that Geico was the likely sponsor of the survey, respondents were much more likely to name "Geico" in response to the survey

12

questions on which the Ford Survey relied, making the survey results severely biased and invalid.

29.    In Question 2, the interviewer pointed to one of the sponsored links and said:

"2a.    Now if you clicked on "Geico,"[14] what company or companies website would you expect to go to?"

2b.    Why do you say that?"

Considering that Question 2 was always asked after respondents had been told to search for information about "Geico" and then asked about the listing they would go to first if they wanted to purchase Geico insurance, the rather obvious interpretation of Question 2 was that, following Question 1, the interviewer was now pointing to the correct Geico website/link.

30.    As indicated, four of the five sponsored links that the interviewer (in the Ford Google Survey) pointed to and named in Question 2 included the name "Geico." That is, the interviewer explicitly named "Geico" as part of the question. This, of course, should have removed any doubt in the respondents' minds as to what company name the interviewer wanted them to say. Again, this is a straightforward illustration of demand effects and a leading question. Dr. Ford was asked during his deposition (page 83) why the interviewers did not simply point to the listing without naming "Geico." Dr. Ford responded that he wanted to minimize the chances that the interviewer would point to the wrong listing. This explanation is odd. First, interviewers routinely handle tasks that are more complicated than pointing to a particular listing. More importantly, a researcher should never solve a potential problem by creating another (much more serious) problem, whereby the wording of

---

[14] For each sponsored link, the interviewer read the first line of that link.

the question provided the answer desired by the company on whose behalf the survey was conducted.

31.    As this analysis indicates, many respondents were likely to comply with the leading question and say that the link selected for them would take them to Geico's site, even when the name "Geico" was not explicitly mentioned in the question. The results among respondents who were asked about the sponsored link "InsureCom.com," with the heading "Free Insurance Quotes," provides perhaps the clearest evidence that many respondents simply followed the lead and answered "Geico," because that seemed like the "right" answer that the interviewer was looking for. Note that the text under the "Free Insurance Quotes" heading did not mention "Geico" at all. However, the most common explanation provided by respondents in this group as to why the link they were asked about would take them to Geico was "Says Geico" or the "name/address." These responses, of course, make no sense (and Dr. Ford was unable to explain them during his deposition) considering that the heading, text, and address of the InsureCom.com sponsored link did not mention "Geico." However, these explanations make perfect sense when we consider the demand and order effect produced by the fatally flawed procedure and questions used in the Ford Survey. Quite simply, most respondents could figure out that "Geico" was the expected ("correct") answer, but the best explanation they could come up with was the name "Geico" in the heading (even though "Geico" was not in the heading, text, or address). Importantly, the same problem affected the responses pertaining to the other links to which interviewers pointed, and the only difference was that those links did include the name "Geico," making the justification for the expected answer easier to make.

32.    It is also important to point out that, as the Ford Survey results show, respondents who indicated that the link they were asked about would take them to Geico did not explain those answers by saying that the sponsored links must have been

14

related to Geico because the search term they had entered was "Geico." In other words, the respondents' own accounts show that they did not believe that the mere fact that a particular company's name was used as the search term meant that all sponsored links appearing on the search results page represented that company.

Question 3

33.    Respondents who failed to provide the "right" answer to Questions 1 and 2 were given another opportunity to do so in Question 3, which asked them (a) whether they thought that the company that sponsored the listing they were asked about was "associated or connected" with any other company or companies, (b) to name the companies, and (c) to explain their answers. Although this question came after Questions 1 and 2 and suffered from the same demand and order effects, and it was phrased in a one-sided leading manner (i.e., the standard practice is to ask if the listing "*is or is not* affiliated ..."), only three of the 22 respondents who were given that last opportunity to name "Geico" did so.

The Ford Survey's "Control"

34.    A survey conducted in the context of litigation to estimate likelihood of confusion must include proper "controls."[15] A control is designed to estimate the degree of "noise" or "error" in the survey. Indeed, without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects guessing and the flaws of the survey methodology. For example, Professor McCarthy[16] cites a case in which the Seventh Circuit affirmed a finding of no infringement where a survey found that a 25% rate of confusion between

---

[15] See, for example, S. Diamond, *Reference Guide on Survey Research*, in *Reference Manual on Scientific Evidence* 221, 226 n.8 (Federal Judicial Center ed., 1994).

[16] McCarthy at §32:187.

the contesting products but the control survey using a radically different named and dressed product found "noise" of 20%. To fulfill its function, a control must be similar to the junior mark at issue, without infringing on the senior mark. For example, in the case of *Simon Property Group v mySimon, Inc.*, the court determined that any likelihood of confusion survey with a control that does not include the name component "Simon" "amounts to little more than a meaningless word association or memory exercise."[17] Thus, to obtain an estimate of the net likelihood of confusion (after accounting for "noise"), the researcher subtracts the measured confusion level in the control from the measured confusion level in the "test" (or "treatment") version. Because the confusion estimate derived in the control group is subtracted, a control cannot raise the net estimate of the likelihood of confusion, it can only reduce it.

35.     The only control used in the Ford Survey was "Nike." As is obvious, the name "Nike" is quite different from the name "Geico," and the two companies are in very different lines of business. Thus, the only conclusion that one can draw from the finding of no confusion in the "control" version is that placing sponsored links, such as those mentioning Nike, on search results pages causes no confusion with the company used as the search term. That is, the only aspect that "Nike" controls for is whether entering the search term "Geico" causes confusion with any sponsored link that appears on the search results page. As the Ford Survey results show, respondents were not confused between the Nike sponsored links and Geico, indicating that the mere fact that consumers use the "Geico" search term does not cause confusion with sponsored links.

36.     Since "Nike" was the only control used, the Ford effectively had no control for the most serious sources of bias and "noise." For example, the Ford Survey made no attempt to find out whether respondents who enter the "Geico" search term,

---

[17] *Simon Property Group L.P. v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1045 (S.D. Ind. 2000).

shown the same organic results and sponsored links, but were asked about a different insurance company (e.g., Progressive) were as likely to be "confused" as those asked about "Geico." Furthermore, the Ford Survey also failed to include controls to determine whether measured confusion was due solely to the name "Geico" in the heading of sponsored links, to the mention of "insurance" or "quotes," or to other relevant aspects.

37.     Thus, the Ford Survey effectively had no control for the most significant sources of "noise" and bias. Considering that the measured confusion in the control versions is subtracted from the measured confusion in the treatment (or "test") version, the failure to include proper controls meant that the Ford Survey likely grossly overestimated the likelihood of confusion. This is another fatal flaw, which makes it impossible to rely on the Ford Survey for any conclusions regarding the likelihood that sponsored links pertaining to insurance or any other related businesses cause confusion.

38.     Identifying proper controls was not difficult in this case, and, as indicated, such controls could inform us whether responses were due to the inclusion of the name "Geico" in the sponsored links and whether the results would have been similar or different if respondents were asked about a different automobile insurance company. Dr Ford was asked during his deposition about his decision to use "Nike" as the only control. His explanation (page 91) was that it was too complicated to try to figure out which factors caused confusion, because there were too many of them, so he decided to "test all of them simultaneously" using the Nike "control." As indicated, finding proper controls was not difficult in this case. But even if identifying and implementing proper controls were difficult, that would not be an acceptable justification for not doing it properly. A flawed, meaningless control is a flawed, meaningless control that provides no information. For example, with "Nike" as the only control, the survey provided no information and did not claim to provide any

information as to whether a sponsored link for a financial services firm or an insurance company, which did not include the name "Geico," would cause initial or any other type of confusion. Thus, similar to other surveys that failed to use proper controls, this survey cannot be relied upon.

## MARKETING PRINCIPLES REGARDING THE TARGETING OF
## COMPETITORS' CUSTOMERS

39.     One of the most basic principles of marketing, which I discussed extensively in the Marketing Management course that I taught during the past 17 years, is that a company should divide its potential customers into segments or groups, a practice referred to as "market segmentation." A common way to segment customers is based on their brand loyalty, including a segment of those who are already users of the company's own products and services and those who are users of specific competitors' products and services. Relatedly, a key aspect of standard competitive strategies is to try to convince customers of competing companies' products to switch. The companies trying to get customers to switch, of course, should not based their competitive strategies on confusion, but targeting competitors' customers is a very basic and commonly used marketing strategy.

40.     For example, when consumers purchase orange juice, they often receive with their supermarket receipt a coupon for a competitor's orange juice brand.Similarly, retailers often locate their stores next to competitors' stores (e.g., in a shopping mall), in large part because they hope to attract customers of competing stores. In other cases, salespeople call customers' attention to competing brands and may recommend that the consumer purchase another brand. For example, a consumer may visit an electronics store to purchase an Apple iPod. The salesperson may call that consumer's attention to a competing digital music player by Sony and say that the latter costs less. The consumer may then consider all factors and decide which of the two brands s/he wishes to buy.

41.     As indicated earlier, the Internet makes it particularly easy to gather information about different options, and the cost of exploring various links and potentially relevant websites is very low. If the information provided on a particular website is not useful or irrelevant, the consumer can simply go back to the previous

site or continue to search. The Internet also makes it possible for marketers to try to reach customers of competing brands. Just as one orange juice manufacturer tries to reach in supermarkets buyers of a competing brand, an insurance company may try to reach prospective purchasers of another insurance company's services. For example, companies often try to convince customers of competitors that they offer better prices, better products, or both.

42.    Consumers who use the Internet are routinely exposed to various ads and persuasion attempts, and consistent with basic principles of consumer learning, they come to expect such selling efforts. If they wish to purchase insurance from Geico and visit a website advertising free quotes, they may or may not choose to obtain information from that site, and they can then go back to the search results (if they happened to use a search engine) or simply go to Geico.com. Again, marketing practices that target prospective customers of competitors represent widely accepted marketing principles that are applied routinely as part of normal competitive marketing strategies.

## SUMMARY OF CONCLUSIONS

43.  The Ford Survey has several major flaws:

(a)  The survey failed to define the proper respondent universe;

(b)  The survey failed to disguise the purpose of the study and the identity of its sponsor, leading to severe demand and order effects;

(c)  Although the first survey question (in the Main Questionnaire) was highly ambiguous, the results showed lack of confusion when the sponsored link did not include the "Geico" name;

(d)  The second question was highly leading and suffered from strong demand effects, as illustrated by respondents who provided the "correct" response ("Geico") even when they had no basis for doing so;

(e)  Contrary to the most basic survey principle, the Ford Survey effectively had no control for the most serious sources of "noise" and bias. The Nike control showed that merely entering the "Geico" search term did not cause confusion with sponsored links. However, the "Nike" control was completely uninformative regarding, among others, the likelihood of "confusion" with any insurance company (based on the same search results) and whether the measured confusion was due primarily to the name "Geico" in the sponsored links.

44.  Overall, considering the combination of several fatal flaws, the Ford Survey results cannot be relied upon and provided no relevant evidence of likelihood of confusion, except for showing lack of confusion when sponsored links do not refer to the trademark used as the search term.

10/19/2004
Date

I. Simonson
Itamar Simonson, Ph.D.

21

# TAB A

# Itamar Simonson

**ADDRESSES**                                                                              August 2004

Home:                                                    Office:
  1044 Vernier Place                               Graduate School of Business
  Stanford, CA 94305                                Stanford University
    (650) 857-9038                         Stanford, CA 94305-5015
  Cell: (650) 387-7677                                (650) 725-8981
  Fax: (650) 857-9090                                 itamars@stanford.edu

## EDUCATION

Ph.D.                          Duke University, Fuqua School of Business
                               Major: Marketing;  May 1987

M.B.A.                         UCLA,  Graduate School of Management
                               Major: Marketing;  March 1978

B.A.                           Hebrew University, Jerusalem, Israel
                               Major: Economics, Political Science;  August 1976

## ACADEMIC POSITIONS

July 1987 - June 1993          University of California, Berkeley
                               Haas School of Business
                               Assistant Professor

July 1993 – Aug. 1996          Stanford Graduate School of Business
                               Associate Professor of Marketing

Sept. 1996 – Aug. 1999         Stanford Graduate School of Business
                               Professor of Marketing

Sept. 1999 –                   Stanford Graduate School of Business
                               Sebastian S. Kresge Professor of Marketing

1994 – 2000                    Stanford Graduate School of Business
                               Marketing Group Head

Fall 2000                      MIT Sloan School of Management
                               Visiting Professor of Marketing

**AWARDS**

- Best Article in the *Journal of Consumer Research* during the period 1987-1989.
- The 1997 O'Dell Award (for the *Journal of Marketing Research* article that has had the greatest impact on the marketing field in the previous five years).
- The 2001 O'Dell Award.
- Best Article in the *Journal of Public Policy & Marketing* during the period 1993-1995.
- The 2002 American Marketing Association Award for the Best Article in the area of Services Marketing.
- The Association for Consumer Research 1990 "Ferber Award."
- Winner in the Marketing Science Institute and Direct Marketing Association competition on "Understanding and Measuring the Effect of Direct Marketing."
- Finalist for the O'Dell Award:  1995; 2002; 2004.
- Finalist for the 2003 Paul Green Award (for the *Journal of Marketing Research* article with the greatest potential to contribute to the practice of marketing research).
- Runner-up for the 1993 *California Management Review* Best Article Award.
- National Science Foundation Grant (for 1996-8).
- Honorable Mention for the Sloan Executive Program Teaching Award (Fall 1995).
- Five years in the Berkeley School of Business "6-Point Club" (instructors with teaching ratings of 6 or more on a 7-point scale).

**TEACHING EXPERIENCE**

Stanford University:

      Marketing Management  (for MBAs)
      Marketing Management  (the Sloan Executive Program)
      Technology Marketing  (for MBAs)
      Research Methods for Studying Buyer Behavior  (a Ph.D. Course)
      Decision Making  (a Ph.D. Course)
      Buyer Behavior (a Ph.D. course)

University Of California, Berkeley, and Duke University:

      Marketing Management (for MBAs - day and evening programs)
      Consumer Behavior and Decision Making (a Ph.D. Course)
      Principles of Marketing (for undergraduates)
      Various Marketing Executive Education Programs (including High-Tech, Services, Telecommunications, and Strategy).

**BUSINESS EXPERIENCE**

October 1978-August 1983    Motorola, Inc.
Worked in an international subsidiary; responsibilities included marketing research and customer analysis, definition of new products, pricing, analysis of sales force performance, competitive intelligence, and forecasting. Conducted studies of markets for various communications products. Last two years served as Product Marketing Manager for communications products.

**Consulting:**

Consulted for clients from the communications, services, and manufacturing sectors. Expert witness assignments in the areas of trademark infringement, deceptive advertising, market surveys, buyer behavior, marketing management, brand equity, retailing and distribution, and other aspects of marketing.

**PUBLICATIONS**

Itamar Simonson, "Determinants of Customers' Responses to Customized Offers: Conceptual Framework and Research Propositions," Journal of Marketing, in press.

Paul Dholakia and Itamar Simonson, "The Effect of Explicit Reference Points on Consumer Choice and Online Bidding Behavior," Marketing Science, in press.

Itamar Simonson, Thomas Kramer, and Maia Young, "Effect Propensity," Organizational Behavior and Human Decision Processes, in press.

Itamar Simonson and Aimee Drolet, "Anchoring Effects on Consumers' Willingness-to-Pay and Willingness-to-Accept," Journal of Consumer Research, in press.

Ran Kivetz and Itamar Simonson (2003) "The Role of Effort Advantage in Consumer Response to Loyalty Programs: The Idiosyncratic Fit Heuristic," Journal of Marketing Research, 40 (November), 454-67.

Ravi Dhar and Itamar Simonson (2003), "The Effect of Forced Choice on Choice," Journal of Marketing Research, 40 (May), 146-60.

Dan Ariely and Itamar Simonson (2003), "Buying, Bidding, Playing, or Competing? Value Assessment and Decision Dynamics in Online Auctions," Journal of Consumer Psychology, 13(1&2), 113–123.

Ran Kivetz and Itamar Simonson (2002), "Self Control for the Righteous: Toward a Theory of Luxury Pre-Commitment," Journal of Consumer Research, 29 (September), 199-217.

## PUBLICATIONS  (continued)

Ran Kivetz and Itamar Simonson (2002), "Earning the Right to Indulge:  Effort as a Determinant of Customer Preferences Toward Frequency Program Rewards," Journal of Marketing Research, 39 (May), 155-70.

Chezy Ofir and Itamar Simonson (2001), "In Search of Negative Customer Feedback: The Effect of Expecting to Evaluate on Satisfaction Evaluations," Journal of Marketing Research, 38 (May), 170-82.

Itamar Simonson et al. (2001), "Consumer Research: In Search of Identity," Annual Review of Psychology, 52, 249-275.

Ran Kivetz and Itamar Simonson (2000), "The Effect of Incomplete Information on Consumer Choice," Journal of Marketing Research, 37(4), 427-48.

Donnel Briley, Michael Morris, and Itamar Simonson (2000), "Reasons as Carriers of Culture:  Dynamic Vs. Dispositional Models of Cultural Influence on Decision Making," Journal of Consumer Research, 27 (September), 157-178.

Itamar Simonson and Stephen Nowlis (2000), "The Effect of Explaining and Need for Uniqueness on Consumer Decision Making:  Unconventional Consumer Choices Based on Reasons," Journal of Consumer Research, 27 (June), 49-68.

Aimee Drolet, Itamar Simonson, and Amos Tversky (2000), "Indifference Curves that Travel with the Choice Set," Marketing Letters, 11(3), 199-209.

Stephen Nowlis and Itamar Simonson (2000), "Sales promotions and the Choice Context as Competing Influences on Consumer Decision Making," Journal of Consumer Psychology, 9(1), 1-17.

Itamar Simonson (1999), "The Effect of Product Assortment on Consumer Preferences," Journal of Retailing, 75(3), 347-70.

Ravi Dhar and Itamar Simonson (1999), "Making Complementary Choices in Consumption Episodes:  Highlighting Versus Balancing" Journal of Marketing Research, 36 (February), 29-44.

Houghton, David, ..., and Itamar Simonson (1999), "Correction Processes in Consumer Choice," Marketing Letters, 10(2),107-112.

Ziv Carmon and Itamar Simonson (1998), "Price-Quality Tradeoffs in Choice Versus Matching:  New Insights into the Prominence Effect," Journal of Consumer Psychology, 7(4), 323-343.

## PUBLICATIONS (continued)

Stephen Nowlis and Itamar Simonson (1997), "Attribute–Task Compatibility as a Determinant of Consumer Preference Reversals," Journal of Marketing Research, 34 (May), 205-218.

Joel Huber, ..., and Itamar Simonson (1997), "Thinking About Values in Prospect and Retrospect: Maximizing Experienced Utility," Marketing Letters, 7, 324-334.

Stephen Nowlis and Itamar Simonson (1996), "The Impact of New Product Features on Brand Choice," Journal of Marketing Research, 33 (February), 36-46.

Itamar Simonson (1994), "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications," Journal of Public Policy and Marketing, 13(2), 181-199.

Itamar Simonson (1994), "An Empirical Investigation of the Meaning and Measurement of Genericness," Trademark Reporter, 84 (2), 199-223.

Itamar Simonson, Ziv Carmon, and Suzanne O'Curry (1994), "Experimental Evidence on the Negative Effect of Product Features and Sales Promotions on Brand Choice," Marketing Science, 13 (1), 23-40.

Itamar Simonson (1993), "Get Closer to Your Customers by Understanding How They Make Choices," California Management Review, 35 (4), 68-84.

Itamar Simonson, Stephen Nowlis, and Katherine Lemon (1993), "The Effect of Local Consideration Sets on Global Choice Between Lower Price and Higher Quality," Marketing Science, 12 (4), 357-377.

Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," Trademark Reporter, 83 (3), 364-393.

Itamar Simonson, Stephen Nowlis, and Yael Simonson (1993), "The Effect of Irrelevant Preference Arguments on Consumer Choice," Journal of Consumer Psychology, 2 (3), 287-306.

Eldar Shafir, Itamar Simonson, and Amos Tversky (1993), "Reasons-Based Choice," Cognition, 49, 11-36.

Amos Tversky and Itamar Simonson (1993), "Context-Dependent Preferences," Management Science, 39 (10), 1179-1189.

## PUBLICATIONS  (continued)

Itamar Simonson (1992), "Influences of Anticipating Regret and Responsibility on Purchase Decisions," <u>Journal of Consumer Research</u>, 19 (June), 105-118.

Itamar Simonson and Peter Nye (1992), "The Effect of Accountability on Susceptibility to Decision Errors", <u>Organizational Behavior and Human Decision Processes</u>, 51 (3), 416-446.

Itamar Simonson and Barry Staw (1992), "De-Escalation Strategies: A Comparison of Techniques for Reducing Commitment to Losing Courses of Action," <u>Journal of Applied Psychology</u>, 77 (4), 419-426.

Itamar Simonson and Amos Tversky (1992), "Choice in Context: Tradeoff Contrast and Extremeness Aversion," <u>Journal of Marketing Research</u>, 29 (August), 281-295.

Itamar Simonson and Russell S. Winer (1992), "The Influence of Purchase Quantity and Display Format on Consumer Preference for Variety", <u>Journal of Consumer Research</u>, 19 (June), 133-138.

Ravi Dhar and Itamar Simonson (1992), "The Effect of the Focus of Comparison on Consumer Preferences," <u>Journal of Marketing Research</u>, 29 (November), 430-440.

Itamar Simonson (1991), "The Effect of Buying Decisions on Consumers' Assessments of Their Tastes", <u>Marketing Letters</u>, 2, 1, 5-14.

William T. Ross and Itamar Simonson (1991), "Evaluations of Pairs of Experiences: A Preference for Happy Endings," <u>Journal of Behavioral Decision Making</u>, 4(4), 273-282.

Itamar Simonson (1990), "The Effect of Purchase Quantity and Timing on Variety Seeking Behavior," <u>Journal of Marketing Research</u>, 27 (May), 150-162.

Itamar Simonson (1989), "Choice Based on Reasons: The Case of Attraction and Compromise Effects," <u>Journal of Consumer Research</u>, 16 (September), 158-174.

Itamar Simonson, Joel Huber, and John Payne (1988), "The Relationships Between Prior Brand Knowledge and Information Acquisition Order", <u>Journal of Consumer Research</u>, (March), 14,4, 566-78.

## ARTICLES UNDER REVIEW

Nathan Novemsky, Ravi Dhar, Norbert Schwarz, and Itamar Simonson, "Preference Fluency."

Aimee Drolet, Dale Griffin, Mary Frances Luce, and Itamar Simonson, "The Influence of Cognitive Load on Consumer Choice Processes."

Donnel Briley, Michael Morris, and Itamar Simonson, "Language, Cultural Frames, and Consumer Choice."

## EDITORIAL ACTIVITIES

Editorial Board: *Journal of Consumer Research, Journal of Marketing Research, Journal of Consumer Psychology, Journal of Behavioral Decision Making,* and *Marketing Letters.*

Reviewer for *Marketing Science, Journal of Economic Behavior and Organization, Management Science, International Journal of Marketing Research, Journal of Retailing and Consumer Services, Journal of Marketing, Journal of Retailing, Organizational Behavior and Human Decision Processes, Journal of Experimental Psychology, Psychological Review, Psychological Bulletin, Journal of Personality and Social Psychology, Psychological Science,* and *California Management Review.*

## PROFESSIONAL AFFILIATIONS

American Marketing Association
Association for Consumer Research
Judgment and Decision Making Society

## PERSONAL DATA

Birth Date: December 25, 1951
Marital Status: Married, 2 children

# TAB B

EXHIBIT B

Cases in which Dr. Itamar Simonson Testified as an Expert at Trial (including written expert reports submitted to the court) or by Deposition in the Past Four Years

1. Simon Property Group v. mySimon

2. American Tool Company v. Wolfcraft

3. AutoZone v. Tandy (Radio Shack)

4. American Bookseller Association v. Barnes and Noble et al.

5. Visa International v. INTERCO

6. Morrison Entertainment Group v. Nintendo Inc. et al.

7. NBTY v. American Home Products

8. Qwest Communications v. Quest Networks

9. Qwest Communications v. TelQuest

10. State of California v. MCI WorldCom

11. Visa International v. JSL Corp.

12. M2 Software v. Madacy, Inc.

13. Alberto-Culver v. Trevive

14. Carroll Shelby et al. v. Superformance International

15. R.J. Reynolds Tobacco Company v. Cigarettes Cheaper

16. Big O Tires v. Bigfoot 4X4 and Vulcan Chain

17. Oracle v. Light Reading

18. Lectrolarm Custom Systems, Inc. v. Pelco Sales, Inc.

19. Empresa Cubana Del Tabaco v. General Cigar

20. BattleBots v. Anheuser-Busch

21. General Motors Corp. v. Avanti Corp.

22. Kal Kan Foods v. Iams and Procter & Gamble

23. Coffee Bean & Tea Leaf v. Starbucks

24. Starbucks v. Sambuck's Coffeehouse

25. Visa International v. VeriSign; VeriSign v. Visa International

26. Chase and Bank of America v. REI and US Bank

27. Trek Bicycle v. Thane International

28. We've Only Just Begun Wedding, Inc. v. The Little White Wedding Chapel, Inc.

29. Kubota Corporation v. Daedong – USA

30. Duncan McIntosh Company v. Newport Dunes Marina et al.

31. ZonePerfect Nutrition Company v. Hershey Foods and Mr. Barry Sears

32. Verizon Directories v. Yellow Book

33. CipherTrust, Inc. v. IronPort Systems, Inc.

**TAB C**

## EXHIBIT C

## MATERIALS RELIED UPON OR CONSIDERED BY
## ITAMAR SIMONSON, PH.D.

1. GEICO's First Amended Complaint;

2. Defendant Google Inc.'s Motion to Dismiss;

3. Defendant Google Inc.'s Memorandum of Points and Authorities in Support of Motion to Dismiss;

4. Defendant Overture's Motion to Dismiss;

5. Defendant Overture Services, Inc.'s Memorandum in Support of Its Motion to Dismiss;

6. Plaintiff's Opposition to Defendant's Motions to Dismiss;

7. Reply Brief of Google Inc. in Support of Motion to Dismiss;

8. Defendant Overture Services, Inc.'s Reply in Further Support of Its Motion to Dismiss;

9. CD of Gary Ford's survey spreadsheets;

10. Revised Expert Report of Gary Ford with exhibits;

11. Sample Ford questionnaire regarding Google;

12. Deposition of Gary T. Ford.

340637.01